

**U.S. Department of Justice**

United States Attorney
Northern District of Georgia

*U.S. Courthouse*
*Ted Turner Drive SW*
*Suite 600*
*Atlanta, GA 30303*
*(404) 581-6000*
*(404) 581-6181 fax*

December 5, 2023

*Electronically filed (CM/ECF)*
David J. Smith
Clerk of Court

  Re: *United States v. Dubois*, No. 22-10829-W,
    Response to Citation of Supplemental Authority

Dear Mr. Smith:

  The government submits this response to Dubois's December 5, 2023 letter citing *Range v. Atty. General*, 69 F.4th 96 (3d Cir. 2023) (en banc):

  In *Range*, the Third Circuit held that its Second Amendment precedent was abrogated because it depended on the means-end scrutiny rejected in *Bruen*. *See id.* at 100 ("We did so for the first time in [2010] and we continued down that road for over a decade.").

  But this Court's decision in *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) did not rely on a means-end framework. Indeed, this Court "never applied means-ends scrutiny in a published decision analyzing a Second Amendment challenge." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1052 (11th Cir. 2022) (Newsom, J., concurring). Thus, *Rozier* was not abrogated by *Bruen* and remains binding.

  The Third Circuit then held, in a "narrow" decision, that § 922(g)(1) was unconstitutional as applied to "people like Range." *Range*, 69 F.4th at 106. But unlike *Range*, Dubois's appeal briefs raise only a facial challenge to §922(g)(1), placing on him "the burden of proving that the law could never be constitutionally applied." *Jacobs v. Florida Bar*, 50 F.3d 901, 906 n.20 (11th Cir. 1995). And Dubois, with multiple felony convictions for drug trafficking and financial fraud, is unlike Range with his misdemeanor conviction for lying on a food stamp application.

The Third Circuit's holding also contradicts the precedent of every other circuit to reach the issue, including this Court's, and the government has petitioned for certiorari. *See* attached Gov't pet.

Put simply, the Third Circuit focused too narrowly on the need for a historical analogue requiring the "particular" consequence of § 922(g)(1), essentially requiring the government to show a historical twin—which *Bruen* expressly disclaims. In so doing, it improperly dismissed the long history of categorical firearm prohibitions that did not require individualized determinations and failed to set forth any test for as-applied challenges, leading to a decision unsound in principle and unworkable in practice.

*Range* is distinguishable, legally incorrect, and factually distinct from Dubois's challenge, and is contrary to this Court's precedent that forecloses Dubois's claim.

Sincerely,

RYAN K. BUCHANAN
*United States Attorney*

GABRIEL A. MENDEL
*Assistant United States Attorney*

Attachment
Copy to:
Nicole Kaplan

**No.**

# In the Supreme Court of the United States

———————

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

BRYAN DAVID RANGE

———————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT*

———————

**PETITION FOR A WRIT OF CERTIORARI**

———————

ELIZABETH B. PRELOGAR
  *Solicitor General*
  *Counsel of Record*
BRIAN A. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
VIVEK SURI
  *Assistant to the Solicitor*
  *General*
MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
KEVIN B. SOTER
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**QUESTION PRESENTED**

Whether 18 U.S.C. 922(g)(1), the federal statute that prohibits a person from possessing a firearm if he has been convicted of "a crime punishable by imprisonment for a term exceeding one year," *ibid.*, complies with the Second Amendment.

(I)

## PARTIES TO THE PROCEEDING

Petitioners (defendants-appellees below) are Merrick B. Garland, Attorney General, and Steven M. Dettelbach, Director, Bureau of Alcohol, Tobacco, Firearms and Explosives.* Respondent (plaintiff-appellant below) is Bryan David Range.

## RELATED PROCEEDINGS

United States District Court (E.D. Pa.):

*Range* v. *Lombardo*, No. 20-cv-3488 (Aug. 31, 2021)

United States Court of Appeals (3d Cir.):

*Range* v. *Attorney General United States*, No. 21-2835 (June 6, 2023)

---

* Director Dettelbach succeeded Acting Directors Gary M. Restaino, Marvin Richardson, and Regina Lombardo as defendant-appellee.

(II)

**TABLE OF CONTENTS**

Page

Opinions below ............................................................... 1
Jurisdiction .................................................................... 2
Constitutional and statutory provisions involved ................... 2
Statement ...................................................................... 2
Reasons for granting the petition ....................................... 6
    A.   The court of appeals erred in holding Section
        922(g)(1) unconstitutional as applied to Range ............ 7
        1.   This Court's precedents recognize that
            Congress may disarm felons .................................. 8
        2.   Text, history, and tradition confirm that
            Congress may disarm felons ................................. 11
        3.   A person may not obtain an as-applied
            exemption from Section 922(g)(1) based on the
            nature of his crime or his individual
            circumstances ....................................................... 19
    B.   The decision below conflicts with the decisions of
        other courts of appeals and has significant
        practical consequences ................................................ 22
    C.   This Court should hold this certiorari petition
        pending the resolution of *Rahimi* ............................... 25
Conclusion ................................................................... 28
Appendix A — Court of appeals en banc opinion
                  (June 6, 2023) ............................................. 1a
Appendix B — Court of appeals panel opinion
                  (Nov. 16, 2022) ......................................... 99a
Appendix C — District court order (Aug. 8, 2023) ............ 141a
Appendix D — District court order (Aug. 31, 2021) ......... 143a
Appendix E — District court memorandum
                  (Aug. 31, 2021) ....................................... 145a
Appendix F — Court of appeals order sur petition for
                  rehearing en banc (Jan. 6, 2023) ............ 159a
Appendix G — Constitutional and statutory provisions... 161a

(III)

IV

# TABLE OF AUTHORITIES

Cases:                                                    Page

*Austin* v. *United States*, 509 U.S. 602 (1993)...................... 15

*Avery* v. *Everett*, 18 N.E. 148 (N.Y. 1888).................... 14, 15

*Barrett* v. *United States*, 423 U.S. 212 (1976)..................... 18

*Binderup* v. *Attorney General United States*,
   836 F.3d 336 (2016), cert. denied,
   582 U.S. 943 (2017)......................................................... 3, 17

*Blanton* v. *City of North Las Vegas*,
   489 U.S. 538 (1989)................................................................ 20

*Branzburg* v. *Hayes*, 408 U.S. 665 (1972) ........................... 19

*Bucklew* v. *Precythe*, 139 S. Ct. 1112 (2019) ...................... 14

*Burgess* v. *United States*, 553 U.S. 124 (2008)...................... 7

*Calero-Toledo* v. *Pearson Yacht Leasing Co.*,
   416 U.S. 663 (1974)................................................................ 15

*Deming, In re*, 10 Johns. 232 (N.Y. 1813) .......................... 15

*Dickerson* v. *New Banner Institute, Inc.*,
   460 U.S. 103 (1983)................................................................ 18

*District of Columbia* v. *Heller*,
   554 U.S. 570 (2008)........................................................ 8, 10-13

*Heller* v. *District of Columbia*, 670 F.3d 1244
   (D.C. Cir. 2011) ...................................................................... 9

*Iancu* v. *Brunetti*, 139 S. Ct. 2294 (2019) ............................ 25

*Lewis* v. *United States*, 445 U.S. 55 (1980) ......................... 18

*Lewis* v. *United States*, 518 U.S. 322 (1996) ...................... 19

*Logan* v. *United States*, 552 U.S. 23 (2007) .......................... 3

*Mathis* v. *United States*, 579 U.S. 500 (2016) ...................... 7

*McDonald* v. *City of Chicago*, 561 U.S. 742 (2010) ............. 9

*Medina* v. *Whitaker*, 913 F.3d 152 (D.C. Cir.),
   cert. denied, 140 S. Ct. 645 (2019) ............................... 14, 20

*NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022) ...... 4, 9, 10, 18-20

*NYSRPA* v. *City of New York*, 140 S. Ct. 1525 (2020).......... 9

V

Cases—Continued:                                              Page

*Pontarelli* v. *United States Dep't of the Treasury*,
   285 F.3d 216 (3d Cir. 2002) ................................................ 22

*Rehaif* v. *United States*, 139 S. Ct. 2191 (2019) ................. 24

*Richardson* v. *Ramirez*, 418 U.S. 24 (1974)....................... 12

*Spencer* v. *Kemna*, 523 U.S. 1 (1998)................................. 12

*Steel Co.* v. *Citizens for a Better Env't*,
   523 U.S. 83 (1998) ............................................................... 27

*United States* v. *Barton*, 633 F.3d 168 (3d Cir. 2011) ........ 17

*United States* v. *Bullock*, No. 18-cr-165, 2023 WL
   4232309 (S.D. Miss. June 29, 2023) ................................... 25

*United States* v. *Cunningham*, 70 F.4th 502
   (8th Cir. 2023), reh'g denied, No. 22-1080,
   2023 WL 5606171 (Aug. 30, 2023)............................... 22, 23

*United States* v. *Daniels*,
   77 F.4th 337 (5th Cir. 2023) ........................................ 26, 27

*United States* v. *Harper*, No. 21-cr-236,
   2023 WL 5672311 (M.D. Pa. Sept. 1, 2023)....................... 25

*United States* v. *Jackson*, 69 F.4th 495
   (8th Cir. 2023), reh'g denied, No. 22-2870,
   2023 WL 5605618 (Aug. 30, 2023)............................... 22, 23

*United States* v. *McCane*, 573 F.3d 1037
   (10th Cir. 2009), cert. denied, 559 U.S. 970 (2010)........... 23

*United States* v. *Quailes*, No. 21-cr-176,
   2023 WL 5401733 (M.D. Pa. Aug. 22, 2023) ..................... 25

*United States* v. *Rahimi* 610 F.4th 443 (5th Cir.),
   cert. granted, 143 S. Ct. 2688 (2023) ................................... 7

*United States* v. *Skoien*, 614 F.3d 638 (7th Cir. 2010),
   cert. denied, 562 U.S. 1303 (2011) ..................................... 17

*United States* v. *Verdugo-Urquidez*,
   494 U.S. 259 (1990)............................................................. 13

*Vincent* v. *Garland*, 80 F.4th 1197 (10th Cir. 2023) ..... 23, 24

*Voisine* v. *United States*, 579 U.S. 686 (2016) ................... 12

VI

Constitution, statutes, and regulation:                    Page

U.S. Const.:

    Pmbl...................................................................... 13

    Art. I, § 2, Cl. 1 ................................................ 13

    Art. III................................................................ 6, 27

    Amend. II .................... 4, 6-11, 13, 16, 17, 21-23, 26, 161a

    Amend. IV ......................................................... 13

    Amend. V............................................................ 19

    Amend. VI .......................................................... 18, 19

    Amend. X............................................................ 13

    Amend. XIV, §§ 1-2......................................... 12

    Amend. XVII, Cls. 1-2.................................... 13

Act of Oct. 3, 1961, Pub. L. No. 87-342, § 2,

    75 Stat. 757 ......................................................... 7

18 U.S.C. 3559(a) ................................................... 7

18 U.S.C. 921(a)(20) ...................................... 2, 161a

18 U.S.C. 921(a)(20)(A) ................................ 2, 161a

18 U.S.C. 921(a)(20)(B) ................................ 2, 161a

18 U.S.C. 922(g) ............................................. 18, 24, 27

18 U.S.C. 922(g)(1)................ 2-7, 11, 13, 17-25, 27, 28, 162a

18 U.S.C. 922(g)(3)................................................. 27

18 U.S.C. 922(g)(5)................................................. 12

18 U.S.C. 922(g)(7)................................................. 12

18 U.S.C. 922(g)(8)............................................. 26, 162a

18 U.S.C. 924(a)(8) ................................................. 2

18 U.S.C. 925(c)................................................... 3, 21

62 Pa. Cons. Stat. Ann. § 481(a) (West Supp. 1995)............. 3

3 Jac. 1, c. 5, § 16 (1605) (Eng.) ........................... 15

27 C.F.R. 478.144.................................................... 3

VII

Miscellaneous:                                                    Page

Akhil Reed Amar, *The Bill of Rights:  Creation and
    Reconstruction* (1998) ........................................................ 12

William Blackstone, *Commentaries on the Laws of
    England*:
        Vol. 1 (1765) ...................................................... 15
        Vol. 4 (1769) ................................................. 14, 15

Beth A. Colgan, *Reviving the Excessive Fines
    Clause*, 102 Cal. L. Rev. 277 (2014) .................................... 14

Crim. Justice Info. Servs. Div., Fed. Bureau of
    Investigation, U.S. Dep't of Justice:
        *Federal Denials*, https:// https://www.fbi.gov/
            file-repository/federal_denials.pdf/view
            (last visited Oct. 5, 2023) ............................................ 24

        *National Instant Criminal Background Check
            System Operational Report 2020-2021* (Apr.
            2022), https://www.fbi.gov/file-repository/
            nics-2020-2021-operations-report.pdf/view ............. 24

Thomas M. Cooley, *A Treatise on the Constitutional
    Limitations Which Rest Upon the Legislative
    Power of the States of the American Union* (1868) ......... 12

*The Federalist* No. 74 (Alexander Hamilton)
    (Jacob E. Cooke ed. 1961) ...................................................... 20

David Thomas Koning, *"Dale's Laws" and the
    Non-Common Law Origins of Criminal Justice in
    Virginia*, 26 Am. J. Legal Hist. 354 (1982) ...................... 16

*The Popular Sources of Political Authority:  Docu-
    ments on the Massachusetts Constitution of 1780*
    (Oscar Handlin & Mary Handlin eds., 1966) ................... 16

*The Public Records of the Colony of Connecticut
    From May, 1775 to June, 1776* (Charles J. Hoadly
    ed., 1890) .......................................................................... 16

S. Rep. No. 353, 102d Cong., 2d Sess. (1992) ..................... 21

VIII

Miscellaneous—Continued:                                    Page

3 Joseph Story, *Commentaries on the Constitution
 of the United States* (1833)..................................................11

U.S. Sent. Comm'n, *Quick Facts: Felon in
 Possession of a Firearm* (July 2023),
 https://www.ussc.gov/sites/default/files/pdf/
 research-and-publications/quick-
 facts/Felon_In_Possession_FY22.pdf ............................24

# In the Supreme Court of the United States

————

No.

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL.,
PETITIONERS

*v.*

BRYAN DAVID RANGE

————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT*

————

**PETITION FOR A WRIT OF CERTIORARI**

————

The Solicitor General, on behalf of the Attorney General and the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Third Circuit in this case.

**OPINIONS BELOW**

The opinion of the en banc court of appeals (App., *infra*, 1a-98a) is reported at 69 F.4th 96. The opinion of the court of appeals panel (App., *infra*, 99a-140a) is reported at 53 F.4th 262. The memorandum of the district court (App., *infra*, 145a-158a) is reported at 557 F. Supp. 3d 609.

(1)

2

## JURISDICTION

The judgment of the en banc court of appeals was entered on June 6, 2023. On August 25, 2023, Justice Alito extended the time within which to file a petition for a writ of certiorari to and including October 5, 2023. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are reproduced in the appendix. App., *infra*, 161a-162a.

## STATEMENT

1. In 18 U.S.C. 922(g)(1), Congress prohibited a person from possessing a firearm in or affecting commerce if he has been convicted of "a crime punishable by imprisonment for a term exceeding one year." *Ibid.* A knowing violation is punishable by up to 15 years of imprisonment. See 18 U.S.C. 924(a)(8).

Section 922(g)(1) is subject to several exceptions. The provision does not cover certain offenses "relating to the regulation of business practices." 18 U.S.C. 921(a)(20)(A). It also does not cover state offenses that are classified by state law as misdemeanors and that are punishable by two years of imprisonment or less. See 18 U.S.C. 921(a)(20)(B). And it does not cover convictions that have been expunged or set aside, or offenders who have been pardoned or had their civil rights restored. See 18 U.S.C. 921(a)(20).

Until 1992, Congress also allowed an individual to obtain relief from Section 922(g)(1)'s bar to possessing a firearm by demonstrating to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that "the circumstances regarding the disability, and [his] record and reputation, are such that [he] will not be likely to

3

act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. 925(c); see *ibid.* (granting authority to the Attorney General); 27 C.F.R. 478.144 (delegating authority to the Director of ATF). But since 1992, Congress has effectively suspended that provision by prohibiting the use of federal funds to process applications for relief. See *Logan* v. *United States*, 552 U.S. 23, 28 n.1 (2007).

2. In 1995, respondent Bryan Range pleaded guilty in Pennsylvania state court to making a false statement to obtain food stamps, in violation of 62 Pa. Cons. Stat. Ann. § 481(a) (West Supp. 1995). App., *infra*, 2a. Pennsylvania law classified that crime as a misdemeanor but made it punishable by up to five years of imprisonment. *Id.* at 3a. Range was sentenced to three years of probation. *Ibid.* Under Section 922(g)(1), that conviction disqualified Range from possessing firearms. *Ibid.*

Range sued the Attorney General and the Director of ATF in the U.S. District Court for the Eastern District of Pennsylvania. App., *infra*, 4a. He sought a declaratory judgment that Section 922(g)(1) violates the Second Amendment as applied to him and an injunction prohibiting its enforcement against him. *Ibid.*

The district court granted the government's motion for summary judgment. App., *infra*, 145a-158a. The court explained that, in *Binderup* v. *Attorney General United States*, 836 F.3d 336 (2016) (en banc), cert. denied, 582 U.S. 943 (2017), the Third Circuit had set out a multifactor test for determining whether Section 922(g)(1) could constitutionally be applied to a person convicted of a given crime. App., *infra*, 150a. Applying that framework, the court concluded that Range's crime

4

justified disqualifying him from possessing firearms. *Id.* at 151a-157a.

3. A panel of the Third Circuit affirmed. App., *infra*, 99a-140a. The panel determined that this Court's intervening decision in *NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022), had superseded *Binderup*'s multifactor test. App., *infra*, 108a n.9. Applying the textual and historical method required by *Bruen*, the panel rejected Range's claim that Section 922(g)(1) violated the Second Amendment as applied to him. *Id.* at 107a-139a. It determined that "'the people' constitutionally entitled to bear arms are the 'law-abiding, responsible citizens' of the polity, * * * a category that properly excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses, whether or not those crimes are violent." *Id.* at 100a (citation omitted); see *id.* at 111a-114a. It further concluded that, "even if Range falls within 'the people,' the Government ha[d] met its burden to demonstrate that [Section 922(g)(1)'s] prohibition is consistent with historical tradition." *Id.* at 100a; see *id.* at 115a-132a.

4. The Third Circuit granted rehearing en banc. App., *infra*, 157a-158a. The en banc court reversed and remanded. *Id.* at 1a-98a.

a. The en banc court first concluded that, despite his conviction, Range remained "one of 'the people' who have Second Amendment rights." App., *infra*, 8a; see *id.* at 8a-13a. It acknowledged this Court's repeated statements that the Second Amendment protects the right of "'law-abiding, responsible citizens'" to keep and bear arms, but it dismissed those statements as "hopelessly vague" "dicta." *Id.* at 9a, 11a.

5

The en banc court then concluded that the government "ha[d] not carried its burden" of showing that "applying § 922(g)(1) to Range * * * 'is consistent with the Nation's historical tradition of firearm regulation.'" App., *infra*, 13a (citation omitted). The court rejected the government's argument that governments in the Founding Era often punished felonies with death, reasoning that the "greater does not necessarily include the lesser" and that "founding-era governments' execution of some individuals * * * does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id.* at 17a. The court also rejected the government's reliance on historical laws punishing various offenses with forfeiture of the arms involved in those offense, reasoning that "confiscation of the instruments of crime * * * differs from a status-based lifetime ban on firearm possession." *Id.* at 18a.

Although the en banc court described its decision as "narrow" and stated that it had held Section 922(g)(1) unconstitutional only as applied to "people like Range," it neither specified which of Range's circumstances were relevant its decision nor otherwise attempted to define the scope of its holding. App., *infra*, 19a. The court remanded the case to the district court for entry of declaratory and injunctive relief. *Id.* at 20a; see *id.* at 141a-142a (order granting relief on remand).

b. Judge Porter issued a concurrence arguing that *state* laws from the 18th and 19th centuries cannot provide appropriate historical analogues for *federal* firearms restrictions such as Section 922(g)(1). App., *infra*, 21a-27a. Judge Ambro issued a concurrence, which was joined by two other judges, stating that "the majority opinion * * * speaks only to [Range's] situation, and

6

not to those of murderers, thieves, sex offenders, domestic abusers, and the like." *Id.* at 28a; see *id.* at 28a-35a.

c. Judge Shwartz issued a dissent, which was joined by one other judge, arguing that the en banc court's opinion was "inconsistent with [this] Court's jurisprudence" and that Section 922(g)(1) has "a historical basis." App., *infra*, 36a; see *id.* at 36a-43a. Judge Krause issued a dissent arguing that "legislatures have historically possessed the authority to disarm entire groups, like felons, whose conduct evinces disrespect for the rule of law" and that "the doctrinal and practical ramifications" of the en banc court's contrary decision "are profound and pernicious." *Id.* at 47a; see *id.* at 43a-87a. Judge Roth issued a dissent arguing that, because Range had failed to allege that the particular guns he seeks to possess satisfy Section 922(g)(1)'s interstate-commerce element, he lacks Article III standing to challenge Section 922(g)(1). *Id.* at 88a-98a.

## REASONS FOR GRANTING THE PETITION

The en banc Third Circuit held a longstanding federal statute unconstitutional as applied to Range—and opened the courthouse doors to an untold number of future challenges by other felons based on their own particular offenses, histories, and personal circumstances. The court of appeals' decision contradicts the historical understanding of the right to keep and bear arms, as well as this Court's assurances that the Second Amendment does not cast doubt on felon-disarmament laws. It also conflicts with recent decisions of the Eighth and Tenth Circuits expressly rejecting felony-by-felony litigation about 18 U.S.C. 922(g)(1)'s constitutionality. And the decision below threatens public safety and poses serious problems of judicial administration by re-

7

quiring judges to make ad hoc assessments of the risks of allowing convicted criminals to possess guns—a high-stakes task that Congress has already determined cannot be performed with sufficient reliability, and one for which the judiciary is particularly ill-suited.

This Court should not leave the decision below in place. But because the Court is already considering closely related Second Amendment issues in *United States* v. *Rahimi*, cert. granted, 143 S. Ct. 2688 (No. 22-915) (oral argument scheduled for Nov. 7, 2023), plenary review is not warranted at this time. The Court should instead hold the petition for a writ of certiorari pending its decision *Rahimi*, and then dispose of the petition as appropriate.

### A. The Court Of Appeals Erred In Holding Section 922(g)(1) Unconstitutional As Applied To Range

For more than six decades, Congress has restricted the possession, receipt, and transportation of firearms by felons—*i.e.*, persons who have been convicted of crimes "punishable by imprisonment for a term exceeding one year." 18 U.S.C. 922(g)(1); see Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757.* Contrary to the court of appeals' decision, that longstanding law

---

 * "[T]he term 'felony' is commonly defined to mean a crime punishable by imprisonment for more than one year." *Burgess* v. *United States*, 553 U.S. 124, 130 (2008). And federal law classifies crimes punishable by more than a year of imprisonment as felonies. See 18 U.S.C. 3559(a). But some States use different terminology; Pennsylvania classifies Range's crime as a misdemeanor, even though it was punishable by up to five years of imprisonment. This brief uses the term "'felony'" as it is "commonly defined," *Burgess*, 553 U.S. at 130, not as it is defined in Pennsylvania law. See, *e.g.*, *Mathis* v. *United States*, 579 U.S. 500, 503 (2016) (referring to Section 922(g)(1) as the felon-in-possession statute).

8

complies with the Second Amendment and is not subject to individualized Second Amendment challenges based on the nature of a particular criminal's offense or circumstances.

### 1. *This Court's precedents recognize that Congress may disarm felons*

a. In *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), this Court held that the Second Amendment protects the "right of law-abiding, responsible citizens" to possess handguns in the home for self-defense. *Id.* at 635. Consistent with that interpretation, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and it described those restrictions as "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26. The Court incorporated that understanding into its holding, ruling that the plaintiff was entitled to possess a handgun only if he was "not disqualified from the exercise of Second Amendment rights"—meaning, among other things, that he was "not a felon" and was "not insane." *Id.* at 631, 635. The Court stated that those "exceptions" to the Second Amendment had "historical justifications," which the Court would have "time enough to expound upon" "if and when those exceptions come before" it. *Id.* at 635.

In approving felon-disarmament laws, the *Heller* Court adopted a position that had been urged by the plaintiff, many of his amici, and the United States. The plaintiff assured the Court that, although the Second Amendment secured an individual right to keep and bear arms, "basic firearm safety laws," such as the "prohibition on possession of guns by felons," would "easily" pass constitutional muster. Resp. Br. at 57, *Heller, su-*

9

*pra* (No. 07-290). Many amici who supported the plaintiff similarly assured the Court that "bans on ownership by felons" are among the "many valid restrictions on the right to keep and bear arms," NRA Amicus Br. at 22, *Heller*, *supra* (No. 07-290), and that laws disarming "convicted felons" are "consistent with centuries of common law," Texas Amicus Br. at 35, *Heller*, *supra* (No. 07-290). And the United States devoted a section of its amicus brief to marshalling "historical evidence" that the right to keep and bear arms "simply does not extend to felons." U.S. Amicus Br. at 25-26, *Heller*, *supra* (No. 07-290).

In embracing the same view, the Court's decision in *Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws * * * prohibiting possession by felons." *NYSRPA* v. *City of New York*, 140 S. Ct. 1525, 1540-1541 (2020) (Alito, J., dissenting). Or, as then-Judge Kavanaugh put it, "the Court in *Heller* affirmatively *approved* * * * felon-in-possession laws * * * based on a history-and-tradition-based test." *Heller* v. *District of Columbia*, 670 F.3d 1244, 1278 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

b. This Court's decision in *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), reaffirmed that understanding of the Second Amendment. The plurality observed that the Court had "made it clear in *Heller* that [its] holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" *Id.* at 786 (citation omitted). The *McDonald* plurality "repeat[ed] those assurances." *Ibid.*

Similarly, in *NYSRPA* v. *Bruen*, 142 S. Ct. 2111 (2022), the Court repeatedly used the term "law-abiding

10

citizen" to describe the class of persons protected by the Second Amendment. See *id.* at 2122 ("ordinary, law-abiding citizens"); *id.* at 2125 ("law-abiding, adult citizens"); *id.* at 2131 ("law-abiding, responsible citizens") (citation omitted); *id.* at 2133 ("a law-abiding citizen's right to armed self-defense" and "law-abiding citizens"); *id.* at 2134 ("ordinary, law-abiding, adult citizens"); *id.* at 2135 n.8 ("law-abiding citizens"); *id.* at 2138 ("law-abiding citizens"); *id.* at 2138 n.9 ("law-abiding, responsible citizens") (citation omitted); *id.* at 2150 ("law-abiding citizens"); *id.* at 2156 ("law-abiding, responsible citizens" and "law-abiding citizens"). And Justice Kavanaugh's concurrence repeated *Heller*'s statement that "prohibitions on the possession of firearms by felons" are "presumptively lawful regulatory measures." *Id.* at 2162 (Kavanaugh, J., concurring) (brackets and citation omitted).

Many aspects of Second Amendment doctrine rest on the premise that the Amendment protects only law-abiding citizens, not felons. In judging whether modern firearms regulations are consistent with their historical precursors, courts must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. In judging whether the Second Amendment protects particular types of weapons, courts must consider whether those weapons are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And the government may require gun owners to pass background checks—which include a check for felony convictions—because such checks ensure that those who carry guns "are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (citation omitted).

11

### 2. *Text, history, and tradition confirm that Congress may disarm felons*

Three independent but mutually reinforcing legal principles support *Heller*'s approval of felon-disarmament laws. First, felons disqualified from possessing firearms under Section 922(g)(1) are not among "the people" protected by the Second Amendment. Second, the Second Amendment has historically been understood to protect law-abiding individuals, not convicted felons. Third, the Second Amendment has historically been understood to protect only responsible individuals, and felons, as a category, are not responsible.

a. The Second Amendment secures "the right of *the people* to keep and bear arms." U.S. Const. Amend. II (emphasis added). "'The people'" is "a term of art employed in select parts of the Constitution" to refer to "a class of persons who are part of a national community." *Heller*, 554 U.S. at 580 (brackets and citation omitted). The Second Amendment thus guarantees the right to bear arms only to "members of the political community," not to all persons. *Ibid*.

The Second Amendment's background illuminates the reasons for that limitation. The Founders codified the right to bear arms in large part because they regarded it as an important "safeguard against tyranny." *Heller*, 554 U.S. at 600. Justice Story, for instance, described the right to bear arms as the "palladium of the liberties of a republic" and explained that it "enable[s] the people to resist and triumph over" the "usurpation and arbitrary power of rulers." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (1833). It makes sense that a right that was codified in order to enable the polity to "resist tyr-

12

anny," *Heller*, 554 U.S. at 598, would be limited to the members of that polity.

Consistent with that understanding, persons who do not belong to the political community have historically been denied the right to bear arms. For example, the right to bear arms has historically been reserved to "citizens." *Heller*, 554 U.S. at 635; see *id.* at 581 ("Americans"). Noncitizens at the Founding lacked the "right to bear arms"—just as they lacked other "rights of members of the polity," such as the right to "vote, hold public office, or serve on juries." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998). Even today, federal law disarms certain noncitizens— specifically, those who are unlawfully present in the United States, those who are present on nonimmigrant visas, and those who have renounced U.S. citizenship. See 18 U.S.C. 922(g)(5) and (7).

Like noncitizens, felons disarmed under Section 922(g)(1) are not among "the people" protected by the Second Amendment because they have forfeited their membership in the political community. Cf. *Voisine* v. *United States*, 579 U.S. 688, 715 (2016) (Thomas, J., dissenting) (tying *Heller*'s approval of felon disarmament to the understanding that certain individuals "are beyond the scope of the 'People' protected by the Second Amendment"). States have long denied felons the rights of members of the polity—the right to vote, see U.S. Const. Amend. XIV, § 2; *Richardson* v. *Ramirez*, 418 U.S. 24, 41-56 (1974); the right to hold public office, see *Spencer* v. *Kemna*, 523 U.S. 1, 8-9 (1998); and the right to serve on juries, see *ibid.* And as a leading 19th-century scholar explained, "the felon" has "been almost universally excluded" from "the *people* in whom is vested the sovereignty of the State." Thomas M. Coo-

13

ley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868).

The court of appeals reasoned that other constitutional provisions use the term "the people" and that the term's meaning cannot "var[y] from provision to provision." App., *infra*, 10a. But while the phrase "the people" refers to members of the political community throughout the Constitution, see *Heller*, 554 U.S. at 580, the scope of that community varies from provision to provision. For example, noncitizens are not among "the people" protected by the Second Amendment, see *id.* at 581, but certain noncitizens are among "the people" protected by the Fourth Amendment, see *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265, 271-273 (1990). The same is true of felons. And many other constitutional provisions use the term "the people" in a manner that excludes felons who have forfeited the rights that come with membership in the polity. Such felons are not among "the people" who adopted the Constitution, see U.S. Const. Pmbl; or "the people" who are entitled to elect members of Congress, see U.S. Const. Art. I, § 2, Cl. 1; Amend. XVII, Cls. 1-2; or "the people" who reserved powers not delegated to the government, see U.S. Const. Amend. X. So too, felons disarmed under Section 922(g)(1) are not among "the people" entitled to keep and bear arms.

b. Quite apart from the Second Amendment's textual limitation of the right to bear arms to the people, the right has historically been understood to extend only to law-abiding persons. It thus does not extend to felons.

In England before the Founding, felons had no right to keep and bear arms. The standard penalty for a fel-

14

ony was death. See 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769). That punishment extended even to non-violent felonies, such as smuggling, *id.* at 155; fraudulent bankruptcy, *id.* at 156; violating quarantine, *id.* at 162; forging a marriage license, *id.* at 163; and cutting down a cherry tree, *id.* at 4. A felon awaiting execution would be held in prison—where he would have no access to arms. See *id.* at 131 (discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony"). A conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels—including, of course, his arms. See *id.* at 379-382. A convicted felon, finally, was deemed "already dead in law" even before his execution. *Id.* at 374. That status, known as "civil death," involved "an extinction of civil rights, more or less complete." *Avery* v. *Everett*, 18 N.E. 148, 150 (N.Y. 1888). A convicted felon thus had no "right to vote, to sit as a juror, *to bear arms*, [or] to marry"; indeed, "his physical conditions were such that he could do none of these things." *Id.* at 156 (Earl, J., dissenting) (emphasis added).

Early Americans accepted that legislatures had the power to subject felons to similar deprivations. Thus, "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew* v. *Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted). As in England, the death penalty extended even to non-violent crimes, such as forgery and horse theft. See *Medina* v. *Whitaker*, 913 F.3d 152, 158 (D.C. Cir.), cert. denied, 140 S. Ct. 645 (2019). Many States also subjected certain felons to the complete forfeiture of their estates or their goods and chattels. See Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332

15

nn. 275-276 (2014) (collecting statutes).  And at least some States enacted statutes carrying forward the common-law doctrine of civil death.  See, *e.g.*, *In re Deming*, 10 Johns. 232, 233 (N.Y. 1813) (per curiam).

Those punishments were justified by the belief that a person can lose his legal rights by violating "his part of the [social] contract."  4 Blackstone 375.  Capital punishment, for example, was justified on the ground that the right to life can be "forfeited for the breach of th[e] laws of society."  1 Blackstone 129.  The confiscation of felons' estates was likewise justified on the ground that "property was a right derived from society which one lost by violating society's laws."  *Austin* v. *United States*, 509 U.S. 602, 612 (1993); see *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U.S. 663, 682 (1974) ("[A] breach of the criminal law * * * was felt to justify denial of the right to own property.").  And civil death was justified on the ground that someone who has committed a felony should no longer possess "any rights growing out of organized society."  *Avery*, 18 N.E. at 155 (Earl, J., dissenting).

Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming persons convicted of such crimes.  They did, however, enact laws disarming persons who had committed certain offenses that were not punishable by death.  For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending the service of the church of England."  4 Blackstone 55; see 3 Jac. 1, c. 5, § 16 (1605) (Eng.).  In 1624, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the col-

16

ony.  David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982).  And in 1775, Connecticut enacted a statute providing that a person who was convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms."  *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (Charles J. Hoadly ed., 1890).  The fact that legislatures disarmed individuals who committed those offenses suggests, *a fortiori*, the constitutionality of disarming those who commit felonies.

Moreover, some Founding Era sources expressly recognized that the right to bear arms extended only to law-abiding individuals.  In 1780, for example, the Town of Williamsburg, Massachusetts, adopted a resolution proclaiming:  "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Lawfull Subjects of Government* we Ought Never to be deprived of them."  *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966) (emphasis added).  And Anti-Federalists at the Pennsylvania ratifying convention proposed a bill of rights that, among other things, forbade "disarming the people or any of them, *unless for crimes committed*, or real danger of public injury from individuals."  2 *The Documentary History of the Ratification of the Constitution* 598 (Merrill Jensen ed., 1976) (emphasis added).

c. Finally, the government's brief in *Rahimi* explains that the Second Amendment allows Congress to disarm irresponsible individuals—that is, individuals whose possession of firearms would endanger them-

17

selves or others. See Gov't Br. at 10-27, *Rahimi*, *supra* (No. 22-915). English law before the Founding allowed the disarmament of dangerous individuals; an influential Second Amendment precursor contemplated the disarmament of individuals who posed a "real danger of public injury"; 19th-century sources recognized legislatures' power to disarm individuals whose possession of arms would endanger the public; and American legislatures have been disarming such individuals since the 17th century. See *id.* at 27-28.

In exercising that power, Congress need not require case-by-case findings of dangerousness. Congress may make categorical judgments about responsibility; "[t]hat *some* categorical limits are proper is part of the original meaning" of the Second Amendment. *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), cert. denied, 562 U.S. 1303 (2011). For example, past legislatures enacted laws categorically disarming loyalists, see Gov't Br. at 22, *Rahimi*, *surpa* (No. 22-915); minors, see *id.* at 24 & n.16; and vagrants, see *id.* at 25 & n.18—each time without requiring case-by-case findings of dangerousness or irresponsibility.

Section 922(g)(1) is consistent with that tradition of imposing categorical limits on the right to keep and bear arms. Common sense suggests that "felons are more likely to commit violent crimes" than are law-abiding individuals. *United States* v. *Barton*, 633 F.3d 168, 175 (3d Cir. 2011). "[N]umerous studies" show a "link between past criminal conduct and future crime, including gun violence." *Binderup* v. *Attorney General United States*, 836 F.3d 336, 400 (3d Cir. 2016) (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments), cert. denied, 582 U.S. 943 (2017); see *id.* at 400 n.160 (collecting studies). And this Court

18

has repeatedly recognized that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms. *Dickerson* v. *New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983); see, *e.g.*, *Lewis* v. *United States*, 445 U.S. 55, 67 (1980) ("The federal gun laws * * * [focus on the] fact of conviction * * * in order to keep firearms away from potentially dangerous persons."); *Barrett* v. *United States*, 423 U.S. 212, 220 (1976) ("The history of [Section 922(g)] reflects a similar concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.").

d. The court of appeals rejected the government's historical arguments, concluding that the government had failed to identify appropriate "historical analogues" to Section 922(g)(1) (at least as applied to "people like Range"). App., *infra*, 15a, 19a. But the court erred in reducing the inquiry into the Second Amendment's original meaning to a search for a specific analogue. "The test [this Court] set forth in *Heller* and [*Bruen*] requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. That inquiry into original meaning "will often involve reasoning by analogy" to historical statutes, but it need not always do so. *Id.* at 2132. Here, regardless of whether past laws are analogous to Section 922(g)(1), the available historical evidence establishes that laws such as Section 922(g)(1) are consistent with the right to keep and bear arms as it was understood at the Founding.

Moreover, even when the government defends a modern law by invoking historical statutes, it need only cite a "historical *analogue*, not a historical *twin*." *Bruen*,

19

142 S. Ct. at 2133. The court of appeals rejected the potential analogues identified by the government on the ground that none of them imposed "the *particular*" consequence at issue here, namely, "lifetime disarmament" of convicted criminals. App., *infra*, 17a. But as Judge Krause observed, demanding "a Founding-era statute that imposed the 'particular' restriction for the same length of time on the same group of people as a modern law" is tantamount to demanding a "'historical twin.'" *Id.* at 69a-70a (Krause, J., dissenting) (citations omitted).

### 3. A person may not obtain an as-applied exemption from Section 922(g)(1) based on the nature of his crime or his individual circumstances

a. To uphold Section 922(g)(1), this Court need only recognize that Congress may disarm individuals who have been convicted of crimes that satisfy the common definition of a felony—that is, crimes punishable by imprisonment for more than one year. In interpreting other provisions of the Bill of Rights that require the Court to distinguish among different types of crimes, the Court has traditionally focused on the "maximum authorized penalty"—which "provides an 'objective indication of the seriousness with which society regards the offense'"—rather than on "the particularities of an individual case." *Lewis* v. *United States*, 518 U.S. 322, 328 (1996) (brackets and citation omitted). For example, the Grand Jury Clause applies only to "capital" or "infamous" crimes, U.S. Const. Amend. V, and a crime is "infamous" if it is punishable by "imprisonment for more than a year," *Branzburg* v. *Hayes*, 408 U.S. 665, 687 n.24 (1972) (citation omitted). The Sixth Amendment right to a jury trial similarly does not extend to petty offenses, and an offense is petty if it is punishable

20

by a prison term of six months or less. See *Blanton* v. *City of North Las Vegas*, 489 U.S. 538, 541-545 (1989).

This Court should follow a similar approach in interpreting the Second Amendment, which is subject to the same "body of rules" as "the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (citation omitted). In particular, when a person has been convicted of a crime punishable by more than one year of imprisonment, a court need not inquire further into the nature of the crime in order to determine whether disarmament is justified. Rather, the maximum authorized penalty for the offense by itself establishes that the crime is serious enough to support disarmament. See *Medina*, 913 F.3d at 160-161.

b. A regime of individualized as-applied challenges to Section 922(g)(1) would be unsound in principle and unworkable in practice. To begin, it would distort the separation of powers. In our constitutional system, the Legislative Branch traditionally determines the consequences of criminal convictions—not only the punishment, but also the collateral consequences, such as disfranchisement, disqualification from jury duty, ineligibility for public benefits, sex-offender registration, and disarmament. The Executive Branch, in turn, traditionally grants clemency if it determines that the punishment or the collateral consequences prescribed by law do not fit a particular offender's circumstances. If federal courts were to create a system of as-applied exemptions from Section 922(g)(1), they would in effect usurp the Executive Branch's role of deciding when to make "exceptions" to the "rigor" and "severity" of the "criminal code" enacted by Congress. *The Federalist* No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed. 1961).

21

A regime of individualized as-applied challenges would also treat the right to possess arms differently from other rights that criminals forfeit upon conviction. As discussed above, States have long denied convicts the right to vote, the right to serve on juries, and the right to hold public office. See pp. 12-13, *supra*. This Court has never suggested that a felon can challenge those disabilities on the ground that they do not fit his felony or his circumstances. This Court should not treat the right to possess arms any differently.

A regime of individualized as-applied challenges to Section 922(g)(1) would, moreover, pose serious problems of judicial administration. Neither the court of appeals nor Range has offered a workable test for identifying the applications of Section 922(g)(1) that, in their view, violate the Second Amendment. The court, in fact, did not even try to craft a test, instead ruling that Section 922(g)(1) violates the Constitution as applied to "people like Range." App., *infra*, 19a.

Range, for his part, suggests that Congress may disarm only "dangerous" felons. See App, *infra*, 15a n.9. Congress previously tried a variant of that approach: Until 1992, felons could obtain relief from Section 922(g)(1) by demonstrating to ATF that they would "not be likely to act in a manner dangerous to public safety." 18 U.S.C. 925(c). But Congress found that program unworkable and abandoned it. See pp. 2-3, *supra*. A congressional report explained that judging whether applicants posed "a danger to public safety" was "a very difficult and subjective task" that "could have devastating consequences for innocent citizens if the wrong decision is made." S. Rep. No. 353, 102d Cong., 2d Sess. 19, 20 (1992). Another report explained that "too many * * * felons whose gun ownership rights were restored went

22

on to commit crimes with firearms." H.R. Rep. No. 183, 104th Cong., 1st Sess. 15 (1996). The regime that Range appears to envision would, if anything, be even less feasible than the system of administrative relief that Congress tried and abandoned. Unlike an administrative agency, courts "possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety." *Pontarelli* v. *United States Dep't of the Treasury*, 285 F.3d 216, 231 (3d Cir. 2002) (en banc).

### B. The Decision Below Conflicts With The Decisions Of Other Courts Of Appeals And Has Significant Practical Consequences

1. The Third Circuit's decision in this case conflicts with the decisions of other courts of appeals. In a pair of recent decisions, the Eighth Circuit held that Section 922(g)(1) complies with the Second Amendment. See *United States* v. *Jackson*, 69 F.4th 495, 501-506 (2023), reh'g denied, No. 22-2870, 2023 WL 5605618 (Aug. 30, 2023); *United States* v. *Cunningham*, 70 F.4th 502, 506 (2023), reh'g denied, No. 22-1080, 2023 WL 5606171 (Aug. 30, 2023). The Eighth Circuit reasoned that "history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." *Jackson*, 69 F.4th at 504. It added that, even if "dangerousness is considered the traditional *sine qua non* for dispossession," history demonstrates that Congress may prohibit "possession by categories of persons based on a conclusion that the category as a whole present[s] an unacceptable risk of danger if armed." *Ibid.* Finally, the court determined that "there is no need for felony-by-felony litigation regarding [Section 922(g)(1)'s] consti-

23

tutionality." *Id.* at 502. Based on that conclusion, the court rejected as-applied challenges to Section 922(g)(1) by defendants with felony convictions for drug dealing, see *id.* at 504-506, and for driving under the influence, see *Cunningham*, 70 F.4th at 504. The Eighth Circuit has denied petitions for rehearing en banc in each of those cases. See *Jackson*, 2023 WL 5605618, at *1; *Cunningham*, 2023 WL 5606171, at *1.

The Tenth Circuit, too, has held that Section 922(g)(1) complies with the Second Amendment. Before *Bruen*, the Tenth Circuit had upheld Section 922(g)(1) based on *Heller*'s assurances regarding the constitutionality of "longstanding prohibitions on the possession of firearms by felons." *United States* v. *McCane*, 573 F.3d 1037, 1047 (2009) (citation omitted), cert. denied, 559 U.S. 970 (2010). The Tenth Circuit recently determined that *Bruen* had not superseded its earlier decision. See *Vincent* v. *Garland*, 80 F.4th 1197, 1197-1202 (2023). The court also explained that, under its precedent, it had "no basis to draw constitutional distinctions based on the type of felony involved." *Id.* at 1202. The court accordingly upheld Section 922(g)(1) as applied to someone who had been convicted of bank fraud. *Id.* at 1199.

Those decisions establish, at a minimum, a 2-1 circuit conflict over the question presented. It is not clear whether the Third Circuit would have reached a different result if it had been presented with the facts in *Jackson*, *Cunningham*, and *Vincent*, because the challengers in those cases may not have been "like Range." App., *infra*, 19a. But it is clear that the Eighth and Tenth Circuits would have reached a different result here, because those courts have categorically rejected "felony-by-felony determinations," *Cunningham*, 70

24

F.4th at 506, and "constitutional distinctions based on the type of felony involved," *Vincent*, 80 F.4th at 1202.

2. The court of appeals' decision also has significant practical consequences. Section 922(g) "is no minor provision." *Rehaif* v. *United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting). It "probably does more to combat gun violence than any other federal law." *Ibid.* And Section 922(g)(1) is by far the most frequently applied of Section 922(g)'s disqualifications. In Fiscal Year 2022, the government obtained more than 8600 convictions under Section 922(g); more than 7600 of those convictions (around 88%) were under Section 922(g)(1). See U.S. Sent. Comm'n, *Quick Facts: Felon in Possession of a Firearm* (July 2023). In addition, felony convictions are "the leading reason" for background checks to result in the denial of firearms transactions. Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *National Instant Criminal Background Check System Operational Report 2020-2021*, at 18 (Apr. 2022). Felony convictions have resulted in more than one million denials since the creation of the federal background-check system in 1998, and in more than 75,000 denials in 2021 (the most recent year for which statistics are available). See *id.* at 19; Crim. Justice Info Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *Federal Denials*.

Although the court of appeals described its as-applied invalidation of Section 922(g)(1) as "narrow," App., *infra*, 19a, its decision has far-reaching practical effects. The court did not identify any criteria—apart from "people like Range," *ibid.*—for deciding which applications of Section 922(g)(1) would, in its view, violate the Second Amendment. Nor, conversely, did the court identify the applications of the statute that would, in its

25

view, comport with the Amendment. The court's decision thus creates significant uncertainty about the constitutionality of other Section 922(g)(1) prosecutions in the Third Circuit.

Experience since the issuance of the court of appeals' decision bears out those concerns. Prosecutors in the Third Circuit are facing a wave of challenges to Section 922(g)(1). One district court in the Third Circuit has already relied on the decision below to hold Section 922(g)(1) unconstitutional as applied to an armed career criminal who had four felony convictions for trafficking heroin and cocaine, see *United States* v. *Quailes*, No. 21-cr-176, 2023 WL 5401733, at *1-*2 (M.D. Pa. Aug. 22, 2023), and an armed career criminal with "thirteen prior felony and eight misdemeanor convictions," including convictions for "multiple armed robberies and drug trafficking," *United States* v. *Harper*, No. 21-cr-236, 2023 WL 5672311, at *1 (M.D. Pa. Sept. 1, 2023). And a district court outside the circuit—relying on the Third Circuit's legal analysis in this case—has held Section 922(g)(1) unconstitutional as applied to a felon with convictions for manslaughter and aggravated assault. See *United States* v. *Bullock*, No. 18-cr-165, 2023 WL 4232309, at *2, *18, *21, *23, * 29 (S.D. Miss. June 28, 2023).

### C. This Court Should Hold This Certiorari Petition Pending The Resolution Of *Rahimi*

The decision below—which held an Act of Congress unconstitutional, conflicts with decisions of other courts of appeals, and has important practical consequences—would ordinarily warrant this Court's review. See, *e.g.*, *Iancu* v. *Brunetti*, 139 S. Ct. 2294, 2298 (2019) (noting that this Court's "usual" approach is to grant review "when a lower court has invalidated a federal statute"). But the Court has already granted review in *Rahimi* to

26

decide the constitutionality of 18 U.S.C. 922(g)(8), the statute that disarms individuals who are subject to domestic-violence protective orders. See Pet. at I, *Rahimi*, *supra* (No. 22-915). The Court should therefore hold this petition for a writ of certiorari until it decides *Rahimi*.

This case substantially overlaps with *Rahimi*. Both cases concern Congress's authority to prohibit a category of individuals from possessing firearms. In each case, the government argues that the Second Amendment allows Congress to disarm individuals who are not law-abiding, responsible citizens. In each, the government relies on statements in *Heller*, *McDonald*, and *Bruen* that the right to keep and bear arms belongs to law-abiding, responsible citizens; on Second Amendment precursors that express a similar understanding; and on 19th-century laws prohibiting unfit individuals from possessing arms. See pp. 16-17, *supra*; Gov't Br. at 10-27, *Rahimi*, *supra* (No. 22-915). Each case also raises similar methodological questions about how to apply the historical test set forth in *Bruen*. Indeed, as Judge Krause's dissent observed, the Third Circuit's view of *Bruen*—under which "*any* difference between a historical law and contemporary regulation defeats an otherwise-compelling analogy"—"tracks precisely the Fifth Circuit's deeply disturbing decision in   * * * *Rahimi*." App., *infra*, 46a, 71a; see *id.* at 70a-71a. And the Fifth Circuit has stated that its interpretation of the Second Amendment in *Rahimi* "accords with" the Third Circuit's decision in this case. *United States* v. *Daniels*, 77 F.4th 337, 343 n.2 (5th Cir. 2023).

This Court should also hold this petition because it will receive multiple petitions this Term concerning the constitutionality of status-based disqualifications in

27

Section 922(g). On the same day that the government is filing this petition, it is also filing a petition in a case in which the Fifth Circuit invalidated 18 U.S.C. 922(g)(3), the provision disarming unlawful users of controlled substances. See *Daniels*, 77 F.4th at 340. Petitions concerning other status-based disqualifications could also come before this Court. Holding such petitions for *Rahimi* would be more efficient than granting multiple overlapping petitions over the course of the Term.

Finally, this Court could receive additional certiorari petitions concerning the constitutionality of Section 922(g)(1) by the time it resolves *Rahimi*. As discussed above, the Eighth and Tenth Circuits recently issued decisions holding that Section 922(g)(1) complies with the Second Amendment. See p. 22-23, *supra*. In addition, the Second Circuit held oral argument earlier this year in an appeal concerning Section 922(g)(1)'s constitutionality. See *Zherka* v. *Garland*, No. 22-1108 (argued May 8, 2023).

One of those cases may provide a better vehicle than this case for resolving Section 922(g)(1)'s constitutionality. Judge Roth's dissent argued that Range had failed to establish Article III standing because he had failed to plead that the particular firearms he wishes to possess satisfy Section 922(g)(1)'s interstate-commerce element. See App., *infra*, 88a-98a. The government does not agree with that argument, but this Court would have an independent obligation to address that issue before it could reach the merits in this case. See *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 94-102 (1998). In addition, this case involves an offense classified by state law as a misdemeanor. The state-law label should not, in the government's view, affect the constitutional analysis, but this Court may prefer to resolve Section

28

922(g)(1)'s constitutionality in the context of an offense that is expressly classified as a felony—the typical context in which Section 922(g)(1) applies.

For all those reasons, this Court should hold this petition for *Rahimi*. After deciding *Rahimi*, the Court should either (1) grant this petition, vacate the court of appeals' judgment, and remand the case for reconsideration in light of *Rahimi* or (2) grant plenary review in this case or in another case that provides a more suitable vehicle for resolving Section 922(g)(1)'s constitutionality.

## CONCLUSION

This Court should hold the petition for a writ of certiorari pending the disposition of *United States* v. *Rahimi*, cert. granted, 143 S. Ct. 2688 (No. 22-915) (oral argument scheduled for Nov. 7, 2023), and then dispose of the petition as appropriate.

Respectfully submitted.

ELIZABETH B. PRELOGAR
  *Solicitor General*
BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*
BRIAN H. FLETCHER
  *Deputy Solicitor General*
VIVEK SURI
  *Assistant to the Solicitor*
    *General*
MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
KEVIN B. SOTER
  *Attorneys*

OCTOBER 2023

# APPENDIX

## TABLE OF CONTENTS

Page

Appendix A — Court of appeals en banc opinion
(June 6, 2023)...........................................1a

Appendix B — Court of appeals panel opinion
(Nov. 16, 2022).....................................99a

Appendix C — District court order (Aug. 8, 2023).........141a

Appendix D — District court order (Aug. 31, 2021).......143a

Appendix E — District court memorandum
(Aug. 31, 2021)...................................145a

Appendix F — Court of appeals order sur petition for
rehearing en banc (Jan. 6, 2023)........159a

Appendix G — Constitutional and statutory provisions:
U.S. Const. Amend. II.......................161a
18 U.S.C. 921(a)(20) ...........................161a
18 U.S.C. 922(g)(1) ............................162a
18 U.S.C. 924(a)(8)............................162a

## APPENDIX A

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 21-2835

BRYAN DAVID RANGE, APPELLANT

*v.*

ATTORNEY GENERAL UNITED STATES OF AMERICA;
REGINA LOMBARDO, ACTING DIRECTOR, BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES

————

Argued before Merits Panel on Sept. 19, 2022
Argued En Banc on Feb. 15, 2023
Filed:    June 6, 2023

————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5:20-CV-03488)
District Judge:    Honorable Gene E.K. Pratter

————

## OPINION OF THE COURT

————

Before:    CHAGARES, *Chief Judge*, JORDAN, HAR-
DIMAN, GREENAWAY, JR., SHWARTZ, KRAUSE, RESTREPO,

(1a)

2a

BIBAS, PORTER, MATEY, PHIPPS, FREEMAN, MONTOMERY-REEVES, ROTH,* and AMBRO,** *Circuit Judges.*

HARDIMAN, *Circuit Judge*, with whom CHAGARES, *Chief Judge*, and JORDAN, GREENAWAY, JR., BIBAS, PORTER, MATEY, PHIPPS, and FREEMAN, *Circuit Judges*, join.

Bryan Range appeals the District Court's summary judgment rejecting his claim that the federal "felon-in-possession" law—18 U.S.C. § 922(g)(1)—violates his Second Amendment right to keep and bear arms. We agree with Range that, despite his false statement conviction, he remains among "the people" protected by the Second Amendment. And because the Government did not carry its burden of showing that our Nation's history and tradition of firearm regulation support disarming Range, we will reverse and remand.

I

A

The material facts are undisputed. In 1995, Range pleaded guilty in the Court of Common Pleas of Lancaster County to one count of making a false statement to obtain food stamps in violation of Pennsylvania law. *See* 62 Pa. Stat. Ann. § 481(a). In those days, Range was earning between $9.00 and $9.50 an hour as he and his wife struggled to raise three young children on $300 per week. Range's wife prepared an application for food stamps that understated Range's income, which

---

* Judge Roth is participating as a member of the en banc court pursuant to 3d Cir. I.O.P. 9.6.4.

** Judge Ambro assumed senior status on February 6, 2023 and elected to continue participating as a member of the en banc court pursuant to 3d Cir. I.O.P. 9.6.4.

3a

she and Range signed.   Though he did not recall re-
viewing the application, Range accepted full responsibil-
ity for the misrepresentation.

Range was sentenced to three years' probation,
which he completed without incident.   He also paid
$2,458 in restitution, $288.29 in costs, and a $100 fine.
Other than his 1995 conviction, Range's criminal history
is limited to minor traffic and parking infractions and a
summary offense for fishing without a license.

When Range pleaded guilty in 1995, his conviction
was classified as a Pennsylvania misdemeanor punisha-
ble by up to five years' imprisonment.   That conviction
precludes Range from possessing a firearm because fed-
eral law generally makes it "unlawful for any person
. . .  who has been convicted in any court, of a crime
punishable by imprisonment for a term exceeding one
year" to "possess in or affecting commerce, any firearm
or ammunition."   18 U.S.C. § 922(g)(1).   Although
state misdemeanors are excluded from that prohibition
if they are "punishable by a term of imprisonment of two
years or less," 18 U.S.C. § 921(a)(20)(B), that safe har-
bor provided no refuge for Range because he faced up
to five years' imprisonment.

In 1998, Range tried to buy a firearm but was re-
jected by Pennsylvania's instant background check sys-
tem.   Range's wife, thinking the rejection a mistake,
gifted him a deer-hunting rifle.   Years later, Range
tried to buy a firearm and was rejected again.   After
researching the reason for the denial, Range learned he
was barred from buying a firearm because of his 1995
conviction.   Range then sold his deer-hunting rifle to a
firearms dealer.

4a

B

Range sued in the United States District Court for the Eastern District of Pennsylvania, seeking a declaration that § 922(g)(1) violates the Second Amendment as applied to him.  He also requested an injunction prohibiting the law's enforcement against him.  Range asserts that but for § 922(g)(1), he would "for sure" purchase another deer-hunting rifle and "maybe a shotgun" for self-defense at home.  App. 197-98.  Range and the Government cross-moved for summary judgment.

The District Court granted the Government's motion. *Range v. Lombardo*, 557 F. Supp. 3d 609, 611 (E.D. Pa. 2021).  Faithfully applying our then-controlling precedents, the Court held that Range's crime was "serious" enough to deprive him of his Second Amendment rights. *Id.*  In doing so, the Court noted the two-step framework we established in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).  *Range*, 557 F. Supp. 3d at 613.  The Court began—and ended—its analysis at the first step.  It considered five factors to determine whether Range's conviction made him an "unvirtuous citizen" of the kind historically barred from possessing a firearm:  (1) whether the conviction was classified as a misdemeanor or a felony; (2) whether the elements of the offense involve violence; (3) the sentence imposed; (4) whether there was a cross-jurisdictional consensus as to the seriousness of the crime, *Binderup v. Att'y Gen.*, 836 F.3d 336, 351-52 (3d Cir. 2016) (en banc) (plurality); and (5) the potential for physical harm to others created by the offense, *Holloway v. Att'y Gen.*, 948 F.3d 164, 173 (3d Cir. 2020).  *Range*, 557 F. Supp. 3d at 613-14.

5a

The Government conceded that four of the five factors favored Range because he was convicted of a nonviolent, non-dangerous misdemeanor and had not been incarcerated. *Id.* at 614. But the District Court held the "cross-jurisdictional consensus" factor favored the Government because about 40 jurisdictions would have classified his crime as a felony. *Id.* at 614-15. Noting that our decisions in *Holloway*, 948 F.3d at 177, and *Folajtar v. Att'y Gen.*, 980 F.3d 897, 900 (3d Cir. 2020), had rejected as-applied challenges to § 922(g)(1) despite only one of the relevant factors weighing in the Government's favor, the District Court held that the cross-jurisdictional consensus alone sufficed to disarm Range. *Range*, 557 F. Supp. 3d at 615-16. Range timely appealed.

While Range's appeal was pending, the Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The parties then submitted supplemental briefing on *Bruen*'s impact. A panel of this Court affirmed the District Court's summary judgment, holding that the Government had met its burden to show that § 922(g)(1) reflects the Nation's historical tradition of firearm regulation such that Range's conviction "places him outside the class of people traditionally entitled to Second Amendment rights." *Range v. Att'y Gen.*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam).

Range petitioned for rehearing en banc. We granted the petition and vacated the panel opinion. *Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2022).

6a

## II

The District Court had jurisdiction under 28 U.S.C. § 1331 because Range's complaint raised a federal question: whether the federal felon-in-possession law, 18 U.S.C. § 922(g)(1), violates the Second Amendment as applied to Range. We have jurisdiction under 28 U.S.C. § 1291.

## III

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees an individual right to keep and bear arms unconnected with militia service. 554 U.S. 570, 583-84 (2008). In view of that right, the Court held unconstitutional a District of Columbia law that banned handguns and required other "firearms in the home be rendered and kept inoperable at all times." *Id.* at 630. It reached that conclusion after scrutinizing the text of the Second Amendment and deducing that it "codified a *pre-existing* right." *Id.* at 592. The *Heller* opinion did not apply intermediate or strict scrutiny. In fact, it did not apply means-end scrutiny at all. But in response to Justice Breyer's dissent, the Court noted in passing that the challenged law would be unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628-29.

Many courts around the country, including this one, overread that passing comment to require a two-step approach in Second Amendment cases, utilizing means-end scrutiny at the second step. We did so for the first time in *Marzzarella*, 614 F.3d at 97, and we continued down that road for over a decade. *See, e.g.*, *Drake v. Filko*, 724 F.3d 426, 429, 434-40 (3d Cir. 2013); *Bind-*

7a

*erup*, 836 F.3d at 344-47, 353-56; *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 117 (3d Cir. 2018); *Beers v. Att'y Gen.*, 927 F.3d 150, 154-55 (3d Cir. 2019), *vacated sub nom. as moot, Beers v. Barr*, 140 S. Ct. 2758 (2020); *Holloway*, 948 F.3d at 169-172; *Folajtar*, 980 F.3d at 901.

*Bruen* rejected the two-step approach as "one step too many." 142 S. Ct. at 2127. The Supreme Court declared: "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* Instead, those cases teach "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. And "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Applying that standard, *Bruen* held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 2122. But the "where" question decided in *Bruen* is not at issue here. Range's appeal instead requires us to examine *who* is among "the people" protected by the Second Amendment. U.S. Const. amend. II; *see Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm. . . . "); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009) (distinguishing among "who," "what," "where," "when," and

8a

"how" restrictions).   Range claims he is one of "the people" entitled to keep and bear arms and that our Nation has no historical tradition of disarming people like him.   The Government responds that Range has not been one of "the people" since 1995, when he pleaded guilty in Pennsylvania state court to making a false statement on his food stamp application, and that his disarmament is historically supported.

## IV

Having explained how *Bruen* abrogated our Second Amendment jurisprudence, we now apply the Supreme Court's established method to the facts of Range's case. Both sides agree that we no longer conduct means-end scrutiny.   And as the panel wrote:   "*Bruen*'s focus on history and tradition," means that "*Binderup*'s multifactored seriousness inquiry no longer applies."   *Range*, 53 F.4th at 270 n.9.

After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct.   142 S. Ct. at 2134-35.   If it does, the government now bears the burden of proof:   it "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."   *Id.* at 2127.

## A

We begin with the threshold question:   whether Range is one of "the people" who have Second Amendment rights.   The Government contends that the Second Amendment does not apply to Range at all because "[t]he right to bear arms has historically extended to the political community of law-abiding, responsible citizens."   Gov't En Banc Br. at 2.   So Range's 1995 con-

9a

viction, the Government insists, removed him from "the people" protected by the Second Amendment.

The Supreme Court referred to "law-abiding citizens" in *Heller*. In response to Justice Stevens's dissent, which relied on *United States v. Miller*, 307 U.S. 174 (1939), the Court reasoned that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. In isolation, this language seems to support the Government's argument. But *Heller* said more; it explained that "the people" as used throughout the Constitution "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. So the Second Amendment right, *Heller* said, presumptively "belongs to all Americans." *Id.* at 581. Range cites these statements to argue that "law-abiding citizens" should not be read "as rejecting *Heller*'s interpretation of 'the people.'" Range Pet. for Reh'g at 8. We agree with Range for four reasons.

First, the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So their references to "law-abiding, responsible citizens" were dicta. And while we heed that phrase, we are careful not to overread it as we and other circuits did with *Heller*'s statement that the District of Columbia firearm law would fail under any form of heightened scrutiny. Second, other Constitutional provisions reference "the people."[1] It mentions "the people" twice

---

[1] *See, e.g.*, U.S. Const. pmbl. ("We *the People* of the United States. . . . " (emphasis added)); *id.* amend. IX (recognizing rights "retained by the people"); *id.* amend. X (acknowledging the powers reserved "to the people").

10a

with respect to voting for Congress,[2] and "the people" are recognized as having rights to assemble peaceably, to petition the government for redress,[3] and to be protected against unreasonable searches and seizures.[4] Unless the meaning of the phrase "the people" varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude that Range is not among "the people" for Second Amendment purposes would exclude him from those rights as well.   *See* 554 U.S. at 580.   And we see no reason to adopt an inconsistent reading of "the people."

Third, as the plurality stated in *Binderup*:   "That individuals with Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical."   836 F.3d at 344 (Ambro, J.).   That statement tracks then-Judge Barrett's dissenting opinion in *Kanter v. Barr*, in which she persuasively explained that "all people have the right to keep and bear arms," though the legislature may constitutionally "strip certain groups of that right."   919 F.3d 437, 452 (7th Cir. 2019).

---

[2]  U.S. Const. art. I, § 2 ("The House of Representatives shall be composed of Members chosen every second Year by *the People* of the several States. . . . "   (emphasis added)); *id.* amend. XVII ("The Senate of the United States shall be composed of two Senators from each State, elected by *the people* thereof. . . . "   (emphasis added)).

[3]  U.S. Const. amend. I ("Congress shall make no law respecting . . . the right of *the people* peaceably to assemble, and to petition the Government for a redress of grievances."   (emphasis added)).

[4]  U.S. Const. amend. IV ("The right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . . "   (emphasis added)).

11a

We agree with that statement in *Binderup* and then-Judge Barrett's reasoning.

Fourth, the phrase "law-abiding, responsible citizens" is as expansive as it is vague.   Who are "law-abiding" citizens in this context?   Does it exclude those who have committed summary offenses or petty misdemeanors, which typically result in a ticket and a small fine?   No. We are confident that the Supreme Court's references to "law-abiding, responsible citizens" do not mean that every American who gets a traffic ticket is no longer among "the people" protected by the Second Amendment.   Perhaps, then, the category refers only to those who commit "real crimes" like felonies or felony-equivalents?   At English common law, felonies were so serious they were punishable by estate forfeiture and even death.   4 William Blackstone, Commentaries on the Laws of England 54 (1769).   But today, felonies include a wide swath of crimes, some of which seem minor.[5]   And some misdemeanors seem serious.[6] As the Supreme Court noted recently:   "a felon is not always more dangerous than a misdemeanant."   *Lange v. California*, 141 S. Ct. 2011, 2020 (2021) (cleaned up). As for the modifier "responsible," it serves only to undermine the Government's argument because it renders the category hopelessly vague.   In our Republic of over

---

[5]  *See, e.g.*, 18 U.S.C. § 1464 (uttering "any obscene, indecent, or profane language by means of radio communication"); Mich. Comp. Laws Ann. § 445.574a(2)(d) (returning out-of-state bottles or cans); 18 Pa. Cons. Stat. Ann. § 3929.1 (third offense of library theft of more than $150); *id.* § 7613 (reading another's email without permission).

[6]  *See, e.g.*, 18 Pa. Cons. Stat. Ann. § 2504 (involuntary manslaughter); *id.* § 2707 (propulsion of missiles into an occupied vehicle or onto a roadway); 11 Del. Code § 881 (bribery).

12a

330 million people, Americans have widely divergent ideas about what is required for one to be considered a "responsible" citizen.

At root, the Government's claim that only "law-abiding, responsible citizens" are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from "the people."   We reject that approach because such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting).   And that deference would contravene *Heller*'s reasoning that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table."   554 U.S. at 636; *see also Bruen*, 142 S. Ct. at 2131 (warning against "judicial deference to legislative interest balancing").

In sum, we reject the Government's contention that only "law-abiding, responsible citizens" are counted among "the people" protected by the Second Amendment.   *Heller* and its progeny lead us to conclude that Bryan Range remains among "the people" despite his 1995 false statement conviction.

Having determined that Range is one of "the people," we turn to the easy question:   whether § 922(g)(1) regulates Second Amendment conduct.   It does.   Range's request—to possess a rifle to hunt and a shotgun to defend himself at home—tracks the constitutional right as defined by *Heller*.   554 U.S. at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").   So "the Second Amendment's plain text covers [Range's] conduct,"

13a

and "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126.

## B

Because Range and his proposed conduct are protected by the Second Amendment, we now ask whether the Government can strip him of his right to keep and bear arms. To answer that question, we must determine whether the Government has justified applying § 922(g)(1) to Range "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. We hold that the Government has not carried its burden.

To preclude Range from possessing firearms, the Government must show that § 922(g)(1), as applied to him, "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Historical tradition can be established by analogical reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133. To be compatible with the Second Amendment, regulations targeting longstanding problems must be "distinctly similar" to a historical analogue. *Id.* at 2131. But "modern regulations that were unimaginable at the founding" need only be "relevantly similar" to one. *Id.* at 2132. *Bruen* offers two metrics that make historical and modern firearms regulations similar enough: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.

In attempting to carry its burden, the Government relies on the Supreme Court's statement in *Heller* that "nothing in our opinion should be taken to cast doubt on

14a

longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626. A plurality of the Court reiterated that point in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). And in his concurring opinion in *Bruen*, Justice Kavanaugh, joined by the Chief Justice, wrote that felon-possession prohibitions are "presumptively lawful" under *Heller* and *McDonald*. 142 S. Ct. at 2162 (quoting *Heller*, 554 U.S. at 626-27 & n.26).[7] Section 922(g)(1) is a straightforward "prohibition[] on the possession of firearms by felons." *Heller*, 554 U.S. at 626. And since 1961 "federal law has generally prohibited individuals convicted of crimes punishable by more than one year of imprisonment from possessing firearms." Gov't En Banc Br. at 1; *see* An Act To Strengthen The Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961). But the earliest version of that statute, the Federal Firearms Act of 1938, applied only to *violent* criminals. Pub. L. No. 75-785, §§ 1(6), 2(f), 52 Stat. 1250, 1250-51 (1938). As the First Circuit explained: "the current federal felony firearm ban differs considerably from the [original] version. . . . [T]he law initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary, but extended to both felons and misdemeanants convicted of qualifying offenses." *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *see also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).

---

[7] The *Heller*, *McDonald*, and *Bruen* Courts cited no such "longstanding prohibitions," presumably because they did "not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626.

15a

Even if the 1938 Act were "longstanding" enough to warrant *Heller*'s assurance—a dubious proposition given the *Bruen* Court's emphasis on Founding- and Reconstruction-era sources, 142 S. Ct. at 2136, 2150—Range would not have been a prohibited person under that law. Whatever timeframe the Supreme Court might establish in a future case, we are confident that a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratification—falls well short of "longstanding" for purposes of demarcating the scope of a constitutional right. So the 1961 iteration of § 922(g)(1) does not satisfy the Government's burden.[8]

The Government's attempt to identify older historical analogues also fails.[9] The Government argues that

---

[8] Nor are we convinced by the slightly older state and local felonin-possession laws cited by the amicus brief in support of the Government filed by Everytown for Gun Safety. Amicus cites a series of state statutes banning firearm possession by felons passed in the 1920s. But this is still too late: "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28. And the 19th-century local laws cited by Amicus are inapposite because they involved prohibitions on concealed carry, a lesser restriction than the total ban on firearm possession that § 922(g)(1) imposes.

[9] Range argues that because "there is no historical tradition of disarming nonviolent felons," dangerousness is the "touchstone." Range Pet. for Reh'g at 10. In support of that view, Range quotes a concurring opinion of five judges in *Binderup* that focused on dangerousness. 836 F.3d at 369 (Hardiman, J., concurring in part). He also cites Judge Bibas's dissent in *Folajtar*, 980 F.3d at 913-20, and then-Judge Barrett's dissent in *Kanter*: "The historical evidence . . . [shows] that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of

16a

"legislatures traditionally used status-based restrictions" to disarm certain groups of people. Gov't En Banc Br. at 4 (quoting *Range*, 53 F.4th at 282). Apart from the fact that those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances. That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be "far too broad[ ]." *See Bruen*, 142 S. Ct. at 2134 (noting that historical restrictions on firearms in "sensitive places" do not empower legislatures to designate any place "sensitive" and then ban firearms there).

The Government also points out that "founding-era felons were exposed to far more severe consequences than disarmament." Gov't En Banc Br. at 4. It is true that "founding-era practice" was to punish some "felony offenses with death." *Id*. at 9. For example, the First Congress made forging or counterfeiting a public security punishable by death. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 115 (1790). States in the early Republic likewise treated nonviolent crimes "such as forgery and horse theft" as capital offenses. *See Folajtar*,

---

guns would otherwise threaten the public safety." 919 F.3d at 454. The Government replies that 10 of the 15 judges in *Binderup* and the Court in *Holloway* and *Folajtar* rejected dangerousness or violence as the touchstone. We need not decide this dispute today because the Government did not carry its burden to provide a historical analogue to permanently disarm someone like Range, whether grounded in dangerousness or not.

17a

980 F.3d at 904 (citations omitted).    Such severe treatment reflects the founding generation's judgment about the gravity of those offenses and the need to expose offenders to the harshest of punishments.

Yet the Government's attempts to analogize those early laws to Range's situation fall short.    That Founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition.    The greater does not necessarily include the lesser:    founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed.    As one of our dissenting colleagues notes, a felon could "repurchase arms" after successfully completing his sentence and reintegrating into society.    Krause Dissent at 28-29.    That aptly describes Range's situation.    So the Government's attempt to disarm Range is not "relevantly similar" to earlier statutes allowing for execution and forfeiture.    *See Bruen*, 142 S. Ct. at 2132.

Founding-era laws often prescribed the forfeiture of the weapon used to commit a firearms-related offense without affecting the perpetrator's right to keep and bear arms generally.    *See, e.g.*, Act of Dec. 21, 1771, ch. 540, N.J. Laws 343-344 ("An Act for the Preservation of Deer, and other Game, and to prevent trespassing with Guns"); Act of Apr. 20, 1745, ch. 3, N.C. Laws 69-70 ("An Act to prevent killing deer at unseasonable times, and for putting a stop to many abuses committed by white persons, under pretence of hunting").    Range's crime, however—making a false statement on an application

18a

for food stamps—did not involve a firearm, so there was
no criminal instrument to forfeit.   And even if there
were, government confiscation of the instruments of
crime (or a convicted criminal's entire estate) differs
from a status-based lifetime ban on firearm possession.
The Government has not cited a single statute or case
that precludes a convict who has served his sentence
from purchasing the same type of object that he used to
commit a crime.   Nor has the Government cited forfei-
ture cases in which the convict was prevented from re-
gaining his possessions, including firearms (except
where forfeiture preceded execution).   That's true
whether the object forfeited to the government was a
firearm used to hunt out of season, a car used to
transport cocaine, or a mobile home used as a metham-
phetamine lab.   And of those three, only firearms are
mentioned in the Bill of Rights.[10]

Finally, the Government makes an argument from
authority.   It points to a decision from a sister circuit
court that "look[ed] to tradition and history" in deciding
that "those convicted of felonies are not among those en-
titled to possess arms."   Gov't En Banc Br. at 4 (quot-
ing *Medina v. Whitaker*, 913 F.3d 152, 157-61 (D.C. Cir.
2019)).   The Government also cites appellate decisions
that "have categorically upheld felon-possession prohi-
bitions without relying on means-end scrutiny."   *Id.*

---

[10] Even arms used to commit crimes bordering on treason were
sometimes returned to the perpetrators during the Founding era.
After the Massachusetts militia quelled Shays's Rebellion in 1787,
the state required the rebels and those who supported them to "de-
liver up their arms."   1 Private and Special Statutes of the Com-
monwealth of Massachusetts from 1780-1805, 145-47 (1805).   But
those arms were to be returned after three years upon satisfaction
of certain conditions.   *Id.* at 146-47.

19a

(citing *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (per curiam); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009)). And it cites the more than 80 district court decisions that have addressed § 922(g)(1) and have ruled in favor of the Government. *Id.* at 5 (citing Brief for Fed. Gov't at 17 n.5, *Vincent v. Garland*, No. 21-4121 (10th Cir. Jan. 17, 2023)).

As impressive as these authorities may seem at first blush, they fail to persuade. First, the circuit court opinions were all decided before *Bruen*. Second, the district courts are bound to follow their circuits' precedent. Third, the Government's contention that "*Bruen* does not meaningfully affect this Court's precedent," Gov't Supp. Br. at 9, is mistaken for the reasons we explained in Section III, *supra*.

For the reasons stated, we hold that the Government has not shown that the Nation's historical tradition of firearms regulation supports depriving Range of his Second Amendment right to possess a firearm. *See Bruen*, 142 S. Ct. at 2126.

\* \* \*

Our decision today is a narrow one. Bryan Range challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a). Range remains one of "the people" protected by the Second Amendment, and his eligibility to lawfully purchase a rifle and a shotgun is protected by his right to keep and bear arms. Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range

20a

of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights. We will reverse the judgment of the District Court and remand so the Court can enter a declaratory judgment in favor of Range, enjoin enforcement of § 922(g)(1) against him, and conduct any further proceedings consistent with this opinion.

21a

PORTER, *Circuit Judge*, concurring.

I join the majority opinion in full.    I write separately to highlight one reason why there are no examples of founding, antebellum, or Reconstruction-era federal laws like 18 U.S.C. § 922(g)(1) permanently disarming non-capital criminals.

Until well into the twentieth century, it was settled that Congress lacked the power to abridge anyone's right to keep and bear arms.    The *right* declared in the Second Amendment was important, but cumulative. The people's first line of defense was the reservation of a *power* from the national government.[1]    As James Wilson explained, "A bill of rights annexed to a constitution is *an enumeration of the powers* reserved."    James Wilson, *Remarks in the Pennsylvania Convention to Ratify the Constitution of the United States* (Nov. 28, 1787), reprinted in 1 *Collected Works of James Wilson* 195 (Liberty Fund ed., 2007).

Even without the Second Amendment, the combination of enumerated powers and the Ninth and Tenth Amendments ensured that Congress could not permanently disarm anyone.    *See* Kurt T. Lash, *The Lost*

---

[1]  "The powers delegated by the proposed constitution to the federal government, are few and defined.    Those which are to remain in the state governments, are numerous and indefinite.    The former will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce; with which last the power of taxation will, for the most part, be connected.    The powers reserved to the several states will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people; and the internal order, improvement, and prosperity of the state."    The Federalist No. 45, at 241 (Madison) (Liberty Fund ed. 2001).

22a

*History of the Ninth Amendment* 72-93 (2009) (discussing how the Ninth and Tenth Amendments work in tandem to serve federalist purposes). The adoption of substantive protections in the Bill of Rights, such as the right to keep and bear arms, was another layer of protection reinforcing dual sovereignty.

A founding-era source is illustrative. In his influential constitutional law treatise, William Rawle, a Federalist, grounded the people's right to keep and bear arms in Congress's lack of delegated power. He described the Second Amendment as a backstop to prevent the pursuit of "inordinate power."

> The prohibition is general. No clause in the Constitution could by any rule of construction be conceived to give congress a power to disarm the people. Such a flagitious attempt could only be made under some general pretence by a state legislature. But if in any blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both.

William Rawle, *A View of the Constitution of the United States of America* 125-26 (2d ed. 1829).

At oral argument, counsel for the government hypothesized that the paucity of early American criminal laws resulting in disarmament may be explained by a lack of political demand. That's implausible. As Judge Krause's dissenting opinion shows, states were free to, and did, regulate gun ownership and use, indicating political demand. The most obvious explanation for a century and a half of congressional inaction is not lack of political will but dual sovereignty and respect for state police power.

23a

A New Deal Era attempt at federal gun control is revealing. In 1934, the Roosevelt Administration proposed the National Firearms Act to address the gangster-style violence of the Prohibition Era by reducing the sale of automatic weapons and machine guns. Stymied by the federal government's lack of police power, Attorney General Homer Cummings urged Congress to regulate guns indirectly through its enumerated taxing power. Nicholas J. Johnson, *The Power Side of the Second Amendment Question: Limited, Enumerated Powers and the Continuing Battle Over the Legitimacy of the Individual Right to Arms*, 70 Hastings L.J. 717, 750-58 (2019). Congress accepted that suggestion, avoiding the acknowledged constitutional problem by imposing a tax—rather than a direct prohibition—on the making and transfer of particular firearms. *See* National Firearms Act, ch. 757, Pub. L. No. 73-474, 48 Stat. 1236 (1934) (current version at 26 U.S.C. § 5801 et seq.).

The landscape changed in 1937, when the Supreme Court adopted an expansive conception of the Commerce Clause. *See NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937). Newly empowered, Congress promptly enacted the Federal Firearms Act of 1938. For the first time, that law disarmed felons convicted of a "crime of violence," which the Act defined as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by more than one year." Federal Firearms Act, Pub. L. No. 75-785, 52 Stat. 1250 (1938). In 1961, Congress extended the firearms disqualification to all felons, violent or otherwise. *See* An Act to Strengthen the Federal Firearms

24a

Act, Pub. L. No. 87-342, 75 Stat. 757 (1961); *see also* 18 U.S.C. § 922(g)(1).

As the majority opinion makes plain, these modern laws have no longstanding analogue in our national history and tradition of firearm regulation.[2]   Maj. Op. 15-22.   That's unsurprising because before the New Deal Revolution, Congress was powerless to regulate gun possession and use.   *See United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (Congress lacks power to infringe the right declared by the Second Amendment); *Presser v. People of State of Ill.*, 116 U.S. 252, 265 (1886) (same).

Lacking any relevant historical federal data, we may look to state statutes and cases for contemporaneous clues about the people's right to keep and bear arms.[3] By 1803, seven of the seventeen states protected gun possession and use in their own declarations of rights. Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208-11 (2006).   And by 1868, twenty-two of thirty-seven states protected the right in their state constitutions.   *Id.* The history and tradition of firearm regulation in those states may shed light on the scope of the federal constitutional right, depending on how similar each state's constitutional protection was to the Second Amendment. *See District of Columbia v. Heller*, 554 U.S. 570, 600-03

---

[2]  *Bruen* defines relevant history for these purposes as the period between approximately 1791 and 1868.   *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ----, 142 S. Ct. 2111, 2137-50 (2022) (summarizing "antebellum" historical evidence).

[3]  *Pace* Judge Shwartz, I do not understand the Supreme Court to require that firearm regulations can be supported only "by a federally enacted analog in existence at the founding[.]"   Shwartz Dissent at n.5.

25a

(2008) (founding-era state constitutions corroborate individual-right interpretation of Second Amendment). After all, state constitutions and their respective bills of rights were "the immediate source from which Madison derived what became the U.S. Bill of Rights." Donald S. Lutz, *The State Constitutional Pedigree of the U.S. Bill of Rights*, 22 Publius 19, 29 (1992).

But precisely because the states—unlike the national government—retained sweeping police powers and weren't originally constrained by the Bill of Rights, they were free to regulate the possession and use of weapons in whatever ways they thought appropriate (subject to state constitutional restrictions that were not uniform). *See Barron ex rel. Tiernan v. Mayor of Baltimore*, 32 U.S. (7 Pet.) 243 (1833). Because of that important difference, it's unclear what many early state laws prove about the contours of the *Second Amendment* right.

For example, Judge Krause's dissent cites founding or antebellum-era disarmament laws from Delaware, Maryland, New Jersey, New York, and Virginia. Krause Dissent at 15-21, 26-28 & nn.94-96, 98. But Maryland, New Jersey, and New York have never enumerated a Second Amendment analogue. Volokh, *supra*, at 205. Delaware and Virginia did not do so until 1987 and 1971, respectively. *Id.* at 194, 204. So those states' laws provide little insight about the scope of the Second Amendment right.

After *McDonald v. City of Chicago*, 561 U.S. 742 (2010), state gun laws are subject to the Second Amendment because it is incorporated through the Fourteenth Amendment. The Supreme Court has said that "if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits

26a

or requires." *Timbs v. Indiana*, 586 U.S. ----, 139 S. Ct. 682, 687 (2019); *see also Bruen*, 142 S. Ct. at 2137. But unlike *McDonald*, *Timbs*, and *Bruen*, this case doesn't involve application of an incorporated right against a state law; it's a challenge to the constitutionality of a relatively recent federal statute that has no historical analogue in antebellum federal law.

Using state laws indiscriminately to determine the scope of the constitutional right seems incongruous in this context. It seeks effectively to reverse incorporate state law into federal constitutional law. In *Bolling v. Sharpe*, 347 U.S. 497 (1954), the Supreme Court held that Fourteenth Amendment equal-protection principles applicable to the states also bind the federal government through the Fifth Amendment's Due Process Clause because the alternative would be "unthinkable." *Id.* at 500; *but see United States v. Vaello Madero*, 142 S. Ct. 1539, 1544-47 (2022) (Thomas, J., concurring) (criticizing *Bolling*'s rationale). Here, there is no textual basis plausibly supporting reverse incorporation. And *Bolling*'s rule appears to be cabined to equal-protection claims; the Court has only invoked reverse incorporation to redress invidious discrimination. Without an equal-protection or due-process hook, using state law to define a federal constitutional amendment that was fashioned to protect individual rights *and* a reserved power poses a doctrinal conundrum.

A conception of the Second Amendment right that retcons modern commerce power into early American state law is anachronistic and flunks *Bruen*'s history-and-tradition test. Setting the federal floor through a combination of antebellum state police power and Congress's post-New Deal commerce authority, as the dis-

27a

sents propose, would underprotect the constitutional right to keep and bear arms.

28a

AMBRO, *Circuit Judge*, concurring, joined by GREENA-
WAY, JR. and MONTGOMERY-REEVES, *Circuit Judges*.

Bryan Range decades ago made a false statement to
obtain food stamps to feed his family. That untrue
statement, however, was a misdemeanor in violation of
Pennsylvania law. *See* 62 Pa. Stat. Ann. § 481(a).
And his conviction barred him from possessing a firearm
per 18 U.S.C. § 922(g)(1).

I agree with the well-crafted majority opinion of
Judge Hardiman that Range is among "the people" pro-
tected by the Second Amendment and that the law is un-
constitutional as applied to him. I write separately,
however, to explain why the Government's failure to
carry its burden in this case does not spell doom for
§ 922(g)(1). It remains "presumptively lawful." *New
York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct.
2111, 2162 (2022) (Kavanaugh, J., concurring) (quoting
*District of Columbia v. Heller*, 554 U.S. 570, 626-27
(2008)). This is so because it fits within our Nation's
history and tradition of disarming those persons who
legislatures believed would, if armed, pose a threat to
the orderly functioning of society. That Range does
not conceivably pose such a threat says nothing about
those who do. And I join the majority opinion with the
understanding that it speaks only to his situation, and
not to those of murderers, thieves, sex offenders, domes-
tic abusers, and the like.

Section 922(g)(1) is the federal "felon-in-possession"
law. It makes it "unlawful for any person . . . who
has been convicted in any court . . . of a crime pun-
ishable by imprisonment for a term exceeding one year"
to possess firearms or ammunition. 18 U.S.C. § 922(g)(1).
Although those convicted of state misdemeanors "pun-

29a

ishable by a term of imprisonment of two years or less" are excluded from the prohibition, Range is subject to it because his crime carried a maximum penalty of five years' imprisonment even though he received no prison sentence.    18 U.S.C. § 921(a)(20)(B).

Congress may disarm felons because, as Justice Scalia explained in *Heller*, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." 554 U.S. at 626.    He demonstrated this is so by listing "presumptively lawful" regulations that the ruling should not "be taken to cast doubt on."    *Id.* at 626-27 & n.26.    That list included "longstanding prohibitions on the possession of firearms by felons."    *Id.* at 626-27. Just two years later, in *McDonald v. City of Chicago*, the Supreme Court incorporated the Second Amendment against the states.    561 U.S. 742, 767-68 (2010). In doing so, it assured the public that "incorporation does not imperil every law regulating firearms."    *Id.* at 786.    Thus, it stood by its statement "in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'"    *Id.* (quoting *Heller*, 554 U.S. at 626-27).    *See also United States v. Jackson*, No. 22-2870, --- F.4th ----, 2023 WL 3769242, at *4 (8th Cir. June 2, 2023) (observing the Supreme Court has provided assurances that felon-in-possession laws are constitutional).

In *United States v. Barton*, we held that "*Heller*'s list of 'presumptively lawful' regulations is not dicta."    633 F.3d 168, 171 (3d Cir. 2011).    That aligned us with the Ninth and Eleventh Circuits.    *Id.* (citing *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010), and *United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th

30a

Cir. 2010)).   And every other circuit court has looked to the Supreme Court's treatment of "presumptively lawful" prohibitions for guidance.[1]

*New York State Rifle & Pistol Ass'n v. Bruen* reaffirms that felon-in-possession laws are presumed to be lawful.   142 S. Ct. 2111 (2022).   Although that case had nothing to do with those laws, three of the six Justices in the majority went out of their way to signal that view. Justice Kavanaugh's concurrence, joined by Chief Justice Roberts, explained that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations" before quoting the *Heller* excerpt that casts prohibitions on the possession of firearms by felons as presumptively lawful.   *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626-27 & n.26).   Justice Alito's concurrence also explained that the Court's opinion has not "disturbed anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns."   *Id.* at 2157 (citation omitted).

Of course, we are here for a reason.   *Bruen* abrogated the circuit courts' use of means-end analysis and replaced it with a history-driven test:

---

[1]  *See United States v. Booker*, 644 F.3d 12, 23-24 (1st Cir. 2011); *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018); *United States v. Chester*, 628 F.3d 673, 679-80 (4th Cir. 2010); *Hollis v. Lynch*, 827 F.3d 436, 446-47 (5th Cir. 2016); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 686-87 (6th Cir. 2016) (en banc); *United States v. Skoien*, 614 F.3d 638, 639-40 (7th Cir. 2010); *United States v. Bena*, 664 F.3d 1180, 1182-83 (8th Cir. 2011); *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1124 (10th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011).

31a

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126. In the wake of *Bruen*, assessing a gun restriction by balancing a government's interest (safety of citizens) with the burden imposed on an individual's right to bear arms is out. Instead, laws that burden Second Amendment rights must have "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphases in original). So we must use "analogical reasoning" to determine whether § 922(g)(1) is "relevantly similar" to a law from a period of history that sheds light on the Second Amendment's meaning. *Id.* at 2132.

Given that three Justices in *Bruen*'s majority opinion reminded us that felon-in-possession laws remain presumptively lawful, and the three dissenting Justices echoed that view, *id.* at 2189 (Breyer, J., dissenting) ("Like Justice Kavanaugh, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding."), a sound basis exists for § 922(g)(1)'s constitutional application in a substantial amount of cases. Any historical inquiry that reaches a contrary result must be wrong in view of the answer the Supreme Court

32a

has already supplied. *See Jackson*, 2023 WL 3769242, at *4.

We begin with a look to firearm regulation in the era of the Second Amendment's ratification. In England, non-Anglican Protestants and Catholics were disarmed during times of tumult. *See Range v. Att'y Gen.*, 53 F.4th 262, 274-76 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023). The American colonies also disarmed religious dissenters. See *id.* at 276-77. And in the Revolutionary War period, British loyalists and those who refused to take loyalty oaths were disarmed by several colonies. *See id.* at 277-79. *See also Jackson*, 2023 WL 3769242, at *5.

True, those laws are, by today's standards, unconstitutional on non-Second Amendment grounds. But at our Founding they were measures driven by the fear of those who, the political majority believed, would threaten the orderly functioning of society if they were armed. From this perspective, it makes sense that § 922(g)(1) is presumptively lawful. Society is protecting itself by disarming, *inter alia*, those who murder, rob, possess child porn, and leak classified national security information. *See id.* at *7. Most felons have broken laws deemed to underpin society's orderly functioning, be their crimes violent or not. Section 922(g)(1) thus disarms them for the same reason we prohibited British loyalists from being armed.

Of course, the relevant period may extend beyond the Founding era. Indeed, the Supreme Court has not yet decided whether individual rights are defined by their public understanding at the time of the ratification of the Bill of Rights in 1791 or the Fourteenth Amendment in 1868. *See Bruen*, 142 S. Ct. at 2162-63 (Barrett., J.,

33a

concurring).   If the latter, as the Eleventh Circuit held in *National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322-24 (11th Cir. 2023), then Founding-era regulations remain instructive unless contradicted by something specific in the Reconstruction-era.   In any event, the more long-standing a prohibition, the more likely it is to be constitutional.[2]

Certain regulations contemporaneous with the Fourteenth Amendment's ratification reaffirm the familiar desire to keep arms from those perceived to threaten the orderly functioning of society.   A slew of states prohibited "tramps" from carrying firearms or dangerous weapons.[3]   Kansas barred those "not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States" from carrying "a pistol, bowie-knife, dirk or other deadly weapon."   2 General Statutes of the State of Kansas 353 (1897) (passed in 1868).   And Wisconsin prohibited "any person in a state of intoxication to go armed with any pistol or revolver."   1883 Wis. Sess. Laws 290, ch.

---

[2] The Supreme Court did not specify how long it takes for a law to become "longstanding."

[3] *See, e.g.,* 1878 N.H. Laws 612, ch. 270 § 2; 1878 Vt. Laws 30, ch. 14 § 3; 1879 R.I. Laws 110, ch. 806 § 3; 1880 Ohio Rev. St. 1654, ch. 8 § 6995; 1880 Mass. Laws 232, ch. 257, § 4; 1987 Iowa Laws 1981, ch. 5 § 5135.   Tramps were typically defined along the lines of the following Pennsylvania statute:   "Any person going about from place to place begging, asking or subsisting upon charity, and for the purpose of acquiring money or living, and who shall have no fixed place of residence, or lawful occupation in the county or city in which he shall be arrested, shall be taken and deemed to be a tramp."   1 A DIGEST OF THE STATUTE LAW OF THE STATE OF PENNSYLVANIA FROM THE YEAR 1700 TO 1894, 541 (Frank F. Brightly, 12th ed. 1894).

34a

329, § 3.   Although these regulations are not felon-in-possession laws, they echo the impetus of the Founding-era laws—a desire to stop firearms from being possessed or carried by those who cannot be trusted with them.

But presumptions aren't rules—they can be rebutted.   And so it may be that an individual subject to § 922(g)(1) would not, if armed, plausibly pose a threat to the orderly functioning of society.   Here, the Government has not carried its burden of proving that Range poses such a threat.   Hence, he may not be constitutionally disarmed on the record presented.

Range committed a small-time offense.   He did so with a pen to receive food stamps for his family.   There is nothing that suggests he is a threat to society.   He therefore stands apart from most other individuals subject to § 922(g)(1) whom we fear much like early Americans feared loyalists or Reconstruction-era citizens feared armed tramps.   I therefore concur because there is no historical basis for disarming him.

I close with the observation that the Supreme Court will have to square its history-driven test with its concurrent view that felon gun restrictions are presumptively lawful.   Scholars have scrambled to find historical roots for that presumption.   *See, e.g.*, Carlton F.W. Larson, *Four Exceptions in Search of a Theory:*  District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1386 (2008) (originalist analysis "yield[s] partial and incomplete answers" for why the measures *Heller* cited as presumptively lawful enjoy that status).   Others conclude that a historical basis only exists for disarming violent felons, *see, e.g.*, Joseph G.S. Greenlee, *The Historical Justification for Prohib-*

35a

*iting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020), who represent but a small fraction of the felon population, thus leaving out, for example, those who leak national security information, disrupt markets with their fraud, and possess child porn. *See* Brian A. Reaves, U.S. Dep't of Justice, Bureau of Justice Statistics, State Violent Felons in Large Urban Counties, at 1 (2006) ("From 1990 to 2002, 18% of felony convictions in the 75 largest counties were for violent offenses.").

This opinion is one attempt to offer a historical justification for § 922(g)(1), recognizing that history offers no precise analogue. And if that proves unsatisfying to the Court, it may do away with the presumption that disarming felons is lawful. I hope it does not do so. Not just because arming those who pose a threat to the orderly functioning of society will lead to more deaths, but because it would be a dangerous precedent. It is incongruous to believe history displaces means-ends balancing for the Second Amendment only. The Court's approach here will affect our ability to pass any rights-burdening law—whether the right be protected by the First, Second, Fourth, or Sixth Amendment—that lacks a neat historical basis. I trust it will fulfill its promise that *Bruen* imposes no "regulatory straightjacket," 142 S. Ct. at 2133, and permit § 922(g)(1) to apply to those who threaten the orderly functioning of civil society.

36a

SHWARTZ, *Circuit Judge*, dissenting, joined by RE-
STREPO, *Circuit Judge*.

Today, the Majority of our Court has decided that an
individual convicted of fraud cannot be barred from pos-
sessing a firearm. While my colleagues state that their
opinion is narrow, the analytical framework they have
applied to reach their conclusion renders most, if not all,
felon bans unconstitutional. Because the Supreme
Court has made clear that such bans are presumptively
lawful, and there is a historical basis for such bans, I re-
spectfully dissent.[1]

In New York State Rifle & Pistol Ass'n, Inc. v. Bruen,
142 S. Ct. 2111 (2022), the Supreme Court set forth a
history-based framework for deciding whether a fire-
arm regulation is constitutional under the Second
Amendment. Courts must now examine whether the
"regulation [being reviewed] is part of the historical tra-
dition that delimits the outer boundaries of the right to
keep and bear arms." Id. at 2127. To make this de-
termination, a court must decide whether the challenger
or conduct at issue is protected by the Second Amend-
ment and, if so, whether the Government has presented
sufficient historical analogues to justify the restriction.
See id. at 2129-30.

The Majority's analysis is inconsistent with the Su-
preme Court's jurisprudence and has far-reaching con-
sequences. First, the Majority downplays the Su-

---

[1] While I agree with Judge Krause's excellent and comprehensive
review of the history as well as her incisive critique of the Majority
opinion, I write separately to emphasize both that the history sup-
ports banning felons from possessing firearms and that the Majority
opinion is far from narrow.

37a

preme Court's consistent admonishment that felon bans are "longstanding" and "presumptively lawful." District of Columbia v. Heller, 554 U.S. 570, 626-27 & n.26 (2008); McDonald v. City of Chicago, 561 U.S. 742, 786 (2010). In Heller and McDonald, the Supreme Court stated that felon bans are consistent with our historical tradition. Heller, 554 U.S. at 626-27; McDonald, 561 U.S. at 786. More recently, a majority of the Bruen Court reiterated that felon bans are presumptively lawful, and notably did so in the very case that explicitly requires courts to find historical support for every firearm regulation. Bruen, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that Bruen did not "disturb" anything the Court said in Heller or McDonald); id. at 2162 (Kavanaugh, J., concurring, joined by Roberts, J.) ("Nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons." (quoting Heller, 554 U.S. at 626)); id. at 2189 (Breyer, J., dissenting, joined by Sotomayor, J., & Kagan, J.) ("I understand the Court's opinion today to cast no doubt on . . . Heller's holding [regarding longstanding prohibitions.]"). These statements show that felon bans have historical roots.[2] See United States v. Jackson, No. 22-2870, 2023 WL 3769242, --- F. 4th ----, at *4, *7 n.3 (8th Cir. June 2, 2023) (upholding the constitutionality of the federal felon ban as applied to a non-violent drug offender based, in part, on the Supreme Court's statements).

---

[2] The Supreme Court also recognized that other firearm regulations are "longstanding" and "presumptively lawful." Heller, 554 U.S. at 626-27. Thus, the Majority's willingness to devalue the Supreme Court's observations may have consequences on regulations beyond the status-based ban at issue here.

38a

Second, the Majority incorrectly discounts the importance of the Supreme Court's emphasis on law-abidingness as a limitation on the Second Amendment right.  While the Majority dismisses this language as "dicta," Maj. Op. at 11, the <u>Bruen</u> Court's use of the phrase fourteen times highlights the significance that this criterion played in its decision, <u>Bruen</u>, 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 n.9, 2150, 2156; <u>see also</u> <u>Jackson</u>, 2023 WL 3769242, at *6 (noting <u>Bruen</u>'s repeated statements about a law-abider's right to possess arms).  Indeed, the <u>Bruen</u> court approved of certain gun regulations that included criminal background checks.  <u>Bruen</u>, 142 S. Ct. at 2138 n.9.  While the Majority says that the phrase "law abiding" is "expansive" and "vague," Maj. Op. at 13, there is no question that one who has a felony or felony-equivalent conviction is not law abiding.  Thus, the Supreme Court's jurisprudence tells us that the right to bear arms is limited to law abiders, and that felon bans are presumptively lawful.

Third, the Majority acknowledges but then disregards important aspects of <u>Bruen</u>.  The <u>Bruen</u> Court emphasized that its test should not be a "regulatory straightjacket [sic]" and that courts should look for a "historical analogue" to the challenged regulation, not a "historical twin."  142 S. Ct. at 2133.  Despite these instructions, the Majority demands a historical twin by requiring the Government to identify a historical crime, including its punishment, that mirrors Bryan Range's conviction.  At the founding, the fraud-based crime of the type Range committed was considered a capital offense, which obviously carries with it the loss of all pos-

39a

sessory rights.[3]  Folajtar v. Att'y Gen., 980 F.3d 897,
904-05 (3d Cir. 2020) (collecting authorities).   The Ma-
jority recognizes that this severe punishment "reflects
the founding generation's judgment about the gravity
of those offenses" and the need for harsh punishment.
Maj. Op. at 19.   It then, however, rejects this historical
data by stressing that today, a far less severe punish-
ment results, thereby rendering Range's offense not
"relevantly similar" to founding-era fraud offenses.
Id. at 19-20 (quoting Bruen, 142 S. Ct. at 2132).   The
problem with this analysis is that it focuses on present-
day punishments to determine whether a founding-era
crime is a historical analogue.   Like it or not, Bruen
mandates that we look at the law as it existed at the
founding, and so the fact that the law has changed, or in
this case, the punishment has changed, is irrelevant.
Put differently, Bruen requires us to don blinders and
look at only whether there is a historical analogue for
the firearm regulation at issue.   When we do so, history
demonstrates that fraudsters could lose their life, and
hence their firearms rights.

   The Majority also rejects the Government's analogy
to now unconstitutional status-based bans on Native
Americans, Blacks, Catholics, Quakers, loyalists, and
others because Range is not "part of a similar group to-
day."   Maj. Op. at 19.   Whether Range is a member of
one of these groups is irrelevant.   Rather, under
Bruen, the relevant inquiry is why a given regulation,

---

   [3]  Even some noncapital offenses resulted in life imprisonment and
the forfeiture of the offender's entire estate, which contemplates the
loss of all property, including firearms.   Act of Apr. 18, 1786, 2 Laws
of the State of New York 253, 260-61 (1886); Act of Nov. 27, 1700, 2
Statutes at Large of Pennsylvania 12 (Wm. Stanley Ray ed., 1904).

40a

such as a ban based on one's status, was enacted and how that regulation was implemented. Bruen, 142 S. Ct. at 2133. No matter how repugnant and unlawful these bans are under contemporary standards, the founders categorically disarmed the members of these groups because the founders viewed them as disloyal to the sovereign. Range v. Att'y Gen., 53 F.4th 262, 273-82 (3d Cir. 2022) (per curiam) (collecting authorities), vacated by 56 F.4th 992 (3d Cir. 2023); see also Jackson, 2023 WL 3769242, at *5 (observing that the founding-era categorical prohibitions are relevant "in determining the historical understanding of the right to keep and bear arms"). The felon designation similarly serves as a proxy for disloyalty and disrespect for the sovereign and its laws. Such categorization is especially applicable here, where Range's felony involved stealing from the government, a crime that directly undermines the sovereign. Therefore, the trust and loyalty reasons underlying the status-based bans imposed at the founding show that the bans are an appropriate historical analogue for the present-day prohibition on felon possession.[4]

---

[4] The Majority also gives no weight to various founding-era statutory violations that led to disarmament, see, e.g., Act of Dec. 21, 1771, ch. 540, N.J. Laws 343-344; Act of Apr. 20, 1745, ch. 3, N.C. Laws 69-70; see also Range, 53 F.4th at 281 (collecting additional authorities), because it contends that offenders were only disarmed of the firearm they possessed at the time of the violation and not barred from possessing firearms in the future, Maj. Op. at 19-20. From this, the Majority asserts crime-based bans were not permanent. Id. Whether true or not, the federal felon ban under 18 U.S.C. § 922(g) is not permanent. Congress specifically identified ways to avoid the ban, such as by securing an expungement, pardon, or having one's civil rights restored. 18 U.S.C. § 921(a)(20). Additionally, although it is currently unfunded, Congress enacted 18 U.S.C. § 925(c), which allows the Bureau of Alcohol, Tobacco, and

41a

Finally, the Majority's approach will have far-reaching consequences.  Although the Majority states that its holding is "narrow" because it is limited to Range's individual circumstances, Maj. Op. at 22, the only individual circumstance the Majority identifies is that the penalty Range faced differs from the penalty imposed at the founding.  As discussed above, that fact is irrelevant under <u>Bruen</u>.  Thus, the ruling is not cabined in any way and, in fact, rejects all historical support for disarming any felon.[5]  As a result, the Majority's analytical framework leads to only one conclusion:   there will be no, or virtually no, felony or felony-equivalent crime that will bar an individual from possessing a firearm.[6]  This

---

Firearms to restore an individual's right to possess a firearm upon consideration of the individual's personal circumstances.  <u>See</u> <u>Logan v. United States</u>, 552 U.S. 23, 28 n.1 (2007).

[5]  The Majority also says that it need not decide whether disarmament of violent criminals is supported by the historical evidence, Maj. Op. at 18 n.9, but its view of the history, its requirement of a historical twin, and its explanation that federal felon prohibitions enacted in 1938 and 1961 are too recent to be longstanding, necessarily mean that the Majority would conclude that bans on violent felons cannot be justified.

Moreover, the framework outlined in Judge Porter's concurrence would mean that the federal government would be prohibited from enacting any gun regulation.   In fact, Judge Porter's requirement that a current federal regulation be supported by a federally enacted analog in existence at the founding would call into question the federal government's ability to regulate activities that did not then exist.

[6]  Moreover, and significantly, the Majority provides no way for a felon to know whether his crime of conviction prevents him from possessing a firearm.  This, however, is not entirely the Majority's fault.  <u>Bruen</u> requires a review of our nation's history during a finite time period to determine whether a felon's particular crime of conviction constitutionally permits disarmament—an inquiry that,

42a

is a broad ruling and, to me, is contrary to both the sentiments of the Supreme Court and our history.

I therefore respectfully dissent.

---

under the Majority's test, will vary from crime to crime.    Thus, the concerns about due process and notice discussed in Judge Fuentes's dissent in <u>Binderup v. Attorney General</u>, 836 F.3d 336, 409-11 (3d Cir. 2016) (Fuentes, J., dissenting in part and concurring in part), are even more pronounced after <u>Bruen</u>.

43a

KRAUSE, *Circuit Judge*, dissenting.

As Americans, we hold dear the values of individual liberty and freedom from tyranny that galvanized our Founders and are enshrined in the Constitution. So it is not surprising that we often look to history and tradition to inform our constitutional interpretation.[1] But as Alexis de Tocqueville rightly observed of "the philosophical method of the Americans," we "accept tradition only as a means of information, and existing facts only as a lesson to be used in . . . doing better."[2] Thus, when we draw on parallels with the past to assess what is permissible in the present, we typically look to match history in principle, not with precision.

When it comes to permissible regulation of the right to bear arms, it might make good sense to hew precisely to history and tradition in a world where "arms" still meant muskets and flintlock pistols,[3] and where com-

---

[1] In the past few years, the Supreme Court has adopted a "history and tradition" test in a variety of constitutional contexts, breaking from its own history where its precedent diverged from that interpretive method. *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (interpreting the Due Process Clause and overruling *Roe v. Wade*, 410 U.S. 113 (1973)); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) (interpreting the Free Exercise Clause and overruling *Lemon v. Kurtzman*, 403 U.S. 602 (1971)); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) (explaining Article III standing); *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067 (2019) (interpreting the Establishment Clause).

[2] 2 Alexis de Tocqueville, *Democracy in America* 1 (Francis Bowen ed., Henry Reeve trans., 3d ed. 1863).

[3] *See* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. (forthcoming 2023) (manuscript at 47), https://ssrn.com/abstract=4408228 ("Americans in 1791 generally owned muzzleloading flintlocks, liable to misfire

44a

munities were still so small and "close-knit" that "[e]veryone knew everyone else," "word-of-mouth spread quickly," and the population "knew and agreed on what acts were right and wrong, which ones were permitted and forbidden."[4]   But that is not the America of today.   In modern times, arms include assault rifles,[5] high-capacity magazines, and semi-automatic handguns; our population of more than 330 million is mobile, diverse, and, as to social mores, deeply divided; and, tragically, brutal gun deaths and horrific mass shootings—exceeding 260 in just the past five months—are a daily occurrence in our schools, our streets, and our places of worship.[6]   In today's world, the responsibilities that

---

and incapable of firing multiple shots.   Guns, thus, generally were not kept or carried loaded in 1791[.]"   (quotation omitted)); Akhil Reed Amar, *Second Thoughts*, 65 Law & Contemp. Probs. 103, 107 (2002) ("At the Founding  . . .  [a] person often had to get close to you to kill you, and, in getting close, he typically rendered himself vulnerable to counterattack.   Reloading took time, and thus one person could not ordinarily kill dozens in seconds.").

[4]  Stephanos Bibas, *The Machinery of Criminal Justice* 2 (2012).

[5]  *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment:   Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 240 (2020) ("[A]ssault weapons play a disproportionately large role in three types of criminal activity: mass shootings, police killings, and gang activity.").

[6]  *See Statement from President Joe Biden on the Shooting in Allen, Texas*, White House (May 7, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/07/statement-from-president-joe-biden-on-the-shooting-in-allen-texas/;   *A Partial List of U.S. Mass Shootings in 2023*, N.Y. Times (May 30, 2023), https://www.ny-times.com/article/mass-shootings-2023.html;   *Gun Violence in America*, Everytown for Gun Safety (Feb. 13, 2023), https://everytownresearch.org/report/gun-violence-in-america/.

45a

should accompany gun ownership are flouted by those who lack respect for the law.

As debates rage on about the causes of this crisis and the solutions, the people's elected representatives bear the heavy responsibility of enacting legislation that preserves the right to armed self-defense while ensuring public safety.   Although they face evolving challenges in pursuing those twin aims, striking that delicate balance has long been a core function of the legislature in our system of separated powers,[7] and legislatures' authority to disarm those who cannot be trusted to follow the laws has long been crucial to that endeavor.

Section 922(g)(1) of the U.S. Code, Title 18, embodies this delicate equilibrium and comports with traditional principles that have guided centuries of legislative judgments as to who can possess firearms.   As Justice Alito has observed, § 922(g) "is no minor provision.   It probably does more to combat gun violence than any other federal law."[8]   And as a "longstanding"[9] and widely ac-

---

[7]  *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 715 (2007) ("Achievement of that balance requires highly complex socio-economic calculations regarding what kinds of weapons ought to be possessed by individuals and how to limit access to them by those deemed untrustworthy or dangerous. Such complicated multi-factor judgments require trade-offs that courts are not institutionally equipped to make.   Legislatures, by contrast, are structured to make precisely those kinds of determinations."); *see also* Lon L. Fuller, *The Forms and Limits of Adjudication*, 92 Harv. L. Rev. 353, 371 (1978) (noting the "relative incapacity of adjudication to solve 'polycentric' problems").

[8]  *Rehaif v. United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting).

[9]  *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

46a

cepted aspect of our national gun culture,[10] the federal felon-possession ban—carefully crafted to respect the laws of the states—is the keystone of our national background check system,[11] and has repeatedly been characterized by the Supreme Court as "presumptively lawful."[12] Where, as here, the legislature has made a reasonable and considered judgment to disarm those who show disrespect for the law, it is not the place of unelected judges to substitute that judgment with their own.

Yet today's majority brushes aside these realities and the seismic effect of its ruling. It is telling that, although it describes itself as limited "to Range's situation,"[13] today's opinion is not designated non-precedential as appropriate for a unique individual case, but has precedential status, necessarily reaching beyond the particular facts presented. It is also telling that it tracks precisely the Fifth Circuit's deeply disturbing opinion in *United States v. Rahimi*, which, finding no precise historical analogue, struck down as unconstitutional the ban on gun possession by domestic abusers.[14] And in the process, the majority creates a circuit split with the Eighth Circuit's recent opinion in *United States v. Jack-*

---

[10] *See* Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1574 (2022) (explaining § 922(g)(1) is "the centerpiece of gun laws in the United States" and "the center of the gun-regulation universe").

[11] *See id.* at 1575 ("The felon prohibitor functions as the cornerstone of the federal background check system for firearm purchases[.]").

[12] *E.g.*, *Heller*, 554 U.S. at 627 n.26.

[13] Maj. Op. at 19.

[14] 61 F.4th 443 (5th Cir. 2023), *petition for cert. filed* (U.S. Mar. 21, 2023) (No. 22-915).

47a

*son*, which rejected the notion of "felony-by-felony litigation" and recognized that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons."[15]

In short, for all its assurances to the contrary and its lulling simplicity, the majority opinion commits our Court to a framework so indefinite as to be void for vagueness and with dire consequences for our case law and citizenry.    I therefore respectfully dissent.

I write here to clarify three points[16]:    First, the historical record demonstrates that, contrary to the majority opinion, legislatures have historically possessed the authority to disarm entire groups, like felons, whose conduct evinces disrespect for the rule of law.    Second, the doctrinal and practical ramifications of the majority's approach, which my colleagues do not even acknowledge, let alone address, are profound and pernicious.    Third, in order to hold § 922(g)(1) inapplicable to Range in a truly narrow opinion, my colleagues did not need to throw out the baby with the bath water; instead, they could have issued a declaratory judgment holding § 922(g)(1) unconstitutional as applied to the petitioner *currently* before the Court—in effect, prospectively restoring his firearm rights.    At least that approach would have been more faithful to history and consistent with the rule of law than the majority's sweeping, retroactive pronouncement and the calamity it portends.

---

[15]  No. 22-2870, 2023 WL 3769242, at *4, *7 (8th Cir. June 2, 2023).

[16]  I also share the doctrinal and historical concerns raised in Judge Shwartz's cogent dissent, with which I agree in full.

48a

## I. The Historical Validity of § 922(g)(1)

We begin our historical inquiry with the benefit of more than a decade of Supreme Court precedent that illuminates the Court's understanding of traditional firearm regulations. In *Bruen*, the majority characterized the holders of Second Amendment rights as "law-abiding" citizens fourteen times.[17] Delimiting the "unqualified command" of the Second Amendment to "law-abiding" individuals was not novel.[18] In holding "the right of the people"[19] protected by the Second Amendment was an "individual right,"[20] Justice Scalia's seminal opinion in *Heller* specified this meant "the right of law-abiding, responsible citizens" to keep and bear arms,[21] and therefore characterized "prohibitions on

---

[17] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156 (2022).

[18] *Id.* at 2130-31 (quotation omitted).

[19] *Heller*, 554 U.S. at 579. In the first part of its analysis, the majority defends its belief that convicted felons remain part of "the people," so their firearm possession is presumptively protected and the Government must prove its disarmament regulation comports with historical tradition. Maj. Op. at 11-15. Other jurists believe that historical tradition permits the disarmament of felons precisely because "the people" historically meant "law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2131 (quotation omitted). But that debate—unlike the test for what constitutes an adequate "historical analogue," *id.* at 2133 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021))—is largely academic. As then-Judge Barrett recognized, the "same body of evidence" can be used to illuminate who is part of the people or "the scope of the legislature's power," and either approach "yield[s] the same result." *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting).

[20] *Heller*, 554 U.S. at 592.

[21] *Id.* at 635.

49a

the possession of firearms by felons" as both "longstand-
ing" and "presumptively lawful."[22]

In *Bruen*, the Supreme Court clarified who qualifies
as a "law-abiding" citizen when it explained that, despite
the infirmity of New York's may-issue open-carry li-
censing regime, "nothing in our analysis should be inter-
preted to suggest the unconstitutionality of the 43
States' 'shall-issue' licensing regimes . . . [,] which
often require applicants to undergo a [criminal] back-
ground check" and "are designed to ensure only that
those bearing arms in the jurisdiction are, in fact, 'law-
abiding, responsible citizens.'"[23]

Thus, time and again, the Supreme Court has
acknowledged that the deep roots of felon-possession
bans in American history impart a presumption of law-
fulness to 18 U.S.C. § 922(g)(1). Yet my colleagues
persist in disputing it. They contend that, as a twenti-
eth-century enactment, § 922(g)(1) "falls well short of
'longstanding' for purposes of demarcating the scope of
a constitutional right."[24] But "longstanding" can mean
decades, not centuries,[25] when a practice has become an

---

[22] *Id.* at 626-27 & n.26; *see also McDonald v. City of Chicago*, 561
U.S. 742, 786 (2010) (plurality) ("repeat[ing] those assurances");
*Bruen* 142 S. Ct. at 2157 (Alito, J., concurring) (same), 2162 (Ka-
vanaugh, J., concurring) (same).

[23] 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). Those
background checks screen for both violent and non-violent of-
fenses. *See, e.g.*, Wash. Rev. Code Ann. § 9.41.070(1)(a); Colo.
Rev. Stat. Ann. § 18-12-203(1)(c); Kan. Stat. Ann. § 75-7c04(a)(2);
Miss. Code. Ann. § 45-9-101(2)(d); N.H. Rev. Stat. Ann.
§ 159:6(I)(a); N.C. Gen. Stat. Ann. § 14-415.12(b)(1).

[24] Maj. Op. at 17.

[25] *Am. Legion*, 139 S. Ct. at 2082.

50a

accepted part of "our Nation's public traditions,"[26] as the felon-possession ban has,[27] and, by virtue of that acceptance, it is entitled to a "strong presumption of constitutionality."[28] Moreover, *Bruen* observed that historical analogies must be more flexible when a contemporary regulation implicates "unprecedented societal concerns or dramatic technological changes[.]"[29] Section 922(g)(1) is such a regulation, as the lethality of today's weaponry, the ubiquity of gun violence, the size and anonymity of the population, and the extent of interstate travel were unknown at the Founding.[30]

As the Supreme Court has not performed an "exhaustive historical analysis" of the felon-possession ban, much less "the full scope of the Second Amendment,"[31] we must conduct that review to determine whether § 922(g)(1)'s application to felons, including Range, finds support in our national tradition. That analysis confirms it does.

---

[26] *Freedom from Religion Found., Inc. v. County of Lehigh*, 933 F.3d 275, 283 (3d Cir. 2019).

[27] *See* Stevenson, *supra* note 10, at 1574.

[28] *Am. Legion*, 139 S. Ct. at 2085.

[29] 142 S. Ct. at 2132 (quotation omitted). The Eighth Circuit likewise observed that common sense and flexibility are indispensable in assessing historical analogues because "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Jackson*, No. 22-2870, 2023 WL 3769242, at *6 (quoting *Bruen*, 142 S. Ct. at 2132).

[30] Even aside from these modern-day developments, however, the tradition of categorically disarming entire groups whom legislatures did not trust to obey the law dates back to at least the seventeenth century. *See infra* Section I.A.

[31] *Bruen*, 142 S. Ct. at 2128 (quotation omitted).

51a

For purposes of this inquiry, "not all history is created equal."[32]   As the right to keep and bear arms was a "*pre-existing* right," we must consider "English history dating from the late 1600s, along with American colonial views leading up to the founding."[33]   Post-ratification practices from the late eighteenth and early nineteenth centuries are also highly relevant, while later nineteenth century history is less informative.[34]   If we heed the Supreme Court's admonition to analogize to historical regulations, but not to require a "historical twin,"[35] these sources demonstrate the validity of § 922(g)(1) as applied in this case.

A.   England's Restoration and Glorious Revolution

During the late seventeenth century, the English government repeatedly disarmed individuals whose conduct indicated that they could not be trusted to abide by the sovereign and its dictates.

Following the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants.[36]   Of course, not all nonconformists were dangerous; to the contrary, many belonged to pacificist denominations like the Quakers.[37]

---

[32] *Id.* at 2136.

[33] *Id.* at 2127 (citing *Heller*, 554 U.S. at 595).

[34] *See id.* at 2136-37.

[35] *Id.* at 2133.

[36] *See* Joyce Lee Malcolm, *To Keep and Bear Arms:  The Origins of an Anglo-American Right* 45 (1994) (describing how Charles II "totally disarmed  . . .  religious dissenters").

[37] *See* Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition*, 10 Hastings Const. L.Q. 285, 304 n.117 (1983) ("Persons judged to be suspicious by the royal administration were those  . . .  who belonged to the Protestant

52a

However, they refused to participate in the Church of England, an institution headed by the King as a matter of English law.[38]   And nonconformists often refused to take mandatory oaths acknowledging the King's sovereign authority over matters of religion.[39]   As a result, Anglicans accused nonconformists of believing their faith exempted them from obedience to the law.[40]

Protestants had their rights restored after the Glorious Revolution of 1688 replaced the Catholic King James II with William of Orange and Mary, James's Protestant daughter.[41]   But even then, Parliament enacted the English Bill of Rights, which declared:   "Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and *as allowed by Law*."[42]   This "predecessor to our Second Amendment"[43] reveals that the legislature—Parliament—was

---

sects that refused to remain within the Church of England. The Quakers were prominent sufferers.").

[38]  *See Church of England*, BBC (June 30, 2011), https://www.bbc.co.uk/religion/religions/christianity/cofe/cofe_1.shtml   (describing "the Act of Supremacy" enacted during the reign of Henry VIII).

[39]  *See* Frederick B. Jonassen, "*So Help Me?*": *Religious Expression and Artifacts in the Oath of Office and the Courtroom Oath*, 12 Cardozo Pub. L., Pol'y & Ethics J. 303, 322 (2014) (describing Charles II's reinstation of the Oath of Supremacy); Caroline Robbins, *Selden's Pills: State Oaths in England, 1558-1714*, 35 Huntington Lib. Q. 303, 314-15 (1972) (discussing nonconformists' refusal to take such oaths).

[40]  *See* Christopher Haigh, *'Theological Wars': 'Socinians' v. 'Antinomians' in Restoration England*, 67 J. Ecclesiastical Hist. 325, 326, 334 (2016).

[41]  *See* Alice Ristroph, *The Second Amendment in a Carceral State*, 116 Nw. U. L. Rev. 203, 228 (2021).

[42]  1 W. & M., Sess. 2, ch. 2, § 7 (Eng. 1689) (emphasis added).

[43]  *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593).

53a

understood to have the authority and discretion to decide who was sufficiently law-abiding to keep and bear arms.[44]

In 1689, the pendulum of distrust swung the other way. Parliament enacted a statute prohibiting Catholics who refused to take an oath renouncing the tenets of their faith from owning firearms, except as necessary for self-defense.[45] As with nonconformists, this prohibition was not based on the notion that every single Catholic was dangerous. Rather, the categorical argument English Protestants made against Catholicism at the time was that Catholics' faith put the dictates of a "foreign power," namely the Vatican, before English law.[46] Official Anglican doctrine—regularly preached throughout England—warned that the Pope taught "that they that are under him are free from all burdens and charges of the commonwealth, and obedience toward their prince[.]"[47] Accordingly, the disarmament of Catholics in 1689 reflects Protestant fears that Catholics could not be trusted to obey the law.

---

[44] *Cf.* Lois G. Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 Chi.-Kent L. Rev. 27, 47-48 (2000) (explaining how the English Bill of Rights preserved Parliament's authority to limit who could bear arms).

[45] An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (Eng. 1688); *see* Malcolm, *supra* note 36, at 123.

[46] *See* Diego Lucci, *John Locke on Atheism, Catholicism, Antinomianism, and Deism*, 20 Etica & Politica/Ethics & Pol. 201, 228-29 (2018).

[47] *An Exhortation Concerning Good Order, and Obedience to Rulers and Magistrates*, *in* Sermons or Homilies Appointed to Be Read in Churches in the Time of Queen Elizabeth of Famous Memory 114, 125 (new ed., Gilbert & Rivington 1839).

54a

That restriction could be lifted only prospectively and on an individual basis. That is, Parliament permitted Catholics who "repeated and subscribed" to the necessary oath before "any two or more Justices of the Peace" to resume keeping arms.[48] Disavowal of religious tenets hardly demonstrated that the swearing individual no longer had the capacity to commit violence; rather, the oath was a gesture of allegiance to the English government and an assurance of conformity to its laws. The status-based disarmament of Catholics thus again evinces the "historical understanding"[49] that legislatures could categorically disarm a group they viewed as unwilling to obey the law.

B.   Colonial America

The English notion that the government could disarm those not considered law-abiding traveled to the American colonies. Although some of the earliest firearm laws in colonial America forbid Native Americans and Black persons from owning guns,[50] the colonies also repeatedly disarmed full-fledged members of the political community as it then existed—*i.e.*, free, Christian,

---

[48] 1 W. & M., Sess. 1, ch. 15 (Eng. 1688).

[49] *Bruen*, 142 S. Ct. at 2131.

[50] *See* Clayton E. Cramer, *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie* 31, 43 (2006). Today, we emphatically reject these bigoted and unconstitutional laws, as well as their premise that one's race or religion correlates with disrespect for the law. I cite them here only to demonstrate the tradition of categorical, status-based disarmaments. *See* Blocher & Ruben, *supra* note 3, at 63 (urging courts examining historical disarmament laws that would violate the Constitution today to "ask[] *why* earlier generations regulated gun possession more generally, rather than just *who* they disarmed").

55a

white men—whom the authorities believed could not be trusted to obey the law. Those restrictions are telling because they were imposed at a time when, before the advent of the English Bill of Rights, the charters of Virginia and Massachusetts provided unprecedented protections for colonists' firearm rights.[51]

The Virginia Company carried out one of the earliest recorded disarmaments in the American colonies in 1624. For his "opprobrious" and "base and detracting speeches concerning the Governor," the Virginia Council ordered Richard Barnes "disarmed" and "banished" from Jamestown.[52] By disrespecting the colonial authorities, Barnes demonstrated that he could no longer be trusted as a law-abiding member of the community and thus forfeited his ability to keep arms.

During the late 1630s, a Boston preacher named Anne Hutchinson challenged the Massachusetts Bay government's authority over spiritual matters by advocating for direct, personal relationships with the divine.[53] Governor John Winthrop accused Hutchinson and her followers of being Antinomians—those who viewed their salvation as exempting them from the law—and banished her.[54] The colonial government also disarmed at least fifty-eight of Hutchinson's sup-

[51] *See* Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022).

[52] David Thomas Konig, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982).

[53] *See* Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644 (1937).

[54] *Id.* at 648; Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978).

56a

porters, not because those supporters had demonstrated a propensity for violence, but rather "to embarrass the offenders" who were forced to personally deliver their arms to the authorities in an act of public submission.[55]    The Massachusetts authorities therefore disarmed Hutchinson's supporters to shame those colonists because the authorities concluded their conduct evinced a willingness to disobey the law.[56]    Again, restoration of that right was available, but only prospectively, for individuals who affirmatively sought relief: Hutchinson's followers who renounced her teachings and confessed their sins to the authorities "were welcomed back into the community and able to retain their arms," as they had shown that they could once again be trusted to abide by the law.[57]

Like the Stuart monarchs in England, the Anglican colony of Virginia disarmed nonconformist Protestants in the 1640s due to their rejection of the King's sovereign power over religion.    When a group of nonconformist Puritans from Massachusetts resettled in southeastern Virginia,[58] Virginia Governor William Berkeley

---

[55] James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988).

[56] *Cf.* John Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017) (describing other shaming punishments used at the time, including scarlet letters).

[57] Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).

[58] Charles Campbell, *History of the Colony and Ancient Dominion* of Virginia 211 (1860).

57a

"acted quickly to silence the Puritan[s]."[59]    His concern with any "[o]pposition to the king"[60] led Governor Berkeley to disarm the Puritans before banishing them from the colony.[61]

After the Glorious Revolution, the American colonies also followed England in disarming their Catholic residents.    Just three years after designating Anglicanism as the colony's official religion,[62] Governor Benjamin Fletcher of New York disarmed Catholic colonists in 1696.[63]    The colonies redoubled their disarmament of Catholics during the Seven Years' War of 1756-1763.[64] Maryland, for example, though founded as a haven for persecuted English Catholics,[65] confiscated firearms from its Catholic residents during the war.[66]    Notably, that decision was not in response to violence; indeed, the colony's governor at the time, Horatio Sharpe, observed that "the Papists behave themselves peaceably and as

---

[59]  Kevin Butterfield, The Puritan Experiment in Virginia, 1607-1650, at 21 (June 1999) (M.A. thesis, College of William and Mary) (on file with William and Mary Libraries).

[60]  *Id.*

[61]  Campbell, *supra* note 58, at 212.

[62]  *See* George J. Lankevich, *New York City:    A Short History* 30 (2002).

[63]  *See* Shona Helen Johnston, Papists in a Protestant World:    The Catholic Anglo-Atlantic in the Seventeenth Century 219-20 (May 11, 2011) (Ph.D. dissertation, Georgetown University) (on file with the Georgetown University Library).

[64]  *See* Greenlee, *supra* note 57, at 263.

[65]  *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1424 (1990).

[66]  *See* Greenlee, *supra* note 57, at 263; Johnson et al., *supra* note 51, at 197.

58a

good subjects."[67]    Neighboring Virginia likewise disarmed Catholics, but allowed those who demonstrated their willingness to obey the law by swearing an oath of loyalty to the King to retain their weapons.[68]    The colonies therefore continued the English practice of disarming Catholics based on their perceived unwillingness to adhere to the King's sovereign dictates.

Catholics were not the only group of colonists disarmed during the Seven Years' War.    New Jersey confiscated firearms from Moravians, a group of nonconformist Protestants from modern-day Germany.[69]    Like the Quakers, Moravians were—as they are today—committed pacifists who owned weapons for hunting instead of fighting.[70]    Regardless, New Jersey Governor Jonathan Belcher deemed their nonconformist views sufficient evidence that they could not be trusted to obey royal authority, so he ordered their disarmament.[71]

C.    Revolutionary War

As the colonies became independent states, legislatures continued to disarm individuals whose status indicated that they could not be trusted to obey the law. John Locke—a philosopher who profoundly influenced the American revolutionaries[72]—argued that the replace-

---

[67]    Elihu S. Riley, *A History of the General Assembly of Maryland* 224 (1912) (quoting a July 9, 1755 letter from Governor Sharpe).

[68]    *See* Johnson et al., *supra* note 51, at 198.

[69]    *See id.*

[70]    *See id.*

[71]    *See id.* (discussing Governor Belcher's view that the Moravians were "Snakes in the Grass and Enemies of King George").

[72]    *See* Thad W. Tate, *The Social Contract in America, 1774-1787: Revolutionary Theory as a Conservative Instrument*, 22 Wm. &

59a

ment of individual judgments of what behavior is acceptable with communal norms is an essential characteristic of the social contract.[73]   Members of a social compact, he explained, therefore have a civic obligation to comply with communal judgments regarding proper behavior.[74]

Drawing on Locke, state legislatures conditioned their citizens' ability to keep arms on compliance with that civic obligation, and several states enacted statutes disarming all those who refused to recognize the sovereignty of the new nation.[75]   In Connecticut, for instance, as tensions with England rose, colonists denounced loyalists' dereliction of their duty to the civic community.   The inhabitants of Coventry passed a resolution in 1774 stating loyalists were "unworthy of that friendship and esteem which constitutes the bond of social happiness, and ought to be treated with contempt

---

Mary Q. 375, 376 (1965); *see also Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting) (observing "John Locke [was] one of the thinkers who most influenced the framers").

[73] *See* John Locke, *Two Treatises of Government* § 163 (Thomas I. Cook ed., Hafner Press 1947) (reasoning "there only is political society where every one of the members hath quitted his natural power [to judge transgressions and] resigned it up into the hands of the community").

[74] Locke grounded that duty in the consent of those within a political society; however, he argued that mere presence in a territory constitutes tacit consent to the laws of the reigning sovereign. *See id.* § 119.

[75] *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America:   The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 158 (2007).

60a

and total neglect."[76]   "Committees of Inspection" formed across Connecticut and published the names and addresses of suspected loyalists in local newspapers as "persons held up to the public view as enemies to their country." [77]    Concerns that loyalists could not be trusted to uphold their civic duties as members of a new state culminated in a 1775 statute that forbid anyone who defamed resolutions of the Continental Congress from keeping arms, voting, or serving as a public official.[78]

Virginia disarmed those viewed as unwilling to abide by the newly sovereign state's legal norms.[79]   Virginia's loyalty oath statute disarmed "all free born male inhabitants of this state, above the age of sixteen years, except imported servants during the time of their service" who refused to swear their "allegiance and fidelity" to the state.[80]   And conversely, it allowed for prospective restoration of rights upon the taking of that oath.[81]

Pennsylvania also disarmed entire groups whose status suggested they could not be trusted to abide by the

---

[76] G.A. Gilbert, *The Connecticut Loyalists*, 4 Am. Hist. Rev. 273, 280 (1899) (describing this resolution as "a fair sample of most of the others passed at this time").

[77] *Id.* at 280-81.

[78] *See id.* at 282.

[79] An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurance of Allegiance to the Same, and for Other Purposes ch. III (1777), 9 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619 281, 281 (William W. Hening ed., 1821).

[80] *Id.*

[81] *Id.*

61a

law. In 1777, the legislature enacted a statute requiring all white male inhabitants above the age of eighteen to swear to "be faithful and bear true allegiance to the commonwealth of Pennsylvania as a free and independent state,"[82] and providing that those who failed to take the oath "shall be disarmed" by the local authorities.[83] That statute is especially illuminating because Pennsylvania's 1776 constitution protected the people's right to bear arms.[84] Yet the disarmament law deprived sizable numbers of pacifists of that right because oath-taking violated the religious convictions of Quakers, Moravians, Mennonites, and other groups.[85] Those groups were not disarmed because they were dangerous,[86] but rather because their refusal to swear allegiance demonstrated that they would not submit to communal judgments embodied in law when it conflicted with personal

---

[82] Act of June 13, 1777, § 1 (1777), 9 The Statutes at Large of Pennsylvania from 1652-1801 110, 111 (William Stanley Ray ed., 1903).

[83] *Id.* § 3, at 112-13.

[84] *See* Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 670-71 (2002).

[85] *See* Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51 (2006); *see also* Thomas C. McHugh, Moravian Opposition to the Pennsylvania Test Acts, 1777 to 1789, at 49-50 (Sept. 7, 1965) (M.A. thesis, Lehigh University) (on file with the Lehigh Preserve Institutional Repository).

[86] *See Heller*, 554 U.S. at 590 ("Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever. . . . "); Johnson et al., *supra* note 51, at 301 (noting that states disarmed "Quakers and other pacifists; although they were not fighters, they did own guns for hunting").

62a

conviction.[87]   Only those presumptively untrustworthy individuals who came forward and established that they were indeed law-abiding by swearing the loyalty oath before state authorities had their firearm rights restored.[88]

D.   Ratification Debates

The Founding generation reiterated the longstanding principle that legislatures could disarm non-law-abiding citizens during the deliberations over whether to ratify the Constitution.

Debates between the Federalists and Anti-Federalists in Pennsylvania "were among the most influential and widely distributed of any essays published during ratification."[89]   Those essays included "The Dissent of the Minority," a statement of the Anti-Federalist delegates' views[90] that proved "highly influential" for the Second Amendment.[91]   The Dissent of the Minority proposed an amendment stating:

---

[87] *See* Wedeking, *supra* note 85, at 51-52 (describing how Quakers were "penal[ized] for allegiance to their religious scruples over the new government").

[88] Act of June 13, 1777, § 3 (1777), 9 The Statutes at Large of Pennsylvania from 1652-1801 110, 112 (William Stanley Ray ed., 1903).

[89] Saul Cornell, *Commonplace or Anachronism:  The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 227 (1999).

[90] *See id.* at 232-33.

[91] *Heller*, 554 U.S. at 604; *see also* Amul R. Thapar & Joe Masterman, *Fidelity and Construction*, 129 Yale L.J. 774, 797 (2020) ("Although one might question why we should listen to the debate's 'losers,' the Anti-Federalist Papers are relevant for the same rea-

63a

[T]he people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals.[92]

While this amendment was not adopted, it is important because, read in the context of traditional Anglo-American firearm laws, it reflects the understanding of the Founding generation—particularly among those who favored enshrining the right to armed self-defense in the Constitution—that "crimes committed," whether dangerous or not, justified disarmament.

E.　Criminal Punishment

The penalties meted out for a variety of offenses between the seventeenth and nineteenth centuries also demonstrate the widespread acceptance of legislatures' authority to disarm felons.

At the Founding, a conviction for a serious crime resulted in the permanent loss of the offender's ability to keep and bear arms. Those who committed grave felonies—both violent and non-violent—were exe-

---

son that the Federalist Papers are: to quote Justice Scalia, 'their writings, like those of other intelligent and informed people of the time, display how the text of the Constitution was originally understood.' Plus, the Anti-Federalists did not exactly 'lose,' in the same way in which a party who settles a case but gets important concessions does not 'lose' the case." (quoting Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 38 (Amy Gutmann ed., 1997))).

[92] 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis added).

64a

cuted.[93]   *A fortiori*, the ubiquity of the death penalty[94] suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament.   Indeed, under English law, executed felons traditionally forfeited all their firearms, as well as the rest of their estate, to the government.[95]   That practice persisted in the American colonies and the Early Republic.[96]   Even some non-capital offenses triggered the permanent loss of an offender's estate, including any firearms.   For example, a 1786 New York statute punished those who counterfeited state bills of credit with life imprisonment and the for-

---

[93]  *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 904-05 (3d Cir. 2020).

[94]  *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring).

[95]  *See* 4 William Blackstone, *Commentaries* *97-98.

[96]  *See Respublica v. Doan*, 1 U.S. 86, 91 (Pa. 1784) ("Doan, besides the forfeiture of his estate, has forfeited his life.").   At common law, forfeiture also resulted in "corruption of the blood," which prevented the felon's heirs from inheriting or transmitting the offender's property.   Richard E. Finneran & Steven K. Luther, *Criminal Forfeiture and the Sixth Amendment:   The Role of the Jury at Common Law*, 35 Cardozo L. Rev. 1, 27 (2013).   In the Early Republic, several states limited the loss of one's property to the lifetime of the offender.   *See* 2 James Kent, *Commentaries on American Law* *387 (1826); *cf.* U.S. Const. art. III, § 3, cl. 2 ("The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture *except during the Life of the Person attainted*." (emphasis added)).   Estate forfeiture ultimately fell into disuse in the 1820s.   *See Com. v. Pennock*, 1817 WL 1789, at *1-2 (Pa. 1817); Will Tress, *Unintended Collateral Consequences:   Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 473 (2009).

65a

feiture of their entire estate.[97]   Again, this drastic punishment indicates that the Founding generation would not have considered the lesser punishment of disarmament beyond a legislature's authority.

Individuals who committed less serious crimes also lost their firearms on a temporary, if not permanent, basis.   Where state legislatures stipulated that certain offenses were not punishable by death or life imprisonment, but rather resulted in forfeiture,[98] the offender was stripped of his then-existing estate, including any

---

[97] Act of Apr. 18, 1786, 2 Laws of the State of New York 253, 260-61 (1886); *see also* Act of Nov. 27, 1700, 2 Statutes at Large of Pennsylvania 12 (Wm. Stanley Ray ed., 1904) (punishing arson with life imprisonment and estate forfeiture).

[98] *See, e.g.*, Act of Apr. 5, 1790, § 2 (1790), 13 Statutes at Large of Pennsylvania 511, 511-12 (Wm. Stanley Ray ed., 1908) (robbery, burglary, sodomy, buggery); Act of Jan. 4, 1787, § 9 (1787), 24 Colonial Records of North Carolina 787, 788 (Walter Clark ed., 1905) (filing a false inventory of property in connection with a procurement fraud investigation); An Act to Prevent Routs, Riots, and Tumultuous Assemblies, § 4 (1786), 3 Compendium and Digest of the Laws of Massachusetts 1132, 1134 (Thomas B. Wait ed., 1810) (rioting); Act of Nov. 26, 1779, § 2 (1779), 10 Statutes at Large of Pennsylvania 12, 15-16 (Wm. Stanley Ray ed., 1904) (counterfeiting); An Act for the Regulation of the Markets in the City of Philadelphia, and for Other Purposes Therein Mentioned, § 1 (1779), 9 Statutes at Large of Pennsylvania 387, 388-89 (Wm. Stanley Ray ed., 1904) (diverting food en route to Philadelphia or attempting to raise the price of food at the city's market three times); An Act for Establishing an Office for the Purpose of Borrowing Money for the Use of the Commonwealth, § 4 (1777), 9 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619, at 286, 287 (William W. Hening ed., 1821) (counterfeiting).

66a

firearms,[99] and only upon successfully serving of his sentence and reintegrating into society could he presumably repurchase arms.

Finally, colonial and state legislatures punished minor infractions with partial disarmaments by seizing firearms involved in those offenses. For example, individuals who hunted in certain prohibited areas had to forfeit any weapons used in the course of that violation.[100]

* * *

As this survey reflects, and as the Supreme Court observed in *Heller*, restrictions on the ability of felons to possess firearms are indeed "longstanding[.]"[101] Four centuries of Anglo-American history demonstrate that legislatures repeatedly exercised their discretion to impose "status-based restrictions" disarming entire "categories of persons," who were presumed, based on past

---

[99] *See, e.g.*, Act of Apr. 5, 1790, § 2 (1790), 13 Statutes at Large of Pennsylvania 511, 511-12 (Wm. Stanley Ray ed., 1908) (providing that the offender "shall forfeit to the commonwealth all . . . goods and chattels whereof he or she was seized or possessed at the time the crime was committed and at any time afterwards until conviction").

[100] *See* 1652 N.Y. Laws 138; Act of Apr. 20, ch. III (1745), 23 Acts of the North Carolina General Assembly 218, 219 (1805); 1771 N.J. Laws 19-20; An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin Cove Island, Otherwise Called Naushon Island, and on Nennemessett Island, and Several Small Islands Contiguous, Situated in the County of Dukes County § 2 (1790), 1 Private and Special Statutes of the Commonwealth of Massachusetts 258, 259 (Manning & Loring ed., 1805); 1832 Va. Acts 70; 1838 Md. Laws 291-92; 12 Del. Laws 365 (1863).

[101] 554 U.S. at 626.

67a

conduct, unwilling to obey the law.[102]    Legislatures did
so not because the individuals in these groups were con-
sidered dangerous, but because, based on their status,
they were deemed non-law-abiding subjects.[103]    The
particular groups varied dramatically over time, but the
Founding generation understood that felons were one
such group.

The length of disarmaments varied too, but the
Founding generation recognized that legislatures—in
their discretion—could impose permanent, temporary,
or indefinite bans that lasted until the individual affirm-
atively sought relief and made a showing of commitment
to abide by the law.    In that case, the showing was not
viewed as voiding the ban retroactively, from its incep-
tion; rather, it operated prospectively.    Only after the
individual had made the requisite showing to a govern-
ment official—and thus rebutted the presumption that
those with his status were not law-abiding—was the in-
dividual's right to possess firearms restored.

That is precisely how § 922(g)(1) functions, disarming
a group that has demonstrated disregard for the law[104]
and allowing for restoration of the right to keep arms
upon the requisite showing.[105]    Because that statutory
scheme is "consistent with this Nation's historical tradi-

---

[102] *Jackson*, No. 22-2870, 2023 WL 3769242, at *7.

[103] Even if dangerousness were "the traditional *sine qua non* for
dispossession, then history demonstrates that there is no require-
ment for an individualized determination of dangerousness as to
each person in a class of prohibited persons."    *Id.* at *6.

[104] *See* 18 U.S.C. § 922(g)(1).

[105] *See* 18 U.S.C. § 921(a)(20).

68a

tion of firearm regulation,"[106] it comports with the Second Amendment.

## II.   Consequences of the Majority Opinion

Instead of respecting legislatures' longstanding authority to disarm groups who pose a threat to the rule of law, the majority usurps that function and enacts its own policy.   And instead of heeding the Supreme Court's instruction to take § 922(g)(1) as "longstanding" and "lawful,"[107] the majority nullifies it with an insurmountably rigid view of historical analogues and an approach so standardless as to render it void for vagueness in any application.

My colleagues have adopted and prescribed a methodology by which courts must examine each historical practice in isolation and reject it if it deviates in any respect from the contemporary regulation:   Confronted with legislatures' regular practice at the Founding of imposing the far more severe penalty of death for even non-violent felonies, the majority responds that the permanent loss of *all* rights is not analogous to "the *particular* . . . punishment at issue—lifetime disarmament[.]"[108]   To the longstanding practice of forfeiture, which resulted in a permanent loss of firearms for those felons convicted of capital offenses or sentenced to life imprisonment, the majority avers that forfeiture is entirely distinguishable because other felons—those who committed lesser offenses and thus served temporary rather than life sentences—could repurchase arms

---

[106] *Bruen*, 142 S. Ct. at 2126.
[107] *Heller*, 554 U.S. at 626-27 & n.26.
[108] Maj. Op. at 19.

69a

upon their release.[109]   To evidence that legislatures repeatedly disarmed entire groups of people based on their distrusted status, the majority dismisses those laws as inconsistent with contemporary understandings of the First and Fourteenth Amendments.[110]   To the historical reality that disarmament was not limited to those considered violent and indeed extended to well-known pacifists like the Quakers, the majority decrees without elaboration that any analogy between § 922(g)(1) and those laws would be "far too broad."[111] Finally, to the notion that Congress can categorically disarm felons today, just as legislatures once disarmed loyalists, Catholics, and other groups, the majority falls back on its bottom line: *any* analogy will be unlike "Range and his individual circumstances."[112]

The Supreme Court in *Bruen* specifically admonished the judiciary not to place "a regulatory straightjacket" on our Government by requiring a "historical *twin*," and explained that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[113]   Yet, how else would one describe the kind of analogue the majority demands—a Founding-era stat-

---

[109]   *Id.* at 19-20.

[110]   *Id.* at 18-19.   Strikingly, several of my colleagues once asserted that these same laws justified disarming dangerous felons. *See Binderup v. Att'y Gen.*, 836 F.3d 336, 368-69 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part); *Folajtar*, 980 F.3d at 914-15 (Bibas, J., dissenting).   Today's majority provides no such assurance.   Maj. Op. at 18 n.9.

[111]   *Id.* at 19 (quoting *Bruen*, 142 S. Ct. at 2134).

[112]   *Id.*

[113]   *Bruen*, 142 S. Ct. at 2133.

70a

ute that imposed the "*particular*"[114] restriction for the same length of time on the same group of people as a modern law[115]—if not as a contemporary regulation's "dead ringer" and "historical twin"?[116]

While the majority opinion spurns this instruction from *Bruen* and the Eighth Circuit's conclusion that § 922(g)(1) is constitutional as applied to *any* felon,[117] it fully embraces the Fifth Circuit's reasoning in *United States v. Rahimi*.[118]   In that case, the Fifth Circuit held that 18 U.S.C. § 922(g)(8), which prohibits individuals subject to domestic abuse civil protective orders from possessing firearms, violates the Second Amendment.[119] After rejecting the Supreme Court's repeated references to "law-abiding citizens" as devolving too much discretion to the Government,[120] the Fifth Circuit addressed each of the Government's historical analogues in isolation and, paving the way for today's majority, concluded every one was distinguishable from § 922(g)(8):   Statutes disarming distrusted groups were inapt because legislatures believed those groups threatened social and political order generally, whereas domestic abusers threaten identifiable individuals;[121] criminal forfeiture laws seizing arms from those who terrorized the public were insufficient because domestic

---

[114] Maj. Op. at 19.

[115] *See id.*

[116] *Bruen*, 142 S. Ct. at 2133.

[117] *Jackson*, No. 22-2870, 2023 WL 3769242, at *4.

[118] 61 F.4th at 443.

[119] *Id.* at 461.

[120] *Id.* at 453.

[121] *Id.* at 457.

71a

abuse protective orders derive from civil proceedings.[122] Like my colleagues, the *Rahimi* Court concluded that *any* difference between a historical law and contemporary regulation defeats an otherwise-compelling analogy.

For all their quibbling, though, neither today's majority nor the Fifth Circuit explain why those differences suggest the Founding generation would have considered § 922(g) beyond the authority of a legislature. Furthermore, the methodology the majority adopts from *Rahimi* creates a one-way ratchet: My colleagues offer a detailed roadmap for rejecting historical analogues yet refuse to state when, if ever, a historical practice will justify a contemporary regulation.

By confining permissible firearm regulations to the precise measures employed at the Founding, the majority displaces a complex array of interlocking statutes that embody the considered judgments of elected representatives at the federal and state level. For example, in § 922(g)(1), Congress disarmed those who commit felonies or felony-equivalent misdemeanors, but specifically excluded particular offenses it deemed not sufficiently serious: "antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices[.]"[123] The majority ignores that judgment and rewrites the statute with its own expansive view of excludable offenses.

Section 922(g)(1) also disarms those who commit state felonies out of respect for the historic power of

---

[122] *Id.* at 458-59.

[123] 18 U.S.C. § 921(a)(20)(A).

72a

state legislatures to designate which offenses were considered sufficiently serious by the people of that state to be punished as felonies.    Underlying the majority's decision to exempt a felon-equivalent "like Range" from § 922(g)(1), however, is an unspoken premise antithetical to federalism and the separation of powers:    that federal judges know better than the people's elected representatives what offenses should qualify as serious to the people of that state.

In addition to eviscerating the federal disarmament statute, the vague test adopted by the majority impugns the constitutional application of every state statute that prohibits felons from possessing guns.    Those laws differ significantly across the forty-eight states that restrict offenders' firearm rights—including which offenses trigger restrictions as well as their duration—in keeping with each state's local circumstances and values.[124]    But, under the Supremacy Clause, the majority's test, indeterminant as it is, necessarily supplants those laws no less than it does § 922(g)(1).

Similarly, out of respect for federalism, Congress exempted from the federal felon-possession ban any offender whose conviction "has been expunged," who "has

---

[124] *See generally Fifty-State Comparison:    Loss and Restoration of Civil/Firearms Rights*, Restoration Rts. Project (Nov. 2022), https://ccresourcecenter.org/state-restoration-profiles/chart-1-loss-and-restoration-of-civil-rights-and-firearms-privileges-2/. None of these statutes appears to disarm individuals who commit pretextual offenses.    I note, however, that history suggests any pretextual disarmament law would violate the Second Amendment. *See* 1 William Blackstone, *Commentaries* app. *300 (St. George Tucker ed., Birch & Small 1803) (decrying how "[i]n England, the people have been disarmed, generally, under the specious pretext of preserving the game").

73a

been pardoned," or who has had his "civil rights re-
stored."[125]    In every single state, the governor or par-
don board is authorized to issue a pardon, automatically
restoring an offender's firearm rights.[126]    Thirty-six
states also offer additional gun rights restoration mech-
anisms[127]—from automatic restoration after a set term
of years,[128] to individualized judicial expungement pro-
ceedings.[129]    The divergent "state policy judgments"
codified in these statutes promote "the benefits of fed-
eralism:   experimentation, localism, and to some ex-
tent, decentralization"[130]—so much so that the Supreme
Court itself has acknowledged the significance of Con-
gress's decision "to defer to a State's dispensation re-
lieving an offender from disabling effects of a convic-
tion."[131]    Yet the majority annuls these mechanisms for
the restoration of gun rights by declaring that offenders
like Range can never be disarmed in the first place.

In place of legislatures' measured judgments, the
majority imposes a constitutional framework so stand-
ardless as to thwart the lawful application of 18 U.S.C.
§ 922(g)(1) to *any* offender.    Congress enacted a
bright-line rule distinguishing offenders who can pos-
sess firearms from those who cannot.    By looking to the

---

[125] 18 U.S.C. § 921(a)(20).

[126] *See Fifty-State Comparison:   Loss and Restoration of
Civil/Firearms Rights*, *supra* note 124.

[127] *See id.*

[128] *See, e.g.*, Mich. Comp. Laws § 750.224f.

[129] *See, e.g.*, Tenn. Code Ann. § 39-17-1307(c)(1)(C).

[130] D. Bowie Duncan, Note, *Dynamic Incorporation, Rights Res-
toration, and 18 U.S.C. § 922(g)(1)*, 15 N.Y.U. J.L. & Liberty 233,
274 (2021).

[131] *Logan v. United States*, 552 U.S. 23, 37 (2007).

74a

maximum punishment available for his offense, a felon or state misdemeanant can easily determine if he can possess a gun.[132]   The majority, however, replaces that straightforward test with an opaque inquiry—whether the offender is "like Range."[133]

So what exactly is this new test?   What specifically is it about Range that exempts him—and going forward, those "like [him]"—from § 922(g)(1)'s enforcement? Regrettably, that is left to conjecture.   My colleagues describe Range's individual circumstances in minute detail, appearing to attach significance to such specifics as his hourly wage, his marital status, the number of children he raised, his purported justification for his fraud, the amount he stole, his culpability relative to his wife who was not charged, his employment history, his largely law-abiding life post-conviction, his explanations for his post-conviction attempts to purchase a gun, the circumstances in which his wife then purchased it for him, his intended use of firearms to hunt deer in his spare time, and the timing of his discovery that he was subject to § 922(g)(1).[134]   The particulars are plentiful, but the majority never specifies, among these and other descriptors of Range's life pre- and post-conviction, the respects in which an offender must be "like Range" to preclude the application of § 922(g)(1).

If it is that Range's offense was not "violent," that standard is unworkable and leads to perverse results. Federal courts' prior attempts to define "violent felony," *e.g.*, for purposes of the Armed Career Criminal Act,

---

[132] *See* 18 U.S.C. § 921(a)(20).

[133] Maj. Op. at 22.

[134] *Id.* at 5-6.

75a

yielded "repeated attempts and repeated failures to craft a principled and objective standard [for that term,] confirm[ing] its hopeless indeterminacy."[135]    Accordingly, the Supreme Court in *Johnson v. United States* held that the "violent felony" provision "denie[d] fair notice to defendants and invite[d] arbitrary enforcement by judges," thus violating due process.[136]    So does the "like Range" test relegate us to the widely disparaged "categorical approach," excluding all offenses that lack an element of the "use of force"?[137]    Of what relevance is the conduct underlying a given crime?    Will courts be limited to considering *Shepard* documents?[138]    What about crimes that lack an element of force but are undeniably associated with violence, like drug trafficking, human trafficking, drunk driving, and treason?[139]

If it is Range's largely law-abiding life in the nearly 30 years since his conviction, that standard is even more confounding.    My colleagues hold that Range's disarmament was invalid *ab initio*, meaning he could have prevailed on a Second Amendment challenge to § 922(g)(1) had he raised one at the time of his conviction

---

[135] *Johnson v. United States*, 576 U.S. 591, 598 (2015).

[136] *Id.* at 597.

[137] *United States v. Scott*, 14 F.4th 190, 195 (3d Cir. 2021).

[138] Those documents include the "charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented."    *Shepard v. United States*, 544 U.S. 13, 16 (2005).

[139] As Range's counsel candidly conceded at argument, under a "violence" test, offenses like possession of child pornography, money laundering, and drunk driving would not support disarmament.    Oral Arg. at 19:51-20:20, 24:00-24:26.

76a

(as will myriad felons after today's decision).[140]  Yet judges are not soothsayers.  Post-conviction conduct would be relevant if my colleagues were holding narrowly that Range's firearm rights should be restored going forward.  But how can they possibly hold that he should not have lost them upon conviction, *based on post-conviction conduct*?

This retrospective mode of analysis defies not just logic, but also the Due Process Clause.  Due process guarantees that a "person of ordinary intelligence [must have] a reasonable opportunity to know what is prohibited, so he may act accordingly."[141]  Under the majority's "like Range" test, however, offenders cannot possibly know in advance of a court's retroactive declaration whether possessing a firearm post-conviction is a constitutional entitlement or a federal felony.  As interpreted today by the majority, § 922(g)(1) is rendered so vague as to be facially unconstitutional.

On the enforcement side, the majority opinion makes the statute's *mens rea* impossible to establish.  In *Rehaif*, the Supreme Court held that to convict a defendant under § 922(g) the Government must prove the defendant not only knew that he possessed a firearm, but also knew that "he had the relevant status when he possessed [the firearm.]"[142]  The Court then clarified in *Greer* that a *Rehaif* error is not a basis for relief under the plain-error standard unless the defendant can make

---

[140] *See* Maj. Op. at 4 ("[Range] remains among 'the people' protected by the Second Amendment.  And  . . .  the Government did not carry its burden of showing that our Nation's history and tradition of firearm regulation support disarming Range[.]").

[141] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

[142] *Rehaif*, 139 S. Ct. at 2194.

77a

a sufficient argument on appeal that, but for the error, he could have established he did not know he was a felon.[143] That would be a difficult argument to make, the Court observed, because "as common sense suggests, individuals who are convicted felons ordinarily know that they are convicted felons [for purposes of § 922(g)(1).]"[144]

But, today, the majority displaces *Rehaif*'s clear and ascertainable standard with an incoherent one: the Government must prove the defendant knew he was not "like Range" when he possessed firearms. And in lieu of *Greer*'s high threshold for plain-error relief, the majority hands defendants a ready-made argument for appeal: that they could not know at the time they possessed a firearm—indeed, at any time before a court made a "like Range" determination—whether their status was subject to or exempt from § 922(g)(1). In short, the floodgates the Supreme Court attempted to close on *Rehaif* errors in *Greer*, my colleagues throw wide open: Today's opinion will strain the federal courts with a deluge of *Rehaif* challenges,[145] compelling us to vacate

---

[143] *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021).

[144] *Id.* at 2095.

[145] As explained above, courts will struggle to apply the majority's "like Range" test, which apparently extends to offenders' post-conviction conduct. For example, how should a court rule when a felon committed a murder thirty years ago, but has since become deeply religious and a model prisoner? What about someone with Range's employment history and family ties who has amassed a lengthy rap sheet of nonviolent misdemeanors in the decades since his welfare fraud conviction? Or someone otherwise like Range who knew he was subject to § 922(g)(1) as understood before today, yet deliberately engaged his spouse as a straw

78a

countless § 922(g)(1) convictions on direct appeal and compelling our district court colleagues to dismiss countless indictments.

Today's decision will also undermine law enforcement in three critical respects.  First, it will cripple the FBI's National Instant Criminal Background Check System (NICS).  Currently, NICS includes over five million felony conviction records,[146] and that number continues to grow as additional agencies contribute records to the NICS database.[147]  Prior felony convictions are by far the most common reason individuals fail NICS background checks[148] —the very background checks the Supreme Court endorsed in *Bruen* as ensuring individuals bearing firearms are "law-abiding" citizens.[149]  Yet the majority's indeterminant and post-hoc test for which felons fall outside § 922(g)(1) and under what circumstances renders NICS a dead letter.

If the police receive a tip that an ex-offender is toting an assault rifle, it is no longer sufficient for probable cause to simply confirm a prior felony conviction in NICS.  How will officers—or prosecutors for that matter —know whether that felon is sufficiently "like Range" to justify his arrest as a felon-in-possession, or whether they are instead bringing liability on themselves for vi-

---

purchaser to circumvent that statute?  There is no reason for the federal judiciary to hurl itself into this morass.

[146] *Active Records in the NICS Indices*, FBI (Jan. 31, 2023), https://www.fbi.gov/file-repository/active_records_in_the_nics-indices.pdf/view.

[147] *See* Stevenson, *supra* note 10, at 1597.

[148] *Federal Denials*, FBI (Jan. 31, 2023), https://www.fbi.gov/file-repository/federal_denials.pdf/view.

[149] *See* 142 S. Ct. at 2138 n.9.

79a

olating the felon's civil rights?    Must they research the
suspect's post-conviction conduct?    Should they con-
sider relevant conduct underlying the original violation?
How could they possibly determine that conduct in the
case of guilty pleas entered decades earlier?

Second, without a functional background check sys-
tem, how will federal firearms licensees (FFLs) comply
with federal law?    FFLs who discover that a potential
customer was convicted of a felony will have no way of
knowing whether the individual's crime and post-conviction
conduct are sufficiently similar to Range's to preclude
the application of § 922(g)(1).[150]    Of particular concern,
any assessments based on the majority opinion's "vague
criteria are vulnerable to biases" along race, class, gen-
der, and other lines, resulting in disparities between
which groups retain gun rights and which do not.[151]

Third, until today, the prohibition on possessing a
firearm was a well-accepted "standard condition" of bail,

---

[150] The penalty for incorrectly concluding a felon can purchase a
weapon without an exhaustive inspection of the felon's crime, con-
duct, and personal circumstances will be stiff:    a single error will
result in the loss of the FFL's license, barring the FFL from the
industry.    *See Simpson v. Att'y Gen.*, 913 F.3d 110, 114 (3d Cir.
2019) (holding a single violation in which "the licensee knew of his
legal obligation and purposefully disregarded or was plainly indif-
ferent to the requirements" is grounds for revocation).

[151] Ryan T. Sakoda, *The Architecture of Discretion:  Implica-
tions of the Structure of Sanctions for Racial Disparities, Sever-
ity, and Net Widening*, 117 Nw. U. L. Rev. 1213, 1227 (2023); *cf.*
Joseph Blocher & Reva B. Siegel, *Race and Guns, Courts and De-
mocracy*, 135 Harv. L. Rev. F. 449, 449 (2022) (arguing "racial jus-
tice concerns [with firearm laws] should be addressed in demo-
cratic politics rather than in the federal courts").

80a

supervised release, probation, and parole.[152]    But under my colleagues' reasoning, the inclusion of that condition among state or federal conditions of release now appears to be unconstitutional as to any number of defendants, depending on whether the judge at the bail or sentencing hearing views them as "like Range."    That means disarmament on release will be anything but "standard," leaving scores of non-incarcerated criminal defendants armed and subjecting not just the public, but also probation and parole officers to significant risk of harm.

In sum, the majority opinion casts aside the admonitions that § 922(g)(1) is "longstanding,"[153] "presumptively lawful,"[154] and "does more to combat gun violence than any other federal law."[155]    Instead, it abandons judicial restraint, jettisons principles of federalism, unsettles countless indictments and convictions, debilitates law enforcement, and vitiates our background check system—all in the name of re-arming convicted felons. There is a narrower and less hazardous path they could have chosen.

III.    The Narrow Road Not Taken

My colleagues object that § 922(g)(1) can impose a "permanent[]," [156] "lifetime ban on firearm possession,"[157] but their retroactive holding—that the Government could not constitutionally disarm Range when he

---

[152] U.S.S.G. § 5D1.3(c)(10).

[153] *Heller*, 554 U.S. at 626.

[154] *Id.* at 627 n.26.

[155] *Rehaif*, 139 S. Ct. at 2201 (Alito, J., dissenting).

[156] Maj. Op. at 18 n.9.

[157] *Id.* at 20.

81a

was convicted—is far broader than necessary to address their concern. Had they heeded judicial restraint when granting Range relief, the majority would have issued a purely prospective declaratory judgment, restoring Range's gun rights going forward. That approach would have prevented the most grievous consequences of the majority's decision today. And should the Supreme Court agree with my colleagues that the statutory exclusions to § 922(g)(1) are constitutionally inadequate, that approach also offers an administrable alternative worthy of consideration. How could the majority have resolved this case narrowly?

First, the only question the Court had to answer is whether § 922(g)(1) is unconstitutional as applied to the individual petitioning the Court *today*, accounting for his present circumstances and potentially entitling him to bear arms on a forward-looking basis. After all, Range did not challenge the loss of his firearm rights at the time of his conviction or at any time until he initiated the underlying suit here, and all he now seeks is declaratory relief enabling him to purchase and possess firearms *in the future*. The majority, however, reaches out to answer a different question: whether Range's disarmament was *ever* consistent with the Second Amendment.[158] Needlessly invalidating Range's initial disarmament violates "the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity

---

[158] *See* Maj. Op. at 19 (asserting that the "punishment at issue—lifetime disarmament—is [not] rooted in our Nation's history and tradition"); *id.* at 22 (framing the issue presented as "the constitutionality of 18 U.S.C. § 922(g)(1) [] as applied to [Range] given his violation of 62 Pa. Stat. Ann. § 481(a)").

82a

of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."[159]

Second, providing prospective declaratory relief in this case and similar as-applied challenges would resolve my colleagues' permanency concern. I appreciate that their opposition to imposing a permanent ban or putting the onus on the offender to seek relief finds some historical support for certain lesser offenses. That is, the subset of felons who were not sentenced to death or lifetime imprisonment only forfeited their firearms temporarily and did not need to petition to regain their firearm rights; they could simply repurchase arms after completing their sentences. But times have changed. Gone are the days of "close-knit" communities in which "everyone knew everyone else,"[160] and with the extreme mobility and relative anonymity of today's society and the magnitude of harm that can be inflicted by a single assault rifle,[161] automatic restoration of the right to bear arms upon completion of a sentence would jeopardize public safety and the utility of background checks. In any event, it is not the case that legislatures historically imposed only bans that expired of their own accord: They sometimes exercised their authority—just as Congress did in § 922(g)(1)—to cate-

---

[159] *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 450 (2008) (quotations omitted).

[160] Bibas, *supra* note 4, at 1.

[161] *See* Terry Spencer, *Florida School Shooter's AR-15 Shown to His Jurors*, AP (July 25, 2022), https://apnews.com/article/education-florida-fort-lauderdale-parkland-school-shooting-60791bdf38785f4 94400c43b90a97c39 (describing the AR-15 rifle "used to murder 17 students and staff members . . . at Parkland's Marjory Stoneman Douglas High School").

83a

gorically disarm a group presumed, based on status, to be non-law-abiding and to place the burden on individuals in that group to petition for relief and prove, through oaths or similar gestures of allegiance, that they could be trusted to obey the law.[162]

Section 922(g)(1) is sufficiently analogous to that model to meet the history-and-tradition test, as it already allows felons to petition for relief by seeking an expungement, pardon, or restoration of rights under state law. True, Congress provided another avenue for relief in § 925(c) that it has not funded in recent years,[163] but § 921(a)(20) ensures the felon-possession ban fits comfortably in the history of our nation's traditional firearm regulations. And if those avenues are deemed inadequate, that purported infirmity would be cured by a prospective declaratory judgment finding that a convicted felon no longer poses a threat to the rule of law and therefore can once again possess firearms.

Third, such declaratory judgment proceedings would give effect to the purportedly rebuttable presumption to which the Supreme Court referred in describing felon-

---

[162] Historical examples include Parliament's disarmament of Catholics in 1689, Massachusetts's disarmament of Anne Hutchinson's followers, Virginia's disarmament of Catholics during the Seven Years' War, and the loyalty oath laws of Pennsylvania and Virginia during the Revolution. *See supra* notes 45-49, 53-57, 68, 82-88 and accompanying text.

[163] Section 925(c) permitted the Bureau of Alcohol, Tobacco, Firearms and Explosives to conduct individualized reviews and make an administrative determination that the applicant could keep arms prospectively, but that mechanism proved so costly for the country that it was disbanded and has not been funded since 1992. *See Logan*, 552 U.S. at 28 n.1; S. Rep. No. 102-353 (1992).

84a

possession bans as "presumptively lawful,"[164] as well as its admonition that the Government bears the burden at the outset to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation[.]"[165]   That is because once the Government establishes that an offender committed a felony, it has necessarily satisfied its burden consistent with the historical practice of disarming felons upon conviction. The burden at that point, like the taking of oaths or swearing of allegiance, would fall on the felon to rebut the ban's presumptive lawfulness by establishing he is presently a "law-abiding, responsible" citizen.[166]

Fourth, limiting relief in as-applied § 922(g)(1) challenges to prospective declaratory judgments would eliminate the intractable due process problems with the majority's approach.   Any felon who possessed a firearm without first securing a favorable declaratory judgment would remain subject to prosecution pursuant to § 922(g)(1), and those granted relief would have their

---

[164] *Heller*, 554 U.S. at 626-27 & n.26; *see McDonald*, 561 U.S. at 786; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *id.* at 2157 (Alito, J., concurring).   Like the Eighth Circuit, I believe the premise that the Supreme Court used the phrase "presumptively lawful" to establish "a presumption of constitutionality that could be rebutted on a case-by-case basis" is dubious.   *Jackson*, No. 22-2870, 2023 WL 3769242, at *7 n.2.   Rather, the Court most likely "termed the conclusion presumptive because the specific regulations were not at issue in *Heller*."   *Id.*

[165] *Bruen*, 142 S. Ct. at 2126.

[166] *Id.* at 2131.   This approach would not result in repetitive actions because a felon who brings an unsuccessful declaratory judgment suit must provide "newly discovered evidence that, with reasonable diligence, could not have been discovered" to prevail in a subsequent as-applied challenge to § 922(g)(1).   Fed. R. Civ. P. 60(b)(2).

85a

rights restored prospectively.  In contrast to the "like Range" test, that clear rule would provide felons with constitutionally adequate notice as to whether and when they regained their right to bear arms and thus would allow § 922(g)(1) to withstand void-for-vagueness challenges.  Prospective declaratory judgments likewise would avoid opening the floodgates to *mens rea* challenges to § 922(g)(1) prosecutions, and the high threshold *Greer* set for defendants to overturn § 922(g)(1) convictions would endure.[167]

Fifth, this use of declaratory judgments would respect both the separation of powers and federalism. Other than for felons who received favorable declaratory judgments, Congress's decision to disarm those who commit felonies or comparable state misdemeanors would remain intact.  Likewise, state statutes restricting the ability of felons to possess firearms would be generally enforceable, ensuring local communities' priorities continue to shape when felons are permitted to possess firearms under state law.  The states' rights-restoration regimes would also continue to perform an important function, serving as alternatives to federal declaratory judgments.

Finally, prospective relief would avoid the debilitating effect of today's decision on law enforcement, U.S. Attorney's Offices, and our background check system. Currently, those previously convicted of a felony can submit documentation to the FBI through a voluntary appeal file application, including "information regarding an expungement, restoration of firearm rights, pardon,

---

[167] *See* 141 S. Ct. at 2097.

86a

etc."[168]    Successful applicants receive a unique personal identification number to prevent future background check denials.[169]    A felon who secures a prospective declaratory judgment could simply submit that judgment to the FBI to prevent false positives on his background check when next purchasing firearms.    Thus, just as they do today, law enforcement and prosecutors could depend on NICS for data when deciding whom to charge with violating § 922(g)(1); courts could rely on existing jury instructions, the standard conditions of supervised release or parole, and the plain-error test set out in *Greer*; and firearm dealers could ascertain from a background check whether a convicted felon is entitled to purchase weapons.

The majority has taken a far more radical approach, creating a stark circuit split and holding § 922(g)(1) is unconstitutional *ab initio* based on a seemingly random sampling of observations about the pre- and post-conviction conduct of this Appellant.    Our district courts are left without any intelligible standard, and our citizenry will be left reeling from the consequences:    a flood of motions to dismiss indictments, appeals, and reversals of § 922(g)(1) convictions; more armed felons and gun violence on our streets; less faith in elected representatives stymied in their efforts to protect the public; and less trust in a judiciary mired in formalism and the usurpa-

---

[168] *Types of Documents Requested Based on Prohibitor*, FBI (Sept. 14, 2018), https://www.fbi.gov/file-repository/nics-appeal-documents-requested.pdf/view.

[169] *Firearm-Related Challenge (Appeal) and Voluntary Appeal File (VAF)*, FBI (last accessed Mar. 3, 2023), https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/national-instant-criminal-background-check-system-nics-appeals-vaf.

87a

tion of legislative function.    The sooner the Supreme
Court takes up this issue, the safer our republic will be.

IV.    Conclusion

For the foregoing reasons, I respectfully dissent.

88a

ROTH, *Circuit Judge*, dissenting

I agree with the Majority's well-reasoned conclusions that (1) *New York State Rifle & Pistol Association, Inc. v. Bruen*[1] abrogated the use of means-end scrutiny to assess Second Amendment challenges and (2) Bryan Range is among "the people" protected by the Second Amendment.    I part with my colleagues, however, over their determination that the government failed to show that 18 U.S.C. § 922(g)(1), as applied to Range, is consistent with our nation's historical tradition of firearms regulation.

In *Bruen*, the Supreme Court considered whether a regulation issued by a *state* government was a facially constitutional exercise of its traditional police power. Range presents a distinguishable question:   Whether a *federal* statute, which the Supreme Court has upheld as a valid exercise of Congress's authority under the Commerce Clause,[2] is constitutional as applied to him.    The parties and the Majority conflate these spheres of authority and fail to address binding precedents affirming Congress's power to regulate the possession of firearms in interstate commerce.   Because Range lacks standing under the applicable Commerce Clause jurisprudence, I respectfully dissent.

I.

As the Majority explains, the Supreme Court in *Bruen* invalidated the means-end component test that we have, in recent years, applied to Second Amendment

---

[1]  142 S. Ct. 2111 (2022).

[2]  U.S. Const. art. 1, § 8, cl. 3 (authorizing Congress "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes").

89a

challenges.[3]   The Supreme Court held:   "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.   To justify its regulation  . . .   the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."[4]

While I agree with the Majority's assessment of the government's burden, I read *Bruen* to articulate a structured framework for the government's comparative analysis.   This framework is useful because it clarifies both what the government must compare and how close the match must be.

As I read *Bruen*, the government must begin by identifying the societal problem addressed by the challenged regulation.[5]   The government must demonstrate whether the problem is (1) persistent ("has persisted since the 18th century") or (2) modern (involves "unprecedented societal concerns or dramatic technological changes").[6]

If the problem is persistent, the government must demonstrate that its modern regulation is "distinctly similar" to a historical forebear, showing that early and recent legislatures approached the problem in basically the same way.[7]   Here, "lack of a distinctly similar historical regulation addressing that problem" or evidence that "earlier generations addressed the societal problem . . .   through materially different means" are "rele-

---

[3]  *Bruen*, 142 S. Ct. at 2127.

[4]  *Id.* at 2126.

[5]  *Id.* at 2131-32.

[6]  *Id.* at 2131.

[7]  *Id.* at 2132.

90a

vant evidence that the challenged regulation is inconsistent with the Second Amendment."[8]

In contrast, for modern problems that early legislatures did not confront, *Bruen* allows for a more extended comparison. Here, the government must show by analogical reasoning that its regulation is "relevantly similar" to a historical firearm regulation.[9] Under this prong, the government must show that the "modern and historical regulations impose a comparable burden on the right of armed self-defense and . . . that the burden is comparably justified."[10] In other words, the government need not identify a "historical twin," but only show that the regulations are aligned as to "*how* and *why* [they] burden a law-abiding citizen's right to armed self-defense."[11]

## II.

This framework helps to illuminate my substantive disagreement with the Majority opinion, which begins with its characterization of the societal problem addressed by § 922(g)(1). The Majority asserts that "§ 922(g)(1) is a straightforward 'prohibition[] on the possession of firearms by felons.'"[12] This is overbroad.

To identify the problem Congress intended to address, "we look to the text, structure, and purpose of the

---

[8] *Id.*

[9] *Id.*

[10] *Id.* at 2133.

[11] *Id.* (emphasis added).

[12] Op. 16 (quoting *Heller*, 554 U.S. at 626).

91a

statute and the surrounding statutory framework."[13] Section 922(g)(1) makes it unlawful for a person "convicted in any court, of a crime punishable by imprisonment for a term exceeding one year" to "possess *in or affecting commerce*, any firearm or ammunition."[14] This jurisdictional language is essential.   In other contexts, such as for the purposes of categorical analysis or meeting the requirement of scienter, the Supreme Court has distinguished "substantive" from "jurisdictional" elements.[15]   In § 922(g)(1), however, "far from being token, [the] 'conventional jurisdictional element[]' serve[s] to narrow the kinds of crimes that can be prosecuted."[16]   Here, the jurisdictional element constrains Congress's reach "to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce."[17]

The Supreme Court reached this exact conclusion in analyzing § 922(g)(1)'s predecessor, "conclud[ing] that the commerce requirement   .   .   .   must be read as part of the 'possesses' and 'receives' offenses."[18]   Otherwise, the Court concluded, the statute would "dramatically intrude[] upon traditional state criminal jurisdic-

---

[13] *Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414, 419 (3d Cir. 2016) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996)).

[14] 18 U.S.C. § 922(g)(1) (emphasis added).

[15] *See Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019); *Torres v. Lynch*, 578 U.S. 452, 457 (2016).

[16] *Torres*, 578 U.S. at 486 (dissent, J. Sotomayor, with Thomas, J. and Breyer, J.).

[17] *United States v. Lopez*, 514 U.S. 549, 562 (1995).

[18] *United States v. Bass*, 404 U.S. 336, 350 (1971).

92a

tion."[19]   The line of Supreme Court decisions concerning § 922(g)(1) and its predecessor statute [20] deal squarely with the Commerce Clause,[21] considering Congress's authority to regulate firearms in interstate commerce in light of those "modern-era precedents" that, within strict limits, expanded Congress's authority to address "great changes that had occurred in the way business was carried on in this country."[22]   Our Court, with our sisters, expressly upheld the constitutionality of § 922(g)(1) because "by its very terms, [it] only regulates those weapons affecting interstate commerce *by being the subject of interstate trade*.   It addresses items sent in interstate commerce and the channels of commerce themselves, delineating that the latter be kept clear of firearms."[23]   Accordingly, the societal

---

[19] *Id.*

[20] Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.App. § 1202(a).

[21] *Lopez*, 514 U.S. at 556 (favorably contrasting § 922(g)(1) with § 922(q), which the Court deemed unconstitutional for lack of a nexus to interstate commerce); *Scarborough v. United States*, 431 U.S. 563 (1977) (holding § 922(g)(1)'s predecessor statute constitutional); *Bass*, 404 U.S. 336 (same).

[22] *Lopez*, 514 at 556.

[23] *United States v. Singletary*, 268 F.3d 196, 204 (2001); *United States v. Gateward*, 84 F.3d 670, 672 (3d Cir. 1996) ("Congress drafted § 922(g) to include a jurisdictional element, one which requires a defendant felon to have possessed a firearm 'in or affecting commerce.'"); *accord U.S. v. Wallace*, 889 F.2d 580 (5th Cir. 1989) ("[S]ection 922(g) reaches only those firearms that traveled in interstate or foreign commerce and is thus constitutional); *United States v. Dupree*, 258 F.3d 1258, 1259 (2001); *United States v. Stuckey*, 255 F.3d 528, 529-30 (8th Cir. 2001); *United States v. Gallimore*, 247 F.3d 134, 137-38 (4th Cir. 2001); *United States v. Davis*, 242 F.3d 1162, 1162-63 (9th Cir. 2001); *United States v. Santiago*,

93a

problem addressed by § 922(g)(1) is the possession of firearms *in interstate commerce* by particular "channels of commerce"—those channels under the language of § 922(g)(1) being individuals with certain criminal convictions.[24]

The Majority concludes, and I agree, that *Bruen* "abrogated our Second Amendment jurisprudence,"[25] meaning the line of cases from *Marzzarella*,[26] through *Binderup*,[27] to *Holloway* and *Folajtar*.[28] Yet the Majority does not assert that *Bruen* abrogated our Commerce Clause jurisprudence or that of the Supreme Court.[29] Rightly so. We must "leave to the [Supreme]

---

238 F.3d 213, 216-17 (2d Cir. 2001); *United States v. Dorris*, 236 F.3d 582, 584-86 (10th Cir. 2000); *United States v. Napier*, 233 F.3d 394, 399-402 (6th Cir. 2000); *United States v. Wesela*, 223 F.3d 656, 659-60 (7th Cir. 2000).

[24] Notably, § 921(a)(20)(A) makes clear that § 922(g)(1) does not apply uniformly to individuals convicted of any felony offense, expressly excluding individuals convicted of serious "Federal and State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses." Accordingly, to describe the statute as a ban on possession by "felons" overstates its reach.

[25] Op. 10.

[26] *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).

[27] *Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc) (plurality).

[28] *Holloway v. Att'y Gen.*, 948 F.3d 164 (3d Cir. 2020); *Folajtar v. Att'y Gen.*, 980 F.3d (1)

[29] *Lopez*, 514 U.S. at 556; *Scarborough*, 431 U.S. at 566-67 (holding proof the firearm petitioner possessed had previously traveled in interstate commerce sufficient to meet the nexus requirement); *Bass*, 404 U.S. at 350 (holding § 922(g)(1)'s predecessor constitutional in light of the jurisdictional element); *accord Greer v. United States*, 141 S. Ct. 2090, 2095 (2021) (citing *Rehaif*, 139 S. Ct. at 2194

94a

Court itself 'the prerogative of overruling its own deci-sion[s].'"[30]   The Court did not, in *Bruen*, overrule its decisions upholding Congress's power to regulate the possession of firearms in interstate commerce.[31]   These decisions remain good law.

Under the constitutionally mandated Commerce Clause jurisprudence that continues to bind us, Range lacks standing.   "It is well established that plaintiffs bear the burden of demonstrating that they have standing in the action that they have brought."[32]   To meet this burden, they must demonstrate "(1) the invasion of a concrete and particularized legally protected interest and resulting [actual or imminent] injury.  .  .  .  (2) a causal connection between the injury and the conduct complained of  .  .  .  and [3] that the injury will be re-dressed by a favorable decision."[33]

---

(clarifying the mens rea requirement under § 922(g)(1)); *Logan v. United States*, 552 U.S. 23, 37 (2007) (clarifying the scope of § 921(a)(20)).   *See also Small v. United States*, 544 U.S. 385, 394 (2005) (Thomas, J., dissenting) (calling for § 922(g)(1) to apply to a *wider* category of individuals, specifically those convicted in for-eign courts).

[30]  *Singletary*, 268 F.3d at 205.

[31]  As the Majority acknowledges, Op. 16, Justice Kavanaugh's concurrence in *Bruen*, joined by the Chief Justice, asserted that felon-possession prohibitions remain "presumptively lawful" under *Heller* and *McDonald*. 142 S. Ct. at 2162 (quoting *District of Co-lumbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008)) (citing *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)).

[32]  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (citing *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005)).

[33]  *Id.* at 278 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

95a

Before the District Court, Range alleged that "he suffers the on-going harm of being unable to obtain firearms from licensed federal firearms dealers."[34]    While the District of Columbia Court of Appeals has recognized a cognizable injury where "the federal regulatory scheme thwarts [a challenger's] continuing desire to purchase a firearm," it did so in cases where the regulation's facial constitutionality was at issue.[35]    Here, Range brought only an as-applied challenge.[36]    Moreover, he has identified no specific firearm that he has been prohibited from possessing.    To sustain a conviction under § 922(g)(1), the government must prove beyond a reasonable doubt that the specific firearm possessed by the individual moved through interstate commerce.[37]    The reason is that while the nexus need only

---

[34] Appx026.

[35] *Dearth v. Holder*, 641 F.3d 499, 503 (D.C. Cir. 2011) (affirming that the petitioner suffered a cognizable injury where "the federal regulatory scheme thwarts his continuing desire to purchase a firearm"); *see Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007) ("The formal process of application and denial, however routine, makes the injury to [the petitioner's] alleged constitutional interest concrete and particular."), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008); see *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A party asserting a facial challenge 'must establish that no set of circumstances exists under which the Act would be valid.").

[36] *See United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("An as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.").

[37] *See Singletary*, 268 F.3d at 200; *accord United States v. Shambry*, 392 F.3d 631, 632 (3d Cir. 2004); *United States v. Leuschen*, 395 F.3d 155, 160 (3d Cir. 2005).

96a

be minimal,[38] § 922(g)(1) simply does not criminalize possession of firearms *out* of interstate commerce. Here, Range has not asserted that this constitutionally reviewed regulation of commerce intrudes on any Sec-

---

[38] *See Shambry*, 392 F. 3d at 635 (citing *United States v. Corey*, 207 F.3d 84, 88 (1st Cir.2000) ("[T]he 'interstate nexus' element was met provided the government demonstrated that [the defendant] possessed the shotgun in a state other than the one in which it was manufactured."); *United States v. Lawson*, 173 F.3d 666, 670 (8th Cir. 1999) (finding that the stipulation that the guns were manufactured outside of the state where the defendant possessed them satisfied "'the minimal nexus that the firearms have been, at some time, in interstate commerce,' that is, that the firearms at some point prior to [the defendant's] possession . . . crossed a state line" (quoting *United States v. Shelton*, 66 F.3d 991, 992 (8th Cir. 1995) (per curiam))); *United States v. Pierson*, 139 F.3d 501, 504 (5th Cir. 1998) ("[E]vidence that a gun was manufactured in one state and possessed in another state is sufficient to establish a past connection between the firearm and interstate commerce."); *United States v. Crump*, 120 F.3d 462, 466 & n. 2 (4th Cir. 1997) ("[It] is our view that the movement of a firearm beyond the boundaries of its state of manufacture 'substantially affects' interstate commerce. . . . "); *United States v. Lewis*, 100 F.3d 49, 50 (7th Cir. 1996) ("[P]roof of a gun's manufacture outside of the state in which it was allegedly possessed is sufficient to support the factual finding that the firearm was 'in or affecting commerce.'" (quoting *United States v. Lowe*, 860 F.2d 1370, 1374 (7th Cir. 1988))); *United States v. Farnsworth*, 92 F.3d 1001, 1006 (10th Cir. 1996) (finding expert testimony that the defendant's gun had been manufactured in a different state from that in which it was found was sufficient nexus to interstate commerce); *United States v. Sanders*, 35 F.3d 61, 62 (2d Cir. 1994) (finding fact that gun was manufactured in a state different from that in which it was possessed was sufficient nexus to interstate commerce); *United States v. Morris*, 904 F.2d 518, 519 (9th Cir. 1990) (same); *United States v. Singleton*, 902 F.2d 471, 473 (6th Cir. 1990) ("[T]he mere fact that the firearm was manufactured in a different state established a sufficient nexus with interstate commerce.")).

97a

ond Amendment rights by establishing in § 922(g)(1) a prohibition on certain channels of commerce, *i.e.*, felons, possessing firearms that have circulated in interstate commerce.[39]

In short, the harm that Range has asserted is not constitutional.   He has failed to set forth the necessary interstate commerce connections to allow federal jurisdiction of his complaint.   He has merely established that a thoroughly reviewed statute has had its intended effect by preventing him from possessing a firearm in interstate commerce because of his particular criminal conviction, which falls within the statute's clearly defined ambit.

This jurisdictional deficiency has put Range's claims beyond our reach.   It is not unlikely, however, that a future challenge to the prohibition of § 922(g)(1) will come before us in which federal jurisdiction has been properly established.   In such a case, I would share the concern expressed today by my dissenting colleagues[40]

---

[39] The Eighth Circuit recently rejected a similar as-applied challenge to § 922(g)(1). The decision underscored Congress' recognition that "only through adequate Federal control over interstate and foreign commerce in these weapons" could the "grave problem" of lawlessness and violent crime in the United States be dealt with, as it arose from the "widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce" and "the ease with which any person can acquire firearms other than a rifle or shotgun."   *United States v. Jackson*, No. 22-2870, 2023 WL 3769242, *8 (8th Cir. June 2, 2023).   Although the court thus tacitly and, in my view, appropriately acknowledged that Congress' authority to regulate here was under the Commerce Clause, it unfortunately did not address whether Jackson had established standing accordingly for his as-applied challenge.

[40] *See generally* Shwartz Dissent; Krause Dissent 4-5.

98a

about the extent to which this precedential opinion may reverberate beyond the circumstances presented in this as-applied challenge. Certainly, such an analysis would be crucial for us should a future, similar challenge arise within our jurisdiction, particularly on a facial basis.

For the above reasons, I respectfully dissent.

99a

## APPENDIX B

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 21-2835

BRYAN DAVID RANGE, APPELLANT

*v.*

ATTORNEY GENERAL UNITED STATES OF AMERICA;
REGINA LOMBARDO, ACTING DIRECTOR, BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES

————

Argued on Sept. 19, 2022
(Opinion filed Nov. 16, 2022)

————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5:20-CV-03488)
District Judge:   Honorable Gene E.K. Pratter

————

## OPINION

————

Before:   SHWARTZ, KRAUSE and ROTH, <u>Circuit
Judges</u>

*Per Curiam*\*

In *District of Columbia v. Heller*, the Supreme Court held that "the right of the people to keep and bear

————

\* We issue this precedential opinion *per curiam* to reflect both its unanimity and the highly collaborative nature of its preparation.

100a

Arms," enshrined in the Second Amendment, is an individual right. 554 U.S. 570, 595 (2008). While the precise contours of that individual right are still being defined, the Court has repeatedly stated that it did not question the "longstanding prohibition[] on the possession of firearms by felons." *Id.* at 626.

Appellant Bryan Range falls in that category, having pleaded guilty to the felony-equivalent charge of welfare fraud under 62 Pa. Cons. Stat. § 481(a). He now brings an as-applied challenge to 18 U.S.C. § 922(g)(1), contending that his disarmament is inconsistent with the text and history of the Second Amendment and is therefore unconstitutional under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). We disagree. Based on history and tradition, we conclude that "the people" constitutionally entitled to bear arms are the "law-abiding, responsible citizens" of the polity, *id.* at 2131, a category that properly excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses, whether or not those crimes are violent. Additionally, we conclude that even if Range falls within "the people," the Government has met its burden to demonstrate that its prohibition is consistent with historical tradition. Accordingly, because Range's felony-equivalent conviction places him outside the class of people traditionally entitled to Second Amendment rights, and because the Government has shown the at-issue prohibition is consistent with historical tradition, we will affirm the District Court's summary judgment in favor of the Government.

101a

I. <u>Factual and Procedural Background</u>

In 1995, Range pleaded guilty to making false statements about his income to obtain $2,458 of food stamp assistance in violation of 62 Pa. Cons. Stat. § 481(a), a conviction that was then classified as a misdemeanor punishable by up to five years' imprisonment.[1]   Range was sentenced to three years' probation, $2,458 in restitution, $288.29 in costs, and a $100 fine.   He has paid the fine, costs, and restitution.

Congress has deemed it "unlawful for any person . . . who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year"—the definition of a felony under both federal law, 18 U.S.C. § 3156(a)(3), and traditional legal principles, *see Felony*, Black's Law Dictionary (11th ed. 2019)—to "possess in or affecting commerce, any firearm or ammunition."[2]   18 U.S.C. § 922(g)(1).   In deference to state legislatures, Congress also raised the bar for "any State offense classified by the laws of the State as a misdemeanor" by excluding from the prohibition those misdemeanors "punishable by a term of imprisonment of two years or less."   *Id.* § 921(a)(20)(B).[3]   Put differ-

---

[1] In 2018, Pennsylvania amended § 481(b) so that welfare fraud involving "$1,000 or more" in fraudulently obtained assistance became a "[f]elony of the third degree." 62 Pa. Cons. Stat. § 481(b) (2018). However, the parties agree that the offense's categorization at the time of Range's guilty plea controls for purposes of our analysis.

[2] Congress exercised its discretion to exclude certain categories of offenses from this ban, such as "antitrust violations, unfair trade practices, restraints of trade, or other similar offenses[.]"   18 U.S.C. § 921(a)(20)(A).

[3] For ease of reference, we use the term "felony-equivalent" to refer to these misdemeanors.   We do not address whether individuals

102a

ently, it treated state misdemeanors punishable by more than two years' imprisonment as felony-equivalent offenses. As the maximum punishment for Range's offense was five years' imprisonment, his conviction subjected him to § 922(g)(1).

Three years after his conviction, Range attempted to purchase a firearm but was "rejected by the instant background check system." App. 46, 68, 203. Range's wife subsequently bought him a deer-hunting rifle, and when that rifle was destroyed in a house fire, she bought him another.[4] Sometime in 2010 or 2011, believing his first rejection was an error, Range again attempted to purchase a firearm. Again, he was rejected by the instant background check system. Several years after this rejection, Range "researched the matter" and learned that he was barred from purchasing and possessing firearms because of his welfare fraud conviction. App. 46, 205-06. Having "realize[d] that [he] was not allowed to possess a firearm," he sold his deer hunting rifle to a firearms dealer. App. 201.

Range has hunted regularly for at least twenty years, most frequently using a bow or a muzzleloader. During the years that he possessed a deer hunting rifle, he routinely hunted with it on the first morning and the two Saturdays of each two-week season. He maintained a Pennsylvania hunting license at the time he filed his lawsuit and averred in deposition testimony that if not barred by § 922(g)(1), he would "for sure" purchase an-

---

convicted of misdemeanors carrying lesser punishments can be disarmed consistent with the Second Amendment.

[4] A shotgun that Range's father had given him as a teenager was also destroyed in the fire. After his father died in 2008, Range came into possession of his father's pistol, but gave it away within a month.

103a

other hunting rifle and "maybe a shotgun" for self-defense in his own home.   App. 46, 184, 197, 198, 200-02, 210.

In 2020, Range filed suit in the Eastern District of Pennsylvania, seeking a declaratory judgment that § 922(g) violates the Second Amendment as applied to him, as well as an injunction to bar its enforcement against him.   Both Range and the Government moved for summary judgment.   The District Court applied the two-step test that this Court adopted in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) and amplified in *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (en banc), which asks whether (1) a regulation burdens conduct protected by the right to keep and bear arms, and (2) if so, whether that regulation survives means-end scrutiny, *id.* at 346 (quoting *Marzzarella*, 614 F.3d at 89).   Applying *Binderup*, the District Court concluded that Range's challenge failed at step one because the Second Amendment does not protect "unvirtuous citizens," including any person convicted of "a serious offense," *id.* at 349, and Range's offense qualified as serious under the factors we had identified.   The District Court therefore granted the Government's motion for summary judgment, and this appeal followed.

While Range's appeal was pending, the Supreme Court issued *Bruen*, rejecting the means-end component of the second step of *Marzzarella* and *Binderup* and holding the first step was "broadly consistent with *Heller*" to the extent it focused on "the Second Amendment's text, as informed by history."   142 S. Ct. at 2127. The Government filed a letter pursuant to Federal Rule of Appellate Procedure 28(j), contending that Range's

104a

Second Amendment challenge still must fail under *Bruen*'s framework. Range responded with his own Rule 28(j) letter, underscoring *Bruen*'s emphasis on history and asserting "there is no history in 1791 that given the facts of Mr. Range's case that he would be disarmed and prevented from owning and possessing firearms." Dkt. No. 41 at 2.   The panel ordered supplemental briefing on (1) *Bruen*'s impact, if any, on the multifactor analysis developed in *Binderup* and *Holloway v. Attorney General*, 948 F.3d 164 (3d Cir. 2020); (2) whether *Bruen* shifts the burden to the Government to prove that the challenger is outside the scope of those entitled to Second Amendment rights, and whether the Government has met that burden here; and (3) whether we should remand this matter to the District Court.[5]

In supplemental briefing on the effect of *Bruen*, Range argues that the history and tradition of the Second Amendment demonstrates that only individuals with a dangerous propensity for violence, as opposed to peaceful citizens like him, can be disarmed.   *Amici* filed a brief on Range's behalf, echoing his contention that "[t]he historical tradition of disarming dangerous persons provides no justification for disarming Range." Amicus Br. 26.   The Government urges us to reject a narrow focus on dangerousness, reaffirm our holdings in *Binderup* and subsequent cases that the Second Amendment extends only to people considered "virtu-

---

[5] The relevant factual record has been fully developed, and the appeal raises "purely legal questions upon which an appellate court exercises plenary review," *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 187 (3d Cir. 2014) (quoting *Hudson United Bank v. LiTenda Mortg. Corp.*, 142 F.3d 151, 159 (3d Cir. 1998)), so we can apply *Bruen* and resolve this matter without remand, *see Hudson*, 142 F.3d at 159.

ous citizens," and therefore hold that there is a longstanding tradition of disarming citizens who are not law-abiding.

With the benefit of *Bruen*, cases applying *Bruen*,[6] and the parties' briefing and arguments, we turn to the merits of Range's appeal.

## II.  Jurisdiction and Standard of Review

---

[6] Although we appear to be the first Court of Appeals to address the constitutionality of 18 U.S.C. § 922(g)(1) since the Supreme Court decided *Bruen*, a number of district courts have done so. *See United States v. Young*, No. 22-CR-54, 2022 WL 16829260, at *11 (W.D. Pa. Nov. 7, 2022); *United States v. Minter*, No. 22-CR-135, 2022 WL 10662252, at *6-7 (M.D. Pa. Oct. 18, 2022); *United States v. Trinidad*, No. 21-CR-398, 2022 WL 10067519, at *3 (D.P.R. Oct. 17, 2022); *United States v. Raheem*, No. 20-CR-61, 2022 WL 10177684, at *3 (W.D. Ky. Oct. 17, 2022); *United States v. Carrero*, No. 22-CR-30, 2022 WL 9348792, at *3 (D. Utah Oct. 14, 2022); *United States v. Riley*, No. 22-CR-163, 2022 WL 7610264, at *10, *13 (E.D. Va. Oct. 13, 2022); *United States v. Price*, No. 22-CR-97, 2022 WL 6968457, at *9 (S.D.W. Va. Oct. 12, 2022); *United States v. Daniels*, No. 3-CR-83, 2022 WL 5027574, at *4 (W.D.N.C. Oct. 4, 2022); *United States v. Charles*, No. 22-CR-154, 2022 WL 4913900, at *11 (W.D. Tex. Oct. 3, 2022); *United States v. Siddoway*, No. 21-CR-205, 2022 WL 4482739, at *2 (D. Idaho Sept. 27, 2022); *United States v. Collette*, No. 22-CR-141, 2022 WL 4476790, at *8 (W.D. Tex. Sept. 25, 2022); *United States v. Coombes*, No. 22-CR-189, 2022 WL 4367056, at *8, *11 (N.D. Okla. Sept. 21, 2022); *United States v. Hill*, No. 21-CR-107, 2022 WL 4361917, at *3 (S.D. Cal. Sept. 20, 2022); *see also United States v. Ridgeway*, No. 22-CR-175, 2022 WL 10198823, *2 (S.D. Cal. Oct. 17, 2022); *United States v. Cockerham*, No. 21-CR-6, 2022 WL 4229314, at *2 (S.D. Miss. Sept. 13, 2022); *United States v. Jackson*, No. CR 21-51, 2022 WL 4226229, at *3 (D. Minn. Sept. 13, 2022); *United States v. Burrell*, No. 21-20395, 2022 WL 4096865, at *3 (E.D. Mich. Sept. 7, 2022); *United States v. Ingram*, No. 18-CR-557, 2022 WL 3691350, at *3 (D.S.C. Aug. 25, 2022).

106a

The District Court had jurisdiction under 28 U.S.C. § 1331.   We have appellate jurisdiction under 28 U.S.C. § 1291.   We review the District Court's order granting summary judgment *de novo, see Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013), viewing the facts and making all reasonable inferences in the non-movant's favor, *see Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 266-67 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[7]   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[7] While Range's standing to bring this claim was not challenged by Government nor discussed by the District Court, "we have 'an independent duty to satisfy ourselves of our jurisdiction. . . . '" *Bedrosian v. IRS*, 912 F.3d 144, 149 (3d Cir. 2018) (quoting *Papotto v. Hartford Life & Acc. Ins. Co.*, 731 F.3d 265, 269 (3d Cir. 2013)). The party invoking federal jurisdiction must establish the three elements forming "the irreducible constitutional minimum of standing": injury in fact, causation, and redressability.   *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).   "When an individual is subject to [threatened enforcement of a law], an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."   *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).   Here, Range met his burden by showing that the Government's prohibition twice thwarted him from purchasing a firearm and by averring that he would purchase a hunting rifle but for § 922(g)(1).   *See Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007) ("The formal process of application and denial, however routine, makes the injury to [the petitioner's] alleged con-

107a

### III. *Bruen*'s Doctrinal Impact

Applying *Bruen*'s historical focus, we conclude § 922(g)(1) comports with legislatures' longstanding authority and discretion to disarm citizens unwilling to obey the government and its laws, whether or not they had demonstrated a propensity for violence. We proceed in two parts. We begin by explaining how the Supreme Court replaced our two-step framework with a distinct test focused on the text and history of the Second Amendment. Next, we examine disarmament laws from the seventeenth to the nineteenth centuries to determine whether Range's disarmament fits within the nation's history and tradition of the right to keep and bear arms.

### A. Post-*Bruen* Standard for Second Amendment Challenges

The Supreme Court's decision in *Bruen* modifies our prior test for analyzing Second Amendment challenges to 18 U.S.C. § 922(g)(1).

Before *Bruen*, we analyzed Second Amendment challenges under a two-part test that was eventually adopted by most of our sister Circuits. *Marzzarella*, 614 F.3d at 89; *see also Binderup*, 836 F.3d at 346 ("Nearly every court of appeals has cited *Marzzarella* favorably."). At the first step, we considered whether the challenged law burdened conduct within the scope of the Second Amendment. *Marzzarella*, 614 F.3d at 89.

---

stitutional interest concrete and particular."), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008); *Dearth v. Holder*, 641 F.3d 499, 503 (D.C. Cir. 2011) (affirming that the petitioner suffered a cognizable injury where "the federal regulatory scheme thwarts his continuing desire to purchase a firearm").

108a

In examining this subject, we observed that "the right to bear arms was tied to the concept of a virtuous citizenry and that accordingly, the government could disarm 'unvirtuous citizens[,]" including "any person who has committed a serious criminal offense, violent or non-violent."[8]  *Binderup*, 836 F.3d at 348 (quoting *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010)); *see also Heller*, 554 U.S. at 626-27 & n.26.   If the first step was met, we proceeded to the second step and assessed whether the regulation withstood means-end scrutiny.   *Marzzarella*, 614 F.3d at 89.

*Bruen*, however, abrogated *Binderup*'s two-step inquiry and directed the federal courts, in a single step, to look to the Second Amendment's text and "the Nation's historical tradition of firearm regulation."   142 S. Ct. at 2126, 2130; *see also Frein v. Pa. State Police*, 47 F.4th 247, 254, 256 (3d Cir. 2022) (recognizing *Bruen* abrogated our two-step framework).[9]   "Only if a firearm

_____

[8]  On that point, Judge Ambro's three-judge plurality in *Binderup* was joined by the seven judges who signed onto Judge Fuentes's partial concurrence and partial dissent.   *See Binderup*, 836 F.3d at 348-49; *id.* at 387, 389-90 (Fuentes, J., concurring in part).   Judge Hardiman, joined by four other judges, concurred in part and concurred in the judgment.   *Id.* at 357 (Hardiman, J., concurring in part).   Judge Hardiman reasoned that under "traditional limitations on the right to keep and bear arms" legislatures could disarm only individuals with a "demonstrated proclivity for violence."   *Id.*; *see also Folajtar v. Att'y Gen.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) (stating that "the historical limits on the Second Amendment" permitted legislatures to disarm felons "only if they are dangerous"), *cert. denied sub nom.   Folajtar v. Garland*, 141 S. Ct. 2511 (2021).

[9]  Given *Bruen*'s focus on history and tradition, *Binderup*'s multi-factored seriousness inquiry no longer applies.   In the context of a challenge based upon the challenger's status post-*Binderup*, *Bruen*

109a

regulation is consistent with this Nation's historical tra-
dition may a court conclude that the individual's conduct
falls outside the Second Amendment's 'unqualified com-
mand.'" *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg
v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).   Addi-
tionally, because "the Constitution presumptively pro-
tects [individual] conduct" covered by "the Second
Amendment's plain text," the Court explained, the gov-
ernment has the burden of justifying its regulation of
that conduct by demonstrating "not simply [] that the
regulation promotes an important interest," but that
"the regulation is consistent with this Nation's historical
tradition of firearm regulation." *Id.*[10]

Under *Bruen*, the question is whether the regulation
at issue is "relevantly similar" to regulations at the
Founding.   *Id.* at 2132 (quoting Cass R. Sunstein, *On
Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).
To make that determination, we must employ "analogi-
cal reasoning" and compare "how and why the regula-
tions burden a law-abiding citizen's right to armed self-
defense."   *Id.* at 2132-33.   Specifically, the govern-

---

requires consideration of whether there is a historical foundation for
governmental restrictions on firearms possession based on the chal-
lenger's specific status.   If that status changes, then the law would
no longer apply to that person.   Thus, there is still room for "as-
applied" challenges even after *Bruen*.

[10] In *Binderup*, we had imposed the burden at step one on the
challenger, rather than on the government, 836 F.3d at 347, but
after *Bruen*, we note that the government must now meet this bur-
den in the district court, *see* 142 S. Ct. at 2126 (citing *United States
v. Boyd*, 999 F.3d 171, 185 (3d Cir. 2021)).   Because *Bruen* came
down after the Government made its case in the District Court, we
look to its filings in the District Court as well as its supplemental
briefs on *Bruen*'s impact to find that it has met its burden.

110a

ment must "identify a well-established and representa-
tive historical *analogue*, not a historical *twin*." *Id.* at
2133. "So even if a modern-day regulation is not a dead
ringer for historical precursors, it still may be analogous
enough to pass constitutional muster." *Id.*

*Bruen* does not preclude our review of Range's ap-
peal on the record before us. *Bruen* did not address
the substantive issues that we must now determine.
Unlike the open-carry licensing regime in *Bruen* that
created a conduct-based constraint on public carry,
§ 922(g)(1) imposes a status-based restriction—namely,
a possession ban on those convicted of crimes punisha-
ble by more than one year in prison or by more than two
years in prison in the case of state law misdemeanors.
*See* Eugene Volokh, *Implementing the Right to Keep
and Bear Arms for Self-Defense: An Analytical
Framework and a Research Agenda*, 56 UCLA L. Rev.
1443, 1443 (2009) (distinguishing between "what,"
"who," "where," "how," and "when" firearm restric-
tions). Despite that difference, *Bruen* still requires us
to assess whether the Government has demonstrated
through relevant historical analogues that § 922(g)(1) "is
consistent with this Nation's historical tradition of fire-
arm regulation." 142 S. Ct. at 2134. As set forth be-
low, the historical record shows that legislatures had
broad discretion to prohibit those who did not respect
the law from having firearms. Our assessment con-
firms that individuals like Range, who commit felonies
and felony-equivalent offenses, are not part of "the peo-
ple" whom the Second Amendment protects. There-
fore, § 922(g)(1) as applied to Range is constitutional un-
der the Second Amendment.

111a

### B.  Scope of Second Amendment Rights in Historical Perspective

As instructed by *Bruen*, we begin our analysis with the text of the Second Amendment, which protects "the right of the people to keep and bear Arms," U.S. Const. amend. II, and consider if Range, as a felon equivalent under 18 U.S.C. § 921(a)(20)(B), is among those protected by the Amendment.  *Cf. Binderup*, 836 F.3d at 357 (Hardiman, J., concurring in part) ("[T]he Founders understood that not everyone possessed Second Amendment rights.  These appeals require us to decide who count among 'the people' entitled to keep and bear arms."); *United States v. Quiroz*, No. 22-CR-00104, 2022 WL 4352482, at *10 (W.D. Tex. Sept. 19, 2022) (explaining "this Nation does have a historical tradition of excluding specific groups from the rights and powers reserved to 'the people'").

The language of *Bruen* provides three insights into pertinent limits on "the people" whom the Second Amendment protects.  First, the majority characterized the holders of Second Amendment rights as "law-abiding" citizens no fewer than fourteen times.  *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156; *accord Heller*, 554 U.S. at 625, 635. These included its holding that the New York statute "violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms," *Bruen*, 142 S. Ct. at 2156, its explanation that the Second Amendment "'elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense," *id.* at 2131 (quoting *Heller*, 554 U.S. at 635), and its instruction to identify historical analogues

112a

to modern firearm regulations by assessing "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 2133.[11] The Court also quoted nineteenth-century sources extending the right to keep and bear arms to "all loyal and well-disposed inhabitants," and disarming any person who made "an improper *or* dangerous use of weapons." *Id.* at 2152 (em-

---

[11] *See also Bruen* 142 S. Ct. at 2122 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."); *id.* ("[O]rdinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense."); *id.* at 2125 (explaining petitioners were "law-abiding, adult citizens"); *id.* at 2133 (describing New York's argument that "sensitive places where the government may lawfully disarm law-abiding citizens include all places where people typically congregate" (quotations omitted)); *id.* at 2134 (reiterating that petitioners are "two ordinary, law-abiding, adult citizens"); *id.* at 2135 n.8 ("[I]n light of the text of the Second Amendment, along with the Nation's history of firearm regulation, we conclude below that a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense."); *id.* at 2138 ("Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense."); *id.* at 2138 n.9 (noting shall-issue public carry licensing laws "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry" but rather "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" (quotation omitted)); *id.* at 2150 (observing "none [of the historical regulations surveyed] operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose"); *id.* at 2156 ("Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to demonstrate a special need for self-protection distinguishable from that of the general community in order to carry arms in public." (quotations omitted)).

113a

phasis added) (quoting Cong. Globe, 39th Cong., 1st
Sess., at 908-909; and Circular No. 5, Freedmen's Bu-
reau, Dec. 22, 1865).

Second, the Court clarified that, despite the infirmity
of New York's discretionary may-issue permitting re-
gime, "nothing in our analysis should be interpreted to
suggest the unconstitutionality of the 43 States' 'shall-
issue' licensing regimes  . . .  [,] which often require
applicants to undergo a [criminal] background check"
and "are designed to ensure only that those bearing
arms in the jurisdiction are, in fact 'law-abiding, respon-
sible citizens.'"  *Id.* at 2138 n.9 (quoting *Heller*, 554
U.S. at 635).   These criminal background checks that
the Court indicated are constitutional are not limited to
violent offenses; shall-issue statutes typically disqualify
any person "prohibited from possessing a firearm under
federal law."  Wash. Rev. Code Ann. § 9.41.070(1)(a)
(2021); *accord* Colo. Rev. Stat. Ann. § 18-12-203(1)(c)
(2021); Kan. Stat. Ann. § 75-7c04(a)(2) (2021); Miss.
Code. Ann. § 45-9-101(2)(d) (2022); N.H. Rev. Stat. Ann.
§ 159:6(I)(a) (2021); N.C. Gen. Stat. Ann. § 14-
415.12(b)(1) (2022).

Third, neither *Bruen* nor either of the Court's earlier
explanations of the individual right to keep and bear
arms casts doubt on § 922(g)(1).   To the contrary, Jus-
tice Scalia's majority opinion in *Heller* twice described
"prohibitions on the possession of firearms by felons" as
both "longstanding" and "presumptively lawful[.]" 554
U.S. 626-27 & n.26.[12]   Writing for the *McDonald* plu-

---

[12] We note that Congress enacted the federal felon-in-possession
statute in 1938 and extended it to non-violent offenses in 1961.   *See
United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *cf. Freedom
from Religion Found., Inc. v. County of Lehigh*, 933 F.3d 275, 283

114a

rality, Justice Alito "repeat[ed] those assurances." 561 U.S. at 786. In *Bruen*, Justice Thomas's majority opinion acknowledged that the right to keep and bear arms is "subject to certain reasonable, well-defined restrictions," *Bruen*, 142 S. Ct. at 2156 (citing *Heller*, 554 U.S. at 581), and the concurrences by Justices Alito and Kavanaugh, the latter joined by the Chief Justice, echoed the Court's assertions in *Heller* and *McDonald*. *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27 & n.26); *id.* at 2157 (Alito, J., concurring); *see also United States v. Coombes*, No. 22-CR-00189, 2022 WL 4367056, at *9 (N.D. Okla. Sept. 21, 2022) ("[T]he *Bruen* majority did not abrogate its prior statements in *Heller* and *McDonald*.").

Thus, although the Supreme Court has not provided an "exhaustive historical analysis . . . of the full scope of the Second Amendment," *Bruen*, 142 S. Ct. at 2128; *Heller*, 554 U.S. at 626, *Heller*, *McDonald*, and *Bruen* provide a window into the Court's view of the status-based disarmament of criminals: that this group falls outside "the people"—whether or not their crimes involved violence—and that § 922(g)(1) is well-rooted in the nation's history and tradition of firearm-regulation.[13]

———————————

(3d Cir. 2019) (describing a 75-year-old religious symbol as part of "our Nation's public tradition" and therefore "entitled . . . to a 'strong presumption of constitutionality'" under the First Amendment (quoting *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2085 (2019))). As explained below, however, the history and tradition of disarming those who have committed offenses demonstrating disrespect for the rule of law dates back to at least the seventeenth century.

[13] It remains the case, of course, that the executive branch also has authority to impose firearms-related directives and regulations con-

115a

Our Court's own review of the historical record supports the Supreme Court's understanding:   Those whose criminal records evince disrespect for the law are outside the community of law-abiding citizens entitled to keep and bear arms.[14]   Our previous decisions, endorsed by several sister courts of appeals, have expressed a related view in terms of the theory of "civic virtue."[15]   *See, e.g.*, *Folajtar v. Att'y Gen.*, 980 F.3d 897, 902 (3d Cir. 2020); *Binderup*, 836 F.3d at 348; *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir.

---

sistent with the history and tradition, *e.g.*, in the form of executive orders or through ATF or local executive agencies.

[14] By no means do we suggest that legislatures have carte blanche to disarm anyone who commits any crime.   Rather, we decide only that the disarmament of individuals convicted of felony and felony-equivalent offenses comports with the Second Amendment.

[15] Numerous works of legal scholarship have espoused the civic virtue theory of the Second Amendment.   *See, e.g.*, Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2008); Saul Cornell & Nathan DeDino, *A Well Regulated Right:   The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 492 (2004); Saul Cornell, *"Don't Know Much About History":   The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 672 (2002) [hereinafter Cornell, *Don't Know Much About History*]; David Yassky, *The Second Amendment:   Structure, History, and Constitutional Change*, 99 Mich. L. Rev. 588, 626 (2000); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 L. & Contemp. Probs. 143, 146 (1986); Anthony J. Zarillo III, Comment, *Going off Half-Cocked:   Opposing as-Applied Challenges to the "Felon-in-Possession" Prohibition of 18 U.S.C. § 922(g)(1)*, 126 Penn St. L. Rev. 211, 238 (2021).   We concur with the civic virtue theory inasmuch as a person's lack of virtue in the eyes of the community served as a proxy for willingness to disobey the law.

116a

2010); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010). Moreover, as detailed below, the pertinent historical periods were replete with laws "relevantly similar" to the modern prohibition on felon firearm possession because they categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact.[16]

The *Bruen* Court warned that "not all history is created equal" and catalogued the sources that are most probative of the right's original meaning. 142 S. Ct. at 2136. Emphasizing that the right codified in the Second Amendment was a "*pre-existing right,*" the Court saw particular relevance in "English history dating from the late 1600s, along with American colonial views leading up to the founding." *Id.* at 2127 (citing *Heller*, 554 U.S. at 595).[17] The Court made this same point in *Heller*. 554 U.S. at 592. The *Bruen* Court also found highly relevant post-ratification practices from the late eighteenth and early nineteenth centuries. *See Bruen*, 142 S. Ct. at 2136. In contrast, although the Court considered history from Reconstruction to the late nineteenth century, it underscored that it did so merely to

---

[16] *See Folajtar*, 980 F.3d at 911 ("Legislatures have always regulated the right to bear arms.").

[17] When assessing Founding-era precedents, we must assume they derive from a coherent understanding of the right to keep and bear arms shared among the American populace. *See Heller*, 554 U.S. at 604-05 ("[T]hat different people of the founding period had vastly different conceptions of the right to keep and bear arms . . . simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties.").

117a

confirm its conclusions and that evidence from this period is less informative. *See id.* at 2137.

### 1. England's Restoration and Glorious Revolution

We begin with the late seventeenth century, when the English government repeatedly disarmed individuals whose conduct indicated a disrespect for the sovereign and its dictates. Also, the advent of the English Bill of Rights during this period confirmed Parliament's authority to delineate which members of the community could "have arms . . . by Law." 1 W. & M., Sess. 2, ch. 2, § 7 (Eng. 1689).

In the contentious period following the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994) (describing how Charles II "totally disarmed . . . religious dissenters"); Amicus Br. 6 ("Leading up to the Glorious Revolution of 1688, . . . non-Anglican [sic] Protestants were often disarmed."). The reason the Crown seized nonconformists' weapons, according to *Amici*, is that non-Anglican Protestants were dangerous. But the notion that *every* disarmed nonconformist was dangerous defies common sense. Moreover, *Amici*'s resort to dangerousness as the sole explanation for this measure ignores Anglicans' well-documented concern that nonconformists would not obey the King and abide by the law.

By definition, nonconformists refused to participate in the Church of England, an institution headed by the King as a matter of English law. *See Church of England*,

118a

BBC (June 30, 2011), https://www.bbc.co.uk/religion/religions/christianity/cofe/cofe_1.shtml (describing "the Act of Supremacy" enacted during the reign of Henry VIII). Indeed, many refused to take mandatory oaths recognizing the King's sovereign authority over matters of religion. *See* Frederick B. Jonassen, *"So Help Me?": Religious Expression and Artifacts in the Oath of Office and the Courtroom Oath*, 12 Cardozo Pub. L., Pol'y & Ethics J. 303, 322 (2014) (describing Charles II's reinstation of the Oath of Supremacy); Caroline Robbins, *Selden's Pills: State Oaths in England, 1558-1714*, 35 Huntington Lib. Q. 303, 314-15 (1972) (discussing nonconformists' refusal to take such oaths). Anglicans, in turn, accused nonconformists of believing that their faith exempted them from obedience to the law. *See* Christopher Haigh, *'Theological Wars': 'Socinians' v. 'Antinomians' in Restoration England*, 67 J. Ecclesiastical Hist. 325, 326, 334 (2016). In short, the historical record suggests nonconformists as a group were disarmed because their religious status was viewed as a proxy for disobedience to the Crown's sovereign authority and disrespect for the law, placing them outside the civic community of law-abiding citizens.

Even when Protestants' right to keep arms was restored, it was expressly made subject to the discretion of Parliament. One year after the Glorious Revolution of 1688 replaced the Catholic King James II with William of Orange and Mary, James's Protestant daughter, *see* Alice Ristroph, *The Second Amendment in a Carceral State*, 116 Nw. U. L. Rev. 203, 228 (2021), Parliament enacted the English Bill of Rights, which declared: "Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and *as allowed by Law*," 1 W. & M., Sess. 2, ch. 2, § 7 (Eng. 1689)

119a

(emphasis added).    Thus, this declaration, which the Supreme Court has described as the "predecessor to our Second Amendment," *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593), reveals the "historical understanding," *id.* at 2131, that the legislature—Parliament—had the power and discretion to determine who was sufficiently loyal and law-abiding to exercise the right to bear arms.    *Cf.* Lois G. Schwoerer, *To Hold and Bear Arms:  The English Perspective*, 76 Chi.-Kent L. Rev. 27, 47-48 (2000) (explaining how the English Bill of Rights preserved Parliament's authority to limit who could bear arms).

In 1689, Parliament enacted a status-based restriction forbidding Catholics who refused to take an oath renouncing their faith from owning firearms, except as necessary for self-defense.    An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (Eng. 1688); *see* Malcolm, *supra*, at 123.    Proponents of the view that disarmament depended exclusively on dangerousness have argued that Catholics categorically posed a threat of violence at this time.    *See Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 723 (2009). Again, however, this interpretation not only rests on the implausible premise that all Catholics were violent, but also ignores the more likely historical reason for disarming this entire group:   their perceived disrespect for and disobedience to the Crown and English law.    That is manifest in the statute's oath requirement.    When individuals swore that they rejected the tenets of Catholicism, their right to own weapons was restored.    An Act for the Better Securing the Government by Disarming

120a

Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (Eng. 1688).

Disavowal of religious tenets hardly demonstrated that the swearing individual no longer had the capacity to commit violence; rather, the oath was a gesture of allegiance to the English government and an assurance of conformity to its laws.    Likewise, contemporaneous arguments against tolerating Catholicism contended that Catholics' faith subverted the rule of law by placing the dictates of a "foreign power," *i.e.*, the Pope, before English legal commands.    *See* Diego Lucci, *John Locke on Atheism, Catholicism, Antinomianism, and Deism*, 20 Etica & Politica/Ethics & Pol. 201, 228-29 (2018).    The disarmament of Catholics in 1689 thus provides another example of the seizure of weapons from individuals whose status demonstrated, not a proclivity for violence, but rather a disregard for the legally binding decrees of the sovereign.

### 2.    Colonial America

The earliest firearm legislation in colonial America prohibited Native Americans, Black people, and indentured servants from owning firearms.[18]    *See* Michael A. Bellesiles, *Gun Laws in Early America:  The Regulation of Firearms Ownership, 1607-1794*, 16 Law & Hist. Rev. 567, 578-79 (1998).    *Amici* contend that these re-

---

[18]  The status-based regulations of this period are repugnant (not to mention unconstitutional), and we categorically reject the notion that distinctions based on race, class, and religion correlate with disrespect for the law or dangerousness.  We cite these statutes only to demonstrate legislatures had the power and discretion to use status as a basis for disarmament, and to show that status-based bans did not historically distinguish between violent and non-violent members of disarmed groups.

121a

strictions affected individuals outside the political community and so cannot serve as analogues to contemporary restraints on citizens like Range. Amicus Br. 30-31; *see also Carpio-Leon*, 701 F.3d at 978 n.1 (concluding such individuals may not have been part of "the people" at the Founding).   But even accepting *Amici*'s argument, colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white men—were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws.

During the late 1630s, for example, an outspoken preacher in Boston named Anne Hutchinson challenged the Massachusetts Bay government's authority over spiritual matters and instead advocated personal relationships with the divine.   *See* Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644 (1937).   Governor John Winthrop accused Hutchinson and her followers of being Antinomians, those who viewed their salvation as exempting them from the law, and banished her.   *Id.* at 648; Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978). The colonial government also disarmed at least fifty-eight of Hutchinson's supporters, not because those supporters had demonstrated a propensity for violence, but "to embarrass the offenders," as they were forced to personally deliver their arms to the authorities in an act of public submission.   James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988).   Disarming Hutchinson's supporters, in other words, served to shame colonists whose disavowal of the rule of law placed them outside the Puritan's civic community and

122a

obedience to the commands of the government. *Cf.* John Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017) (describing other shaming punishments used at the time, including scarlet letters).

Likewise, Catholics in the American colonies (as in Britain) were subject to disarmament without demonstrating a proclivity for violence. It is telling that, notwithstanding Maryland's genesis as a haven for persecuted English Catholics, *see* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1424 (1990), Maryland—as well as Virginia and Pennsylvania—confiscated firearms from their Catholic residents during the Seven Years' War, *see* Bellesiles, *supra*, at 574; Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020). That decision was not in response to violence; to the contrary, Catholics had remained peaceable even when the colony's Anglican Protestants took control of its government and required Catholics to take oaths recognizing the legal authority of the Crown, rather than the Pope, over matters of religion. *See* Michael Graham, S.J., *Popish Plots: Protestant Fears in Early Colonial Maryland, 1676-1689*, 79 Cath. Hist. Rev. 197, 197 (1993) ("[L]ittle sustained opposition to [the Anglican leadership] crystallized within the colony. What the Protestant Associators had done . . . was widely accepted."); Denis M. Moran, *Anti-Catholicism in Early Maryland Politics: The Protestant Revolution*, 61 Am. Cath. Hist. Soc'y 213, 235 (1950) (explaining how the oaths "asserted the king's supremacy in spiritual as well as in temporal matters"). In sum,

123a

Protestants in the colonies—as in England—disarmed Catholics not because they uniformly posed a threat of armed resistance, but rather because the Protestant majorities in those colonies viewed Catholics as defying sovereign authority and communal values.

### 3. Revolutionary War

Revolutionary-era history furnishes other examples of legislatures disarming non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact.[19]

John Locke—whose views profoundly influenced the American revolutionaries[20]—argued that the replacement of individual judgments of what behavior is transgressive with communal norms is an essential characteristic of the social contract. *See* John Locke, *Two Treatises of Government* § 163 (Thomas I. Cook, ed., Hafner Press 1947) (reasoning "there only is political society where every one of the members hath quitted his natural power [to judge transgressions and] resigned it up into the hands of the community"). Members of a social

---

[19] Again, we cite the repugnant, status-based regulations of an earlier period—disarming individuals on the basis of political affiliation or non-affiliation—merely to demonstrate the Nation's tradition of imposing categorical, status-based bans on firearm possession.

[20] *See* Thad W. Tate, *The Social Contract in America, 1774–1787: Revolutionary Theory as a Conservative Instrument*, 22 Wm. & Mary Q. 375, 376 (1965); *see also Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting) (observing "John Locke [was] one of the thinkers who most influenced the framers[]").

124a

compact, he explained, have a civic obligation to comply with communal judgments regarding proper behavior.[21]

In the newly proclaimed states, compliance with that civic obligation translated to entitlement to keep and bear arms, with many of the newly independent states enacting statutes that required individuals, as a condition of keeping their arms, to commit to the incipient social compact by swearing fidelity to the revolutionary regime.[22] *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 158 (2007).

---

[21] Locke based this duty on the consent of those within the political society; however, he contended that mere presence in a territory constituted tacit consent to the laws of the reigning sovereign. *See* Locke, *supra*, § 119 ("[I]t is to be considered what shall be understood to be a sufficient declaration of a man's consent to make him subject to the laws of any government. There is a common distinction of an express and a tacit consent which will concern our present case. . . . [E]very man that hath any possessions or enjoyment of any part of the dominions of any government doth thereby give his tacit consent and is as far forth obliged to obedience to the laws of that government, during such enjoyment, as any one under it; whether this his possession be of land to him and his heirs for ever, or a lodging only for a week, or whether it be barely travelling freely on the highway; and, in effect, it reaches as far as the very being of anyone within the territories of that government.").

[22] We cite these laws as evidence of the original understanding of the Second Amendment and the traditions concerning firearms regulation in historical context. Of course, our social and political awareness has obviously evolved significantly since that time, and by today's standards, the concept of restricting fundamental rights based on political affiliation would be repugnant to the Constitution, including the First Amendment.

125a

In Connecticut, for example, as hostilities with Britain worsened, colonists denounced loyalists' dereliction of their duties to the civic community. The people of Coventry passed a resolution in 1774 stating loyalists were "unworthy of that friendship and esteem which constitutes the bond of social happiness, and ought to be treated with contempt and total neglect." G.A. Gilbert, *The Connecticut Loyalists*, 4 Am. Hist. Rev. 273, 280 (1899) (describing this resolution as "a fair sample of most of the others passed at this time"). "Committees of Inspection" publicized the names and addresses of suspected loyalists in local newspapers, describing them as "persons held up to public view as enemies to their country," *id.* at 280-81, and in 1775, this stigmatization of individuals suspected of infidelity to the inchoate United States culminated in a statute prohibiting anyone who defamed resolutions of the Continental Congress from keeping arms, voting, or serving as a civil official, *see id.* at 282.

Pennsylvania likewise disarmed non-violent individuals who were unwilling to abide by the newly sovereign state's legal norms. The legislature enacted a statute in 1777 requiring all white male inhabitants above the age of eighteen to swear to "be faithful and bear true allegiance to the commonwealth of Pennsylvania as a free and independent state," Act of June 13, 1777, § 1 (1777), 9 The Statutes at Large of Pennsylvania from 1652-1801 110, 111 (William Stanley Ray ed., 1903), and providing that those who failed to take the oath—without regard to dangerousness or propensity for physical violence—"shall be disarmed" by the local authorities, *id.* at 112-13, § 3.

126a

This statute is particularly instructive because Pennsylvania's 1776 state constitution protected the people's right to bear arms. *See* Cornell, *Don't Know Much About History*, *supra*, at 670-71; Marshall, *supra*, at 724. Yet Pennsylvania's loyalty oath law deprived sizable numbers of pacifists of that right because oath-taking violated the religious convictions of Quakers, Mennonites, Moravians, and other groups. Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51 (2006); *see also* Thomas C. McHugh, Moravian Opposition to the Pennsylvania Test Acts, 1777 to 1789, at 49-50 (Sept. 7, 1965) (M.A. thesis, Lehigh University) (on file with the Leigh Preserve Institutional Repository). So while *Amici* contend that individuals disarmed under loyalty oath statutes "posed a grave danger and were often violent," Amicus Br. 12, Pennsylvania's disarmament of this sizable portion of the state's populace cannot be explained on that ground. *See Heller*, 554 U.S. at 590 ("Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever. . . . "); *cf. Folajtar*, 980 F.3d at 908 n.11 (explaining "[r]efusing to swear an oath" does not "qualify as dangerous").

Instead, the Pennsylvania legislature forbade Quakers and other religious minorities from keeping arms because their refusal to swear allegiance demonstrated that they would not submit to communal judgments embodied in law when it conflicted with personal conviction. *See* Wedeking, *supra*, at 51-52 (describing how Quakers were "penal[ized] for allegiance to their religious scruples over the new government"). The act, in other words, was "an effort by Pennsylvania's Constitutionalist party to restrictively define citizenship"—*i.e.*,

127a

what eventually became "the people"—"to those capable of displaying the requisite virtue." Cornell, *Don't Know Much About History*, *supra*, at 671.

Exercising its broad authority to disarm individuals who disrespected the rule of law, Virginia's General Assembly also passed a loyalty oath statute in 1777. An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurance of Allegiances to the Same, and for Other Purposes ch. III (1777), 9 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619 281, 281 (William W. Hening ed., 1821). That law disarmed "all free born male inhabitants of this state, above the age of sixteen years, except imported servants during the time of their service" who refused to swear their "allegiance and fidelity" to the state. *Id.* But these individuals could not have been considered dangerous spies or threats of violence: the statute still required disarmed individuals to attend militia trainings and run drills without weapons, *id.* at 282—an indignity previously inflicted upon free Black men, Churchill, *supra*, at 160. Instead, this use of disarmament as a method of public humiliation reveals the statute's true social function: distinguishing those unwilling to follow the dictates of the new government from law-abiding members of the civic community.

In sum, the "how and why," *Bruen*, 142 S. Ct. at 2133, of these oath statutes' burden on the right to bear arms teaches us two things about the historical understanding of status-based prohibitions. First, in keeping with Locke's view that compliance with communal judgment is an inextricable feature of political society, these laws "defined membership of the body politic" by disarming

128a

individuals whose refusal to take these oaths evinced not necessarily a propensity for violence, but rather a disrespect for the rule of law and the norms of the civic community. Churchill, *supra*, at 158. Second, legislatures were understood to have the authority and broad discretion to decide when disobedience with the law was sufficiently grave to exclude even a non-violent offender from the people entitled to keep and bear arms. *Cf.* Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1586 (2022) ("[T]he founders thought the legislature should decide which groups pose a threat to the social order or the community.").

### 4. Ratification Debates

The ensuing deliberations over whether to ratify the Constitution similarly illustrate the Founding generation's understanding of legislatures' power and discretion over disarmament of those not considered law-abiding.

In Pennsylvania, debates between the Federalists and Anti-Federalists "were among the most influential and widely distributed of any essays published during ratification." Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 227 (1999). Those essays included "The Dissent of the Minority," which was published by the state's Anti-Federalist delegates, *id.* at 232-33, and which the Supreme Court has viewed as "highly influential" to the adoption of the Second Amendment, *Heller*, 554 U.S. at 604. The amendment proposed by the Dissent of the Minority stated:

129a

> [T]he people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals.

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis added).

As the Dissent of the Minority's proposal makes clear, members of the Founding generation viewed "[c]rimes committed—violent or not—[as] . . . an independent ground for exclusion from the right to keep and bear arms." *Binderup*, 836 F.3d at 349 (quotation omitted); *see also Folajtar*, 980 F.3d at 908-09. *Amici* insist that the proposal's crime and danger clauses must be read together as authorizing the disarmament of dangerous criminals only. *See* Amicus Br. 16; *see also* Greenlee, *supra* at 267; *Binderup*, 836 F.3d at 367 (Hardiman, J., concurring in part). But the Dissent of the Minority's use of the disjunctive "or" refutes this counterargument: The dissenters distinguished between criminal convictions and dangerousness, and provided that *either* could support disarmament. *See, e.g.*, *United States v. Woods*, 571 U.S. 31, 45-46 (2013) (explaining the "ordinary use" of "or" "is almost always disjunctive"—*i.e.*, "the words that it connects are to 'be given separate meanings'") (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).

The Dissent of the Minority therefore comports with the longstanding tradition in English and American law of disarming even non-violent individuals whose actions demonstrated a disrespect for the rule of law as embodied in the sovereign's binding norms.

130a

### 5.    Other Non-Violent Offenses

Punishments meted out for a variety of non-violent offenses between the seventeenth and nineteenth centuries provide additional support for legislatures' authority to disarm even non-violent offenders.

Historically, several non-violent felonies were punishable by death and forfeiture of the perpetrator's entire estate.  *See Folajtar*, 980 F.3d at 904-05.  As the Government observes, those offenses included larceny, repeated forgery, and false pretenses—all of which involve deceit or the wrongful deprivation of another's property and closely resemble Range's welfare fraud offense.   Appellees' Supp. Br. 7-8.[23]   *A fortiori*, given the draconian punishments that traditionally could be imposed for these types of non-violent felonies, the comparatively lenient consequence of disarmament under 18 U.S.C. § 922(g)(1) is permissible.[24]

Additionally, legislatures in the American colonies and United States authorized the seizure of firearms from individuals who committed non-violent, misde-

---

[23] *See* Answering Br. 15 (citing 1 Wayne R. LaFave, *Substantive Criminal Law* § 2.1(b) (3d ed. 2017); Francis Bacon, *Preparation for the Union of Laws of England and Scotland*, *in* 2 *The Works of Francis Bacon* 160, 163-64 (Basil Montagu ed., Cary & Hart 1844); and 2 Jens David Olin, *Wharton's Criminal Law* § 28:2 (16th ed. 2021)).

[24] The *Kanter* dissent takes issue with this analysis in part because the death penalty was not always imposed.   919 F.3d at 458-62 (Barrett, J., dissenting).   How punishments were meted out is beside the point.   What matters is the exposure.   *See id.* at 459 ("[M]any crimes remained eligible for the death penalty.  . . .  ").

131a

meanor hunting offenses.[25]   In 1652, New Netherlands passed an ordinance that forbid "firing within the juris-diction of this city [of New Amsterdam] or about the Fort, with any guns at Partridges or other Game that may by chance fly within the city, on pain of forfeiting the Gun.  .  .  .  "   1652 N.Y. Laws 138.   A 1745 North Carolina law prohibited nonresidents from hunting deer in "the King's Wast" and stated that any violator "shall forfeit his gun" to the authorities.   Act of Apr. 20, ch. III (1745), 23 Acts of the North Carolina General Assembly 218, 219 (1805).   New Jersey enacted a statute "for the preservation of deer, and other game" in 1771 that punished non-residents caught trespassing with a firearm by seizing the individuals' guns.   1771 N.J. Laws 19-20.

State legislatures continued to enact such laws after the Revolution.   To protect the sheep of Naushon Island, Massachusetts passed a statute requiring armed trespassers on the island to forfeit their guns.[26]   An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin Cove Island, Otherwise Called

---

[25] We appreciate that these laws involved the isolated disarmament of the firearm involved in the offense, not a ban on possession as in the other laws we discuss above.   Nevertheless, they support the notion that legislatures' power to strip citizens of their arms was not limited to cases involving violent persons or offenses.

[26] A plaintiff suing the trespasser could alternatively seek the value of the trespasser's firearms.   An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin Cove Island, Otherwise Called Naushon Island, and on Nennemessett Island, and Several Small Islands Contiguous, Situated in the County of Dukes County § 2 (1790), 1 Private and Special Statutes of the Commonwealth of Massachusetts 258, 259 (Manning & Loring ed., 1805).

132a

Naushon Island, and on Nennemessett Island, and Several Small Islands Contiguous, Situated in the County of Dukes County § 2 (1790), 1 Private and Special Statutes of the Commonwealth of Massachusetts 258, 259 (Manning & Loring ed., 1805).   Virginia and Maryland punished individuals who hunted wild fowl on rivers at night by seizing their guns.   1832 Va. Acts 70; 1838 Md. Laws 291-92.   And Delaware law required non-residents who hunted wild geese on the state's waterways to forfeit their guns, even though the statute specified that this hunting offense was a misdemeanor.   12 Del. Laws 365 (1863).

As these centuries of hunting statutes show, legislatures repeatedly exercised their authority to decide when non-violent offenses were sufficiently grave transgressions to justify limiting violators' ability to keep and bear arms.[27]

\*   \*   \*   \*   \*

We draw three critical lessons from the historical record examined above.   First, legislatures traditionally used status-based restrictions to disqualify categories of persons from possessing firearms.   Second, they did so not merely based on an individual's demonstrated propensity for violence, but rather to address the threat purportedly posed by entire categories of people to an

---

[27] We note that history and tradition may indicate that pretextual disarmament is inconsistent with the Second Amendment.   *Cf.* 1 William Blackstone, *Commentaries* app. \*300 (St. George Tucker ed., Birch & Small 1803) (decrying how "[i]n England, the people have been disarmed, generally, under the specious pretext of preserving the game"); *Drummond v. Robinson Twp.*, 9 F.4th 217, 227-29 (3d Cir. 2021).   Range does not claim his conviction was pretextual, however, so we leave the issue for another day.

133a

orderly society and compliance with its legal norms.
Third, legislatures had, as a matter of separated powers,
both authority and broad discretion to determine when
individuals' status or conduct evinced such a threat suf-
ficient to warrant disarmament.[28]

## IV. **Range's Claims**

Having identified the appropriate test and reviewed
the historical evidence in this area, we now turn to
Range's claims.

_____

[28] Deference to state legislatures not only accords with longstand-
ing national tradition, but also respects state legislatures' unique
ability to channel local concerns and values into criminal law. *See*
Joshua M. Divine, *Statutory Federalism and Criminal Law*, 106 Va.
L. Rev. 127, 188 (2020) ("[F]ederal reliance on state law disturbs uni-
formity by baking into federal law variations in state law. But far
from being a downside, regional disparity is an asset."); *see also* Paul
H. Robinson & Tyler Scot Williams, *Mapping American Criminal
Law: Variations Across the 50 States* 4 (2018) (surveying state var-
iation in the incorporation of desert, deterrence, and incapacitation
norms into their criminal laws). There is good reason that the crim-
inal codes of arid states like Nevada and Colorado include offenses
like diverting irrigation water, Nev. Rev. Stat. § 207.225 (2021), and
causing prairie fires, Colo. Rev. Stat. § 18-13-109 (2022), which the
code of a state like Maryland does not.

In addition to preserving federalism and the separation of pow-
ers, upholding legislative determinations of when crimes are suffi-
ciently serious to warrant disarmament avoids forcing "judges to
'make difficult empirical judgments' about 'the costs and benefits of
firearms restrictions,' especially given their 'lack [of] experience' in
the field." *Bruen*, 142 S. Ct. at 2130 (quoting *McDonald*, 561 U.S.
at 790-91). And as explained above, judicial determinations of when
a crime is sufficiently violent have proven infeasible to apply in other
contexts. *See Binderup*, 836 F.3d at 410 (Fuentes, J., concurring in
part).

134a

Range committed an offense that Pennsylvania has classified as a misdemeanor punishable by more than two years' imprisonment, 62 Pa. Cons. Stat. § 481(a), and Congress has concluded is sufficiently serious to exclude Range from the body of law-abiding, responsible citizens entitled to keep and bear arms, *see* 18 U.S.C. §§ 921(a)(20)(B), 922(g)(1).[29]   That determination fits comfortably within the longstanding tradition of legislation disarming individuals whose actions evince a disrespect for the rule of law.   Interpreting the text of the Second Amendment in light of the right's "historical background," *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592), we conclude that Range's criminal conviction placed him beyond the ambit of "the people" protected by the Second Amendment.

Range asserts that "[t]he Government has failed to meet its burden of proving that the plaintiff's conviction

---

[29] Some of our esteemed colleagues have expressed concerns about the breadth of state offenses that trigger disarmament under 18 U.S.C. § 922(g)(1).   *Binderup*, 836 F.3d at 372 n.20 (Hardiman, J., concurring in part); *Folajtar*, 980 F.3d at 921 (Bibas, J., dissenting).   But we do not perceive any inherent absurdity in a state's interest in punishing drug offenders, *see* Ariz. Rev. Stat. Ann. § 13-3405, or individuals who abuse public services like recycling programs, *see* Mich. Comp. Laws Ann. § 445.574a(1)(d), or libraries, *see* 18 Pa. Cons. Stat. Ann. § 3929.1.   Indeed, enforcement of the laws cited by our colleagues illustrates why legislatures have chosen to designate them as felonies.   *Cf. United States v. Bocook*, 59 F.3d 167, 167 (4th Cir. 1995) (describing a prosecution for uttering obscene language by means of radio communication when a defendant "broadcast[s] unauthorized radio messages to aircraft and air traffic controllers" in which he "used obscene language, harassed a female air traffic controller, made threats to shoot down aircraft, and transmitted recorded music, weather reports, and warnings about his own activities").

135a

places him outside the scope of those entitled to Second Amendment rights based on the historical analysis of those who can be disarmed."[30]    Appellant's Supp. Br. 1. Notwithstanding the historical evidence surveyed above, Range contends that his disarmament is inconsistent with the nation's tradition of firearm regulation "because he is not dangerous."    Opening Br. 28.    Echoing positions expressed by some judges, *Amici* agree, arguing "English and American tradition support firearm prohibitions on dangerous persons" but "[t]here is no tradition of disarming peaceable citizens."    Amicus Br. 2; *see Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting); *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting); *Binderup*, 836 F.3d at 369 (Hardiman, J., concurring in part).    Our review of the historical record convinces us otherwise.    Non-violent individuals were repeatedly disarmed between the seventeenth and nineteenth cen-

---

[30] Moreover, in his supplemental brief, Range appears to raise the issue that a permanent ban on firearm possession lacks a historical basis.  *See* Appellant's Supp. Br. 3-4.  As to arguments concerning the duration of a ban, Congress has addressed it in two ways.  First, Congress has exempted any person whose conviction "has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored" from disarmament. § 921(a)(20).  Second, Congress also permitted the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to restore individuals' ability to possess firearms upon consideration of their personal circumstances, criminal record, and the public interest.    18 U.S.C. § 925(c).  But these assessments proved so resource intensive for ATF that Congress has refused to fund the program since 1992.  *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007); S. Rep. No. 102-353 (1992).  As we previously noted, "[i]f [the petitioner] and others in his position wish to seek recourse, it is to the legislature, and not to the judiciary, that efforts should be directed."  *Folajtar*, 980 F.3d at 911; *Binderup*, 836 F.3d at 402-03 (Fuentes, J., concurring in part and dissenting in part).

136a

turies because legislatures determined that those individuals lacked respect for the rule of law and thus fell outside the community of law-abiding citizens. That longstanding tradition refutes Range's constrictive account of Anglo-American history as prohibiting the government from disarming non-violent individuals.

*Amici* offer a few statutes that purportedly prove legislatures' inability to disarm non-violent offenders, but these laws confirm our view. Specifically, *Amici* cite a 1785 Massachusetts law that forbid tax collectors and sheriffs from embezzling tax revenue. Amicus Br. 32 (citing 1785 Mass. Laws 516).[31] Although the statute permitted estate sales to recover embezzled funds, "the necessities of life—including firearms—could not be sold." *Id.* Likewise, *Amici* discuss a 1650 Connecticut law exempting weapons from execution in civil actions and four statutes providing similar protections for militia arms. *Id.* at 33 (citing *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, May 1665*, at 537 (J. Hammond Trumbull ed., 1850); 1 Stat. 271, § 1 (1792); *Archives of Maryland Proceedings and Acts of the General Assembly of Maryland*, at 557 (William Hand Browne ed., 1894); An Act for Settling the Militia ch. XXIV (1705), 3 Statutes at Large: Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year 1619 335, 339 (William W. Hening ed., 1823); An Act for the Settling and Better Regulation of the Militia ch. II (1723), 4 Statutes at Large: Being a Collection of all the Laws of Virginia from the First Session of the Leg-

---

[31] We note that *Amici* cited to a 1786 Massachusetts law, but the language *Amici* references comes from Chapter 46 of the 1785 Act of Massachusetts.

137a

islature, in the Year 1619 118, 121 (William W. Hening
ed., 1820).   But *Amici* place more weight on those laws
than they can rightly bear.   The fact that legislatures
did not *always* exercise their authority to seize the arms
of individuals who violated the law does not show that
legislatures *never* could do so.   Rather, these laws un-
derscore legislatures' power and discretion to determine
when disarmament is warranted.   And, as detailed
above, Range and *Amici*'s contention that legislatures
lacked the *authority* to disarm non-violent individuals
"flatly misreads the historical record."   *Heller*, 554
U.S. at 603.

We believe the Supreme Court's repeated character-
ization of Second Amendment rights as belonging to
"law-abiding" citizens supports our conclusion that indi-
viduals convicted of felony-equivalent crimes, like
Range, fall outside "the people" entitled to keep and
bear arms.[32]   *See, e.g.*, *Bruen*, 142 S. Ct. at 2122; *Heller*,

---

[32] A concern with which district courts have wrestled when as-
sessing the constitutionality of 18 U.S.C. § 922(g)(1) after *Bruen* is
that interpreting "the people" in the Second Amendment to exclude
individuals convicted of offenses would deviate from that phrase's
meaning in the First and Fourth Amendments.   *Cf. Collette*, 22-CR-
141, 2022 WL 4476790, at *8 ("[T]his Nation has a longstanding tra-
dition of exercising its right—as a free society—to exclude from 'the
people' those who squander their rights for crimes and violence."),
*with Coombes*, No. 22-CR-189, 2022 WL 4367056, at *4 ("[T]he court
declines to carve out felons from the scope of the Second Amend-
ment's protection of 'the people.'")   But Justice Stevens's dissent
leveled that very criticism against the *Heller* majority:   "[T]he
Court limits the protected class to 'law-abiding, responsible citizens.'
But the class of persons protected by the First and Fourth Amend-
ments is *not* so limited; for even felons (and presumably irrespons-
ible citizens as well) may invoke the protections of those constitu-
tional provisions."   554 U.S. at 644 (Stevens, J., dissenting).   How-

138a

554 U.S. at 635. As Judge Hardiman explained in his *Binderup* concurrence, Second Amendment challenges to § 922(g)(1) "require us to decide who count among 'the people' entitled to keep and bear arms" because "the Founders understood that not everyone possessed Second Amendment rights." 836 F.3d at 357 (Hardiman, J., concurring in part); *see also* Oral Arg. at 49:54 (*Amici* discussing which individuals fall outside "the people"). Focusing our inquiry on the meaning of "the people" also comports with the Lockean principles that animated Founding-era disarmaments of individuals whose unwillingness to abide by communal norms placed them outside political society. *Cf. Heller*, 554 U.S. at 580 (suggesting "the people" refers to "all members of the *political community*" (emphasis added)); Cornell, *Don't Know Much About History*, *supra*, at 671 (contending the right to keep and bear arms was historically "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner").

But even if we were to adopt the contrary view, treating Range as covered by "the Second Amendment's plain text[,]" *Bruen*, 142 S. Ct. at 2126, would "yield the same result," *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). *Bruen* requires the Government to (1) provide relevant historical analogues demonstrating a traditional basis for disarming those who commit felonies and felony-equivalent crimes, and (2) show that the challenger was convicted of a felony or felony-equivalent offense. *Cf. Charles*, No. 22-CR-154, 2022 WL 4913900,

---

ever, our reasoning applies solely to the Second Amendment and does not imply any limitation on the rights of individuals convicted of felony and felony-equivalent offenses under other provisions of the Constitution.

139a

at *9 ("[R]eading *Bruen* robotically would require the Government in an as-applied challenge[] to find an analogy specific to the crime charged. . . . That's absurd.").

The Government has satisfied its burden on both prongs. First, as discussed above, our Nation's tradition of firearm regulation permits the disarmament of those who committed felony or felony-equivalent offenses. *See Holloway*, 948 F.3d at 172 ("We 'presume the judgment of the legislature is correct and treat any crime subject to § 922(g)(1) as disqualifying unless there is a strong reason to do otherwise.'" (quoting *Binderup*, 836 F.3d at 351)). The Government has established as much through its detailed discussion of our pre-*Bruen* jurisprudence concerning the "the historical justification for stripping felons [of Second Amendment rights], including those convicted of offenses meeting the traditional definition of a felony." Appellees' Supp. Br. 2–3, 7 (quoting *Binderup*, 836 F. 3d at 348); *see also* Answering Br. 11–12.

The Government has also shown that Range was convicted of a felony or felony-equivalent offense. Range pleaded guilty to welfare fraud in violation of 62 Pa. Cons. Stat. § 481(a), a misdemeanor punishable by up to five years' imprisonment. Range's conviction therefore qualifies as a felony-equivalent offense under both federal law, 18 U.S.C. § 921(a)(20)(B), and traditional legal principles, *see Felony*, Black's Law Dictionary (11th ed. 2019). Accordingly, Range may be disarmed consistent with the Second Amendment. *See* Answering Br. at 16 (citing *Hamilton v. Pallozzi*, 848 F.3d 614, 627 (4th Cir. 2017))

**V.   Conclusion**

140a

We have conducted a historical review as required by *Bruen* and we conclude that Range, by illicitly taking welfare money through fraudulent misrepresentation of his income, has demonstrated a rejection of the interests of the state and of the community. He has committed an offense evincing disrespect for the rule of law. As such, his disarmament under 18 U.S.C. § 922(g)(1) is consistent with the Nation's history and tradition of firearm regulation.

For the above reasons, we will affirm the judgment of the District Court.

141a

**APPENDIX C**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————

Civil Action No. 20-3488

BRYAN DAVID RANGE, PLAINTIFF

*v.*

ATTORNEY GENERAL UNITED STATES OF AMERICA,
ET AL., DEFENDANTS

———————

Filed:   Aug. 8, 2021

———————

**ORDER**

———————

**AND NOW**, this [7th] day of August, 2023, in accordance with the Third Circuit Court of Appeals' decision in *Range v. Attorney General United States of America*, 69 F.4th 96 (3d Cir. 2023) (en banc) and the Third Circuit Court of Appeals' Mandate to this District Court (Doc. No. 29), it is here by **ORDERED** as follows:

1.   Declaratory judgment is **ENTERED** in favor of Bryan Range that 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment of the United States Constitution as applied to him.

2.   The enforcement of 18 U.S.C. § 922(g)(1) against Mr. Range is **ENJOINED**.

142a

3.    The Clerk of Court is directed to mark this case
       **CLOSED** for all purposes, including statistics.

                    BY THE COURT:

     /s/    GENE E.K. PRATTER
            GENE E.K. PRATTER
            UNITED STATES DISTRICT JUDGE

143a

## APPENDIX D

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

————

Civil Action No. 20-3488

BRYAN DAVID RANGE, PLAINTIFF

*v.*

REGINA LOMBARDO, ET AL., DEFENDANTS

————

Filed:   Aug. 31, 2021

————

## ORDER

————

**AND NOW**, this 30th day of August, 2021, upon consideration of the Government's Motion for Summary Judgment (Doc. No. 12), Mr. Range's Motion for Summary Judgment (Doc. No. 13), the Government's Statement of Undisputed Facts (Doc. No. 14), the Government's Response in Opposition to Mr. Range's Motion for Summary Judgment (Doc. No. 15), the Government's Response in Opposition to Mr. Range's Statement of Undisputed Material Facts (Doc. No. 16), Mr. Range's Response in Opposition to the Government's Motion for Summary Judgment (Doc. No. 17), and the Government's Reply in Support of its Motion for Summary Judgment (Doc. No. 18), it is **ORDERED** that:

1. The Government's Motion for Summary Judgment (Doc. No. 12) is **GRANTED**.

144a

2.  Mr. Range's Motion for Summary Judgment (Doc. No. 13) is **DENIED**.

3.  Mr. Range's Complaint (Doc. No. 1) is **DIS-MISSED** with prejudice.

4.  The Clerk of Court shall mark this case **CLOSED** for all purposes, including statistics.

**BY THE COURT:**

/s/ <u>**GENE E.K. PRATTER**</u>
**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

145a

**APPENDIX E**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

————

Civil Action No. 20-3488

BRYAN DAVID RANGE, PLAINTIFF

*v.*

REGINA LOMBARDO, ET AL., DEFENDANTS

————

Filed:   Aug. 31, 2021

————

**MEMORANDUM**

————

PRATTER, J.                    AUG. [30], 2021

Bryan Range pled guilty to making a false statement to obtain food stamps assistance more than 25 years ago, which was then a misdemeanor offense.   While Mr. Range served no time in prison because of this conviction, the crime to which he pied guilty was punishable by up to five years' imprisonment.   As a result, 18 U.S.C. § 922(g) prohibits him from owning a weapon.

Mr. Range seeks the Court's declaratory judgment that § 922(g) as applied to him violates the Second Amendment.   Because the Court concludes that Mr. Range's conduct is sufficiently "serious," as that term is defined by Third Circuit precedent, § 922(g) is constitutional as applied.   The Court will grant the Government's motion for summary judgment, and deny Mr. Range's motion for summary judgment.

146a

## BACKGROUND

Mr. Range pied guilty, in August 1995, to one count of making a false statement to obtain food stamps assistance, in violation of 62 Pa. C.S. § 481(a).    At that time, Mr. Range mowed lawns for a living, earning between $9 and $9.50 an hour, or approximately $300 per week. He and his wife struggled to make ends meet caring for their three children-a three-year-old and twin two- year-olds.    Mrs. Range prepared an application for food stamps, which she and Mr. Range both signed.    The application omitted Mr. Range's income.    Mr. Range alleges that he did not review the application, but accepted responsibility for it and acknowledged that it was wrong to not fully disclose his income.    Mr. Range was sentenced to three years' probation, which he satisfactorily completed, $2,458 in restitution, $288.29 in costs, and a $100 fine.    He served no time in jail.    But as will become relevant later, Mrs. Range—who allegedly prepared the application and also signed it—was not charged with a crime.

Violations of 62 Pa. C.S. § 481(a) were at the time classified as first-degree misdemeanors,[1]  punishable by

---

[1] Mr. Range's conduct was classified as a first-degree misdemeanor at the time, but in 2018 the Pennsylvania legislature amended 62 Pa. C.S. § 481 so that fraudulently obtained assistance of $1,000 or more is now classified as a felony of the third degree. However, the parties agree—as does the Court—that the classification of Mr. Range's conduct at the time of his conviction governs. *See Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 351 (3d Cir. 2016) (en banc) ("[T]he category of serious crimes changes over time as legislative judgments regarding virtue evolve."); *United States v. Irving,* 316 F. Supp. 3d 879, 890 (E.D. Pa. 2018), *aff'd sub nom. United Stales v. Mills,* No. 18-3736, 2021 WL 2351114 (3d Cir. June 9, 2021) (applying *Binderup* and noting that "having

147a

up to five years' imprisonment.    Mr. Range alleges that when he pled guilty, neither the prosecution nor the judge informed him of the maximum potential sentence, or of the fact that by pleading guilty, he thereafter would be barred from possessing firearms.

Since 1995, Mr. Range's only other "criminal" history includes minor traffic and parking infractions, as well as a fishing offense in 2011.    He testified that he thought he had renewed his fishing license, and that after paying the fine, he renewed the license.

At one time, Mr. Range attempted to purchase a firearm, but was rejected by the background check system. The employee at the gun store Mr. Range visited reviewed a list of prohibiting offenses with Mr. Range, and Mr. Range verified that he had not committed any of them.    The employee told Mr. Range that the rejection was likely due to a computer error (a common refrain of modern life), and that he should retry his purchase at a later time.    But because Mrs. Range had not been convicted of falsifying the application (or any other crime), she was able to pass a background check.    She purchased a hunting rifle and gifted it to Mr. Range. When that gun later was destroyed in a house fire, she gifted him a different rifle.

Years later, Mr. Range again tried to purchase a gun and was again rejected.    Once more, the store employee told him that the rejection was a mistake.    But when Mr. Range researched the matter further, he learned that he was barred from possessing firearms be-

_____

the Court rule on the constitutionality of an [indictment] based on a jury's verdict some two months later" would "require some form of judicial time travel").

148a

cause of his public assistance application conviction. Mr. Range sold his only firearm so that he would be compliant with the law, and then he brought this lawsuit.

## Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

On a motion for summary judgment, the Court views the evidence presented in the light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249,252 (3d Cir. 2010).

The movant is initially responsible for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-

149a

moving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## DISCUSSION

The controlling issue in this case is what limits the Second Amendment puts on the ability of governments to limit access to firearms because of a citizen's non-violent misdemeanor conviction. This debate asks how to interpret language in the Supreme Court's watershed Second Amendment case, *District of Columbia v. Heller,* 554 U.S. 570 (2008). After concluding that the Second Amendment protects an individual's right to possess firearms, the Supreme Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and that such laws are "presumptively lawful." *Heller,* 554 U.S. at 626-27 & n.26. However, courts have grappled with whether a challenger could rebut *Heller's* "presumption" that such laws are lawful, at least as applied to them, and whether

150a

laws that prohibit the possession of firearms by misde-meanants are also consistent with the Second Amend-ment.

Our Third Circuit Court of Appeals very recently ad-dressed and tackled one of the "uncharted frontiers" re-maining after *Heller*. *See Drummond v. Robinson Twp.*, No. 20-1722, 2021 WL 3627106 (3d Cir. Aug. 17, 2021). While analyzing the issue of the possible inter-ference of zoning rules with citizens' Second Amend-ment right to bear arms, the appellate panel under-scored lessons from *Heller* that demand the delicate bal-ancing of the right to bear arms with the not unlimited nature of that right that leaves room for lawful re-strictions, subject to heightened judicial scrutiny on it. *Id.* at *11-12.

Turning to the specific *Heller* frontier presented by Mr. Range, the Third Circuit Court of Appeals first con-sidered this question en banc in *Binderup v. Attorney General of the United States of America*, 836 F.3d 336 (3d Cir. 2016) (en banc). *Binderup* itself shows the challenging topography of the topic. Three opinions were issued in *Binderup,* none of which represented a majority. Judge Ambro, joined by two other judges, wrote for the court. Judge Hardiman was joined by four other judges, concurring in the judgment. Judge Fuentes was joined by six other judges in an opinion concurring in part and dissenting in part. The Third Circuit Court of Appeals has since treated Judge Am-bro's opinion as controlling based on an analysis under *Marks v. United States,* 430 U.S. 188, 193 (1977), be-cause it represented the median position between the dissenting and concurring opinions. *See Beers v. At-torney General*, 927 F.3d 150, 155-56 (3d Cir. 2019),

151a

*judgment vacated on other grounds, Beers v. Barr*, 140 S. Ct. 2758 (mem.) (2020).

*Binderup* adopted, with some modifications, *United States v. Marzzarella's* two-step approach to determining whether a crime was "serious." *Binderup*, 836 F.3d at 345 (citing *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)). At the first step, a court considers whether the Second Amendment is implicated. *See Drummond*, 2021 WL 3627106, at *3 (citing *Marzzarella*, 614 F.3d at 89). If the claimant has committed a "serious" offense, rendering that person an "unvirtuous citizen" who was historically barred from possessing a firearm, that person is judged to have lost his or her Second Amendment rights. *Holloway v. Attorney General United States,* 948 F.3d 164, 171 (3d Cir. 2020) (quoting *Binderup*, 836 F.3d at 348-49). "[I]f the challenger succeeds at step one, the burden shifts to the Government to determine that the regulation satisfied some form of heightened scrutiny." *Binderup,* 836 F.3d at 347. *See also Drummond*, 2021 WL 3627106, at *3.

Accordingly, the Court will first consider whether Mr. Range's conduct is sufficiently "serious" for Mr. Range to lose his Second Amendment rights. Then, if it finds that the Second Amendment is implicated, it will consider whether the Government has carried its burden of demonstrating that the regulation satisfies heightened scrutiny.

## A. *Marzzarella* Step One:  Whether the Second Amendment is Implicated

*Binderup* set forth a nonexclusive four-factor test for determining whether a crime is "serious":  "(1) wheth-

152a

er the conviction was classified as a misdemeanor or a felony, (2) whether the criminal offense involves violence or attempted violence as an element, (3) the sentence imposed, and (4) whether there is a cross-jurisdictional consensus as to the seriousness of the crime." *Holloway*, 948 F.3d at 172 n.10 (citing *Binderup*, 836 F.3d at 351-52). *Holloway* itself added one more factor: (5) the potential for physical harm to others. *See id.* at 173.

The Government concedes that Mr. Range satisfies four out of the five factors. His conviction was classified as a misdemeanor, the criminal offense does not involve violence or attempted violence as an element, he was not sentenced to any jail time, and the crime involved no potential for physical harm to others. But the parties dispute whether there is a "cross-jurisdictional consensus" as to the seriousness of his crime.

The parties agree that between 39 and 41 jurisdictions in the United States would have classified Mr. Range's conduct as a felony.[2] Mr. Range concedes that 39 jurisdictions would likely constitute a consensus, and the Court agrees-for at least two reasons. First, the word "consensus" implies something short of total unanimity, but rather the acknowledged existence of a "general agreement." *See* Consensus, Black's Law Dictionary (11th ed. 2019) ("A general agreement; collective opinion."); Consensus, Shorter Oxford English Dictionary (6th ed. 2007) ("Agreement or unity of opinion, tes-

---

[2] *See* Doc. Nos. 17 at 18; 18 at 6. Because the parties agree that the difference between 39 and 41 jurisdictions should make no difference to the Court's analysis, the Court will not discuss the details of the parties' dispute over the classification of the remaining two jurisdictions.

153a

timony, etc.; the majority view, a collective opinion. . . . "). Second, as the challenger, the burden rests with Mr. Range to make a "'strong' showing that . . . he has not committed a 'serious' crime." *Holloway,* 948 F.3d at 172 (quoting *Binderup,* 836 F.3d at 347). Therefore, even if this particular case falls close to the line, it is Mr. Range's burden to prove that there is *not* a consensus.

But Mr. Range argues that the proper point of reference is not all 50 states, but rather only those states that criminalize the making of a false statement regarding food stamps specifically. He argues that the Court should disregard the 15 states that punish conduct like Mr. Range's as a felony under a general theft or falsification statute.

The Court disagrees. Every time that the Third Circuit Court of Appeals has applied the *Binderup* balancing test, it has considered the laws of all 50 states. Mr. Range cites no authority for his argument that the Court should only consider laws that define the elements of a crime in the same way as the state in which the challenger was convicted. Instead, he argues that the law should recognize that "there is a difference between a poor parent who applies for too many food stamps, and a sophisticated fraudster who schemes to systematically bilk Medicare of millions." Perhaps, like compassionate human nature, or a personal gauge of morality, the law should make such a distinction. Indeed, it can certainly be said that the law should be written in a way to recognize many finer or closer distinctions than it does. No doubt there are even finer gradations of guilt between the two extremes Mr. Range

154a

proposes.[3]   But under our system of government it is
within the prerogative of every state to choose between
having a more complex criminal code that defines its
statutes narrowly, and more general criminal statutes
that are accompanied by a greater range of possible
punishments.    Nothing in *Binderup,* or any opinion ap-
plying its multifactor test, provides that a state's choice
to classify conduct like Mr. Range's as a felony is irrele-
vant merely because the drafters of the laws in any
given state choose to define crimes with more general
language.

Because the Court has concluded that there is a
cross-jurisdictional consensus that making a false state-
ment regarding food stamps is serious, the question is
whether this one factor is sufficiently important for the
Government to prevail here.    Mr. Range argues that it
is not, for several reasons.    First, he argues that the
law's classification as a misdemeanor or a felony is the
most important factor.    In support of this argument, he
notes that the Third Circuit Court of Appeals has de-
scribed the law's classification as "generally conclusive."
*Folajtar v. Att'y Gen. of the United States,* 980 F.3d 897,
900 (3d Cir. 2020), *cert. denied sub nom.    Folajtar v.
Garland,* No. 20-812, 2021 WL 1520793 (U.S. Apr. 19,
2021).    The Third Circuit Court of Appeals has also
held that the underlying conduct's "potential for danger
and risk of harm to self and others" was sufficiently im-
portant that the Government prevailed even though the
other four factors weighed in favor of the challenger.

---

[3]  Indeed, the compelling tug on the human heart such as Mr.
Range appears to present has stood the test of time and modalities
in literature.    *See* Victor Hugo, Les Miserables (Norman Denny
trans., Penguin Books 1982) (1862).

155a

*See Holloway*, 948 F.3d at 164. Mr. Range reasons that because *Binderup* endorsed a balancing test, he need not prevail on every factor, especially where, as here, both of the factors that the Third Circuit Court of Appeals has treated as most important support his claim.

Mr. Range's position is not without merit. The plurality opinion in *Binderup* described the factor test as a balancing test, not a set of elements that all petitioners must meet. *See Binderup*, 836 F.3d at 351. And Judge Fuentes's opinion dissenting in part likewise viewed the plurality's holding as endorsing a balancing test of factors. *See id.* at 411 ("Judge Ambro's approach . . . would require district court judges to consider a variety of factors in order to assess a crime's 'seriousness' . . . . ") (Fuentes, J., dissenting). One could reason that had *Binderup* intended future challengers to "run the gauntlet," satisfying every factor, it would have said so.

However, that is not how subsequent opinions interpreting *Binderup* have used the multifactor test. Both times that it has applied *Binderup*, the Third Circuit Court of Appeals has held for the Government even though only one factor weighed in its favor. The Government prevailed in *Holloway* even though only the (newly-minted) "likelihood of physical harm" factor weighed in its favor. *Holloway*, 948 F.3d at 173. The Government also prevailed in *Folajtar* even though the only factor in its favor was the law's classification as a felony rather than a misdemeanor. *Folajtar*, 980 F.3d at 900. Indeed, the fact that the dissents in *Folajtar* and *Holloway* both argued that the majorities had improperly treated one factor as dispositive only confirms

156a

this interpretation of those opinions.   Even more important is language in *Binderup* itself.   While no court has held that the cross-jurisdictional factor is similarly important, dicta in *Binderup* suggests that its absence would have been dispositive.   *See Binderup,* 836 F.3d at 353 ("Were the Challengers unable to show that so many states consider their crimes to be non-serious, it would be difficult for them to carry their burden at step one.").

Mr. Range next argues that the Government's proposed approach improperly renders the law's classification as a "one-way rachet, employed only in felony cases to assist the government's defense but relegated to a lower status when considering misdemeanors."   Doc. No. 13-1 at 16.   But a one-way rachet is exactly what the Third Circuit Court of Appeals has twice imposed, once in *Folajtar* where it treated a crime's classification as dispositive, and once in *Holloway* where it relied solely on the likelihood of physical harm.   While Mr. Range argues that *Folajtar* stands for the proposition that a law's classification as a felony or a misdemeanor is "generally conclusive," that is not what *Folajtar* said.   Rather, it said that "the legislature's designation of an offense as a felony is generally conclusive in determining whether that offense is serious."   *Folajtar,* 980 F.3d at 900.   It simply did not speak to the relative importance of a law's classification as a misdemeanor.   Thus, this Court cannot adopt Mr. Range's view that a law's classification as a misdemeanor is generally conclusive that a law is not serious, because this would be inconsistent with *Holloway,* which held for the Government even though the offense was a misdemeanor.   *See Holloway,* 948 F.3d at 174 ("While 'generally the misdemeanor label   .  .  .   in the Second Amendment context

157a

is . . . important' and is a 'powerful expression' of
the state legislature's view, it is not dispositive." (al-
terations in original) (quoting *Binderup,* 836 F.3d at
352)).

While Mr. Range argues that this approach is incon-
sistent with *Binderup's* description of the standard as a
"balancing test," the Court is bound to follow *Folajtar*
and *Holloway.* Moreover, this route makes sense when
considered against the wider context of as applied chal-
lenges to § 922(g)(1). Challengers like Mr. Range do
face an uphill battle because statutes are presumptively
constitutional. *See, e.g., Holloway,* 948 F.3d at 172
(noting that the burden rests with the challenger to
demonstrate that § 922(g) is unconstitutional as ap-
plied); *Ogden v. Saunders,* 25 U.S. (12 Wheat.) 213, 270
(1827) (noting that courts should "presume in favor of [a
statute's] validity, until its violation of the Constitution
is proved beyond a reasonable doubt"). And it is not
merely each state's determination of a statute's serious-
ness that the Court is considering. Congress has also
determined that the conduct in question was sufficiently
serious to justify disarmament. This fact operates as a
powerful "sixth factor" present in every case, weighing
in favor of the Government.

While the Court acknowledges that this can be con-
sidered a matter of first impression, it concludes that
the cross-jurisdictional consensus factor-like the subject
law's classification as a felony, and the likelihood of
physical harm-is generally conclusive that a crime is se-
rious.[4] *See Binderup,* 836 F.3d at 353.

---

[4] Because the Government prevails at *Marzarella* step one, the
Court will not proceed to step two to consider whether the Govern-

158a

## Conclusion

For the foregoing reasons, the Court will grant the Government's Motion for Summary Judgment, and deny Mr. Range's Motion for Summary Judgment. An appropriate order follows.

**BY THE COURT:**

/s/  **GENE E.K. PRATTER**
     **Gene E.K. Pratter**
     **United States District Judge**

---

ment has produced sufficient evidence to withstand heightened scrutiny.

159a

## APPENDIX F

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 21-2835

BRYAN DAVID RANGE, APPELLANT

*v.*

ATTORNEY GENERAL UNITED STATES OF AMERICA;
REGINA LOMBARDO, ACTING DIRECTOR, BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES

———

Filed:    Jan. 6, 2023

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 5:20-cv-03488)

———

## ORDER SUR PETITION FOR REHEARING EN BANC

———

Present:    CHAGARES, <u>Chief Judge</u>, AMBRO, JOR-
DAN, HARDIMAN, GREENAWAY, JR., SHWARTZ, KRAUSE,
RESTREPO, BIBAS, PORTER, MATEY, PHIPPS, FREEMAN,
and ROTH*, <u>Circuit Judges</u>

A majority of the active judges having voted for re-
hearing en banc in the above captioned case, it is or-
dered that the petition for rehearing is GRANTED.

———

*  Judge Roth's vote is limited to panel rehearing; will participate
as a member of the en banc court pursuant to 3d. Cir. I.O.P. 9.6.4.

160a

The case will be argued before the en banc court on Wednesday, February 15, 2023 at 10:00 a.m.   The opinion and judgment entered November 16, 2022 are hereby vacated.

The Appellees shall file a supplemental brief in response to the arguments raised in Appellant's petition for rehearing, not to exceed 15 pages, within 14 days from the date of this order.   Appellees shall file 15 hard copies of the supplemental brief.

BY THE COURT,

/s/   <u>MICHAEL A. CHAGARES</u>
Michael A. Chagares
Chief Judge

Dated:   6 Jan. 2023

161a

## APPENDIX G

1.   U.S. Const. Amend. II provides:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

2.   18 U.S.C. 921(a)(20) provides:

**Definitions**

(a)   As used in this chapter—

(20)   The term "crime punishable by imprisonment for a term exceeding one year" does not include—

(A)   any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

(B)   any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held.  Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

162a

3.   18 U.S.C. 922(g)(1) provides:

**Unlawful acts**

(g)   It shall be unlawful for any person—

(1)   who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;   * * *

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

4.   18 U.S.C. 924(a)(8) provides:

**Penalties**

(8)   Whoever knowingly violates subsection (d) or (g) of section 922 shall be fined under this title, imprisoned for not more than 15 years, or both.