# FEDERAL DEFENDER PROGRAM, INC.
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
SUITE 1500, CENTENNIAL TOWER
101 MARIETTA STREET, N.W.
ATLANTA, GEORGIA 30303

MILDRED GECKLER DUNN
EXECUTIVE DIRECTOR *(INTERIM)*

TELEPHONE
404 688-7530
800 688-7538
FAX
404-688-0768

May 28, 2024

David J. Smith, Clerk of Court
United States Court of Appeals for the Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA  30303

> Re:    Notice of Supplemental Authority in
>           United States v. Dubois, 22-10829-F

Dear Mr. Smith:

Please accept this letter of supplemental authority and please distribute this letter to the en banc court.

The United States Court of Appeals for the Ninth Circuit has issued an opinion in *United States v. Duarte*, __ F.4th __, 2024 WL 2068016 (9th Cir. 2024). The court sustained Mr. Duarte's as applied Second Amendment challenge to his conviction under 18 U.S.C. § 922(g)(1), the felon in possession statute. The court concluded that the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), abrogated its prior precedent because it requires an analysis not previously applied. Duarte, 2024 WL 2068016 at *2.  The court also concluded that Duarte was among "the people" the Second Amendment protects because Bruen "confers an individual right to keep and bear arms that belongs to 'all Americans,' not an 'unspecified subset.' *Id*. (quoting *Bruen*, 597 U.S. at 70). The court also concluded that the Government failed to demonstrate that a categorical prohibition, as applied to Duarte, was part of the historical tradition that provides the outer boundary of the Second Amendment right. *Id*. According to the Ninth Circuit, *Bruen* is a sea-change which replaces the prior analysis with one grounded exclusively in text and history.

Sincerely,

NICOLE M. KAPLAN
Georgia Bar No. 382495
Attorney for Andre Dubois

Enclosure

cc:     Andre Dubois
        AUSA  Gabe Mendel

Encl.

2024 WL 2068016
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Steven DUARTE, aka Shorty, Defendant-Appellant.

No.22-50048
|
Argued and Submitted December
4, 2023 Pasadena, California
|
Filed May 9, 2024

**Synopsis**
**Background:** Defendant was convicted in the United States
District Court for the Central District of California, André
Birotte, Jr., J., of possession of firearm by person who had
been convicted of offense punishable by imprisonment for
term exceeding one year. Defendant appealed.

**Holdings:** The Court of Appeals, Bea, Senior Circuit Judge,
held that:

defendant had good cause for not raising issue of whether
categorical statutory prohibition against possession of firearm
by person who had been convicted of offense punishable
by imprisonment for term exceeding one year, as applied to
nonviolent felon, violated Second Amendment right to keep
and bear arms, and therefore he could raise issue for first time
on appeal and de novo review applied, and

categorical statutory prohibition against possession of firearm
by person who had been convicted of offense punishable
by imprisonment for term exceeding one year, as applied to
nonviolent felon, was not part of historical tradition that
delimited outer bounds of Second Amendment right to keep
and bear arms.

Reversed, and conviction vacated.

Smith, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** Appellate Review.

Appeal from the United States District Court for the Central
District of California, Andre Birotte, Jr., District Judge,
Presiding, D.C. No. 2:20-cr-00387-AB-1

**Attorneys and Law Firms**

Suria M. Bahadue (argued) and Juan M. Rodriguez, Assistant
United States Attorneys; Kyle Kahan, Special Assistant
United States Attorney; Bram M. Alden, Assistant United
States Attorney, Criminal Appeals Section Chief; E. Martin
Estrada, United States Attorney; United States Department
of Justice, Office of the United States Attorney, Criminal
Appeals Section, Los Angeles, California; for Plaintiff-
Appellee.

Sonam A. H. Henderson, Assistant Federal Public Defender;
Cuauhtemoc Ortega, Federal Public Defender; Federal Public
Defender's Office, Los Angeles, California, for Defendant-
Appellant.

Before: Carlos T. Bea, Milan D. Smith, Jr., and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge Bea;

Dissent by Judge M. Smith, Jr.

## OPINION

BEA, Circuit Judge:

18 U.S.C. § 922(g)(1) makes it a crime for any person to
possess a firearm if he has been convicted of an offense
"punishable by imprisonment for a term exceeding one
year." Steven Duarte, who has five prior non-violent state
criminal convictions—all punishable for more than a year
—was charged and convicted under § 922(g)(1) after police
saw him toss a handgun out of the window of a moving car.
Duarte now challenges the constitutionality of his conviction.
He argues that, under the Supreme Court's recent decision in
New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 142
S.Ct. 2111, 213 L.Ed.2d 387 (2022), § 922(g)(1) violates the
Second Amendment as applied to him, a non-violent offender
who has served his time in prison and reentered society. We
agree.

**\*2** We reject the Government's position that our pre-Bruen
decision in United States v. Vongxay, 594 F.3d 1111 (9th Cir.
2010), forecloses Duarte's Second Amendment challenge.

*Vongxay* is clearly irreconcilable with *Bruen* and therefore no longer controls because *Vongxay* held that § 922(g)(1) comported with the Second Amendment without applying the mode of analysis that *Bruen* later established and now requires courts to perform. *Bruen* instructs us to assess all Second Amendment challenges through the dual lenses of text and history. If the Second Amendment's plain text protects the person, his arm, and his proposed course of conduct, it then becomes the Government's burden to prove that the challenged law is consistent with this Nation's historical tradition of firearm regulation. *Vongxay* did not apply these two analytical steps because *Bruen* had not yet established them. We must therefore reconsider § 922(g)(1)'s constitutionality, this time applying *Bruen*'s two-step, text-and-history framework.

At step one of *Bruen*, we easily conclude that Duarte's weapon, a handgun, is an "arm" within the meaning of the Second Amendment's text and that Duarte's "proposed course of conduct—carrying [a] handgun[ ] publicly for self-defense"—falls within the Second Amendment's plain language, two points the Government never disputes. *Bruen*, 597 U.S. at 32, 142 S.Ct. 2111. The Government argues only that "the people" in the Second Amendment excludes felons like Duarte because they are not members of the "virtuous" citizenry. We do not share that view. *Bruen* and *Heller* foreclose that argument because both recognized the "strong presumption" that the text of the Second Amendment confers an individual right to keep and bear arms that belongs to "all Americans," not an "unspecified subset." *Bruen*, 597 U.S. at 70, 142 S.Ct. 2111 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 581, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)). Our own analysis of the Second Amendment's publicly understood meaning also confirms that the right to keep and bear arms was every citizen's fundamental right. Because Duarte is an American citizen, he is "part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 32, 142 S.Ct. 2111.

At *Bruen*'s second step, we conclude that the Government has failed to prove that § 922(g)(1)'s categorical prohibition, as applied to Duarte, "is part of the historical tradition that delimits the outer bounds of the" Second Amendment right. *Bruen*, 597 U.S. at 19, 142 S.Ct. 2111. The Government put forward no "well-established and representative historical analogue" that "impose[d] a comparable burden on the right of armed self-defense" that was "comparably justified" as compared to § 922(g)(1)'s sweeping, no-exception, lifelong ban. *Id.* at 29, 30, 142 S.Ct. 2111. We therefore vacate Duarte's

conviction and reverse the district court's judgment entering the same.

**I.**

On the night of March 20, 2020, two Inglewood police officers noticed a red Infiniti auto drive past them with tinted front windows. The officers turned around and trailed the car for a time before seeing it run a stop sign. When they activated their patrol lights, one of the officers saw the rear passenger (later identified as Duarte) roll the window down and toss out a handgun. The Infiniti drove about a block farther before stopping.

The officers approached the vehicle, removed Duarte and the driver from the car, and handcuffed them. A search of the car's interior recovered a loaded magazine wedged between the center console and front passenger seat. A third officer arrived at the scene and searched the immediate area, where he found the discarded handgun—a .380 caliber Smith & Wesson—with its magazine missing. One of the officers loaded the magazine into the recovered pistol, and it fit "perfectly."

A federal grand jury indicted Duarte for possessing a firearm while knowing he had been previously convicted of "a crime punishable by imprisonment for a term exceeding one year," in violation of 18 U.S.C. § 922(g)(1). The indictment referenced Duarte's five prior, non-violent criminal convictions in California: vandalism, Cal. Penal Code § 594(a); felon in possession of a firearm, *id.* § 29800(a)(1); possession of a controlled substance, Cal. Health & Safety Code § 11351.5; and two convictions for evading a peace officer, Cal. Veh. Code § 2800.2.[1] Each of these convictions carried a possible sentence of one year or more in prison.

**\*3** Duarte pleaded not guilty to the charge in the indictment. His case proceeded to trial, a jury found him guilty, and he received a below-guidelines sentence of 51 months in prison. He timely appealed and now challenges his conviction under the Second Amendment. We have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

**II.**

We normally review claims of constitutional violations *de novo*. *United States v. Oliver*, 41 F.4th 1093, 1097 (9th

Cir. 2022). But because Duarte did not challenge § 922(g)(1) on Second Amendment grounds in the district court below, the Government argues that Federal Rule of Criminal Procedure 52(b)'s more demanding plain error standard of review controls. *Id.* ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). We disagree.

It is true that Rule 52(b)'s plain error standard "is the default standard governing ... consideration of issues not properly raised in the district court" and thus "ordinarily applies when a party presents an issue for the first time on appeal." *United States v. Guerrero*, 921 F.3d 895, 897 (9th Cir. 2019). But when the untimely issue is a Rule 12(b)(3) "defense[ ]" or "objection[ ]" to a criminal indictment, "Rule 12's good-cause standard ... displac[es] the plain-error standard" under Rule 52(b). *Id.*; *see* Fed. R. Crim. P. 12(b)(4)(B)(c)(1) ("[A] court may consider the [untimely] defense, objection, or request if the party shows good cause."). If the defendant demonstrates good cause for failing to raise the Rule 12(b)(3) issue below, we may consider it for the first time and will apply whatever default standard of review would normally govern the merits, which in this case is de novo review. *See United States v. Aguilera-Rios*, 769 F.3d 626, 629 (9th Cir. 2014).

No one disputes here that Duarte's Second Amendment challenge is untimely because he could have raised it as a Rule 12(b)(3) defense or objection to his indictment. Duarte, however, demonstrated good cause for asserting his constitutional claim now instead of then. When Duarte was indicted, he "had no reason to challenge" whether § 922(g)(1) violated the Second Amendment as applied to him. *Aguilera-Rios*, 769 F.3d at 630. We had already held in *Vongxay* "that § 922(g)(1) does not violate the Second Amendment as it applies to ... convicted felon[s]." 594 F.3d at 1118. Only later did the Supreme Court decide *Bruen*, which (for reasons we explain just below) is irreconcilable with *Vongxay*'s reasoning and renders it no longer controlling in this Circuit. Because *Vongxay* "foreclosed the argument [Duarte] now makes," Duarte had good cause for not raising it in a Rule 12(b)(3) pretrial motion. *Aguilera-Rios*, 769 F.3d at 630. We may consider his challenge for the first time and will review it de novo.

### III.

#### A.

We must first decide whether *Bruen* abrogated our decision in *United States v. Vongxay*. We follow our decision in *Miller v. Gammie* to answer that question. 335 F.3d 889 (9th Cir. 2003). Under *Miller*, "where the *reasoning or theory* of [a] prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority," we are "bound by the later and controlling authority" and "reject the prior circuit opinion as ... effectively overruled." *Id.* at 893 (emphasis added). This is a more "flexible approach" than what other circuits use. *Id.* at 899. To abrogate a prior decision of ours under *Miller*, the intervening authority need only be "closely related" to the prior circuit precedent and need not "expressly overrule" its holding. *Compare id.*, *with United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (intervening authority must be "clearly on point" and must "demolish and eviscerate each of [the prior decision's] fundamental props") (citations omitted). So long as the "the Supreme Court ha[s] taken an 'approach [in an area of law] that [is] fundamentally inconsistent with the reasoning of our earlier circuit authority, [']" *Rodriguez v. AT&T Mobility Services LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (quoting *Miller*, 335 F.3d at 889, 990), that "[i]s enough to render them" irreconcilable with one another, *Langere v. Verizon Wireless Services, LLC*, 983 F.3d 1115, 1121 (9th Cir. 2020) (citations omitted).

**\*4** As a result, "[e]ver since ... *Miller v. Gammie*[,] ... we have not hesitated to overrule our own precedents when their underlying reasoning could not be squared with the Supreme Court's more recent pronouncements." *In re Nichols*, 10 F.4th 956, 962 (9th Cir. 2021). We have found the standard met in the obvious cases, such as when a later Supreme Court decision implicitly (but not expressly) overrules an earlier precedent of ours because the supervening authority fundamentally reshapes an area of law by announcing a new or clarified analytical framework that the earlier decision never applied. *See United States v. Slade*, 873 F.3d 712, 715 (9th Cir. 2017); *see also, e.g.*, *United States v. Baldon*, 956 F.3d 1115, 1121 (9th Cir. 2020) ("[The Supreme Court's] clarification [in *Stokeling*] of 'violent force' ... is 'clearly irreconcilable' with ... [*Solorio-Ruiz v. Sessions*, 881 F.3d 733 (9th Cir. 2018)'s] ... analytical distinction between substantial and minimal force. This distinction no longer exists."); *Phelps v. Alameida*, 569 F.3d 1120, 1133 (9th Cir. 2009) (holding previous *per se* rule for rejecting Rule 60(b)(6) motions based on intervening change in law was irreconcilable with Supreme Court's "case-by-case approach"); *Swift v. California*, 384 F.3d 1184, 1190 (9th Cir. 2004). So too have we invoked *Miller* when the *affirmative* reasons for a previous panel decision "necessarily rested on *at least*

*one* assumption that is clearly irreconcilable with intervening higher authority." *Ortega-Mendez v. Gonzales*, 450 F.3d 1010, 1020 (9th. Cir. 2006) (emphasis added); *see Lair v. Bullock*, 798 F.3d 736, 746 (9th Cir. 2015) ("Because [*Montana Right to Life Ass'n v.* ]*Eddleman*[, 343 F.3d 1085 (9th Cir. 2003)] relied *at least in part* on a state's interest in combating 'influence,' whereas *Citizens United*[ *v. Federal Election Com'n*, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010)] narrowed the analysis ... to exclude th[at] state[ ] interest ... *Citizens United* abrogated *Eddleman*'s ... analysis.") (citing *Miller*, 335 F.3d at 893) (emphasis added). Thus, while *Miller*'s "clearly irreconcilable" test may be a "high" standard, by no means is it an "insurmountable" one. *Langere*, 983 F.3d at 1121.

With these principles in mind, we conclude that *Vongxay*'s reasoning is "clearly irreconcilable" with *Bruen* and its holding therefore no longer controls. *Miller*, 335 F.3d at 893. *Vongxay* did not follow the textually and historically focused "mode-of-analysis" that *Bruen* established and required courts now to apply to all Second Amendment challenges. *Id.* at 900 ("[L]ower courts a[re] bound not only by the holdings of higher courts' decisions but also by their 'mode of analysis.'") (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989)); *see, e.g., Slade*, 873 F.3d at 715 ("Since *Jennen* failed to consider whether section 9A.36.021 is divisible ... the decision's reasoning is 'clearly irreconcilable' with the analytical process [later] prescribed by [the Supreme Court in] *Descamps*[ *v. United States*, 570 U.S. 254, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013)] and *Mathis*[ *v. United States*, 579 U.S. 500, 136 S.Ct. 2243, 195 L.Ed.2d 604 (2016)].") (citing *Miller*, 335 F.3d at 893). Nor do *Vongxay*'s affirmative bases for upholding § 922(g)(1) salvage *Vongxay*'s holding. We must therefore conduct our Second Amendment analysis of § 922(g)(1) anew, this time following *Bruen*'s analytical framework.

### 1.

Before *Bruen*, virtually every circuit (ours included) "coalesced around a 'two-step' framework for analyzing Second Amendment challenges." *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111; *see, e.g., United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013). At the first step, we asked whether the challenged law affected conduct historically protected by the Second Amendment. *E.g., Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021) (en banc), *vacated*, ––– U.S. ––––, 142 S. Ct. 2895, 213 L. Ed. 2d 1108 (2022). If it did, we moved to

the second step, where we applied varying levels of scrutiny to the challenged law, depending on how close the regulated conduct lay to the "core" of the Second Amendment right to "keep and bear arms." *Id.*

"*Bruen* effected a sea change in Second Amendment law" by replacing this tiers-of-scrutiny framework with one grounded exclusively in text and history. *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1041 (4th Cir. 2023), *rehearing en banc granted*, 86 F.4th 1038 (4th Cir. 2024). Courts must now consider, as a "threshold inquiry," *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023), whether "the Second Amendment's plain text covers" the person challenging the law, the "arm" involved, and the person's "proposed course of conduct," *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111. If the Second Amendment's "bare text" covers the person, his arm, and his conduct, "the government must [then] demonstrate that the [challenged] regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 18, 44 n.11, 142 S.Ct. 2111. To meet its burden, the Government must "identify a well-established and representative historical *analogue*" to the challenged law. *Id.* at 30, 142 S.Ct. 2111 (emphasis in original). As to courts, "th[e] historical inquiry that [we] must [now] conduct" requires "reasoning by analogy," in which the two "central considerations" will be whether "how" the proffered historical analogue burdened the Second Amendment right, and "why" it did so, are both sufficiently comparable to the challenged regulation. *Id.* at 28, 29, 142 S.Ct. 2111. "Only if" the Government proves that its "firearm regulation is consistent [in this sense] with th[e] Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17, 142 S.Ct. 2111 (citations omitted).

**\*5** Because *Bruen* "had not yet clarified the[se] particular analytical step[s]" until after *Vongxay* was decided, *Vongxay*, predictably, failed to apply them. *See Slade*, 873 F.3d at 715. Unlike post-*Bruen* circuit cases to consider § 922(g)(1)'s constitutionality, *Vongxay* did not grapple with the "threshold [textual] inquiry ... whether [Vongxay] [wa]s part of 'the people' whom the Second Amendment protects," whether "the weapon at issue" was an "arm" within the meaning of the Second Amendment, or "whether the 'proposed course of conduct' f[ell] within the Second Amendment['s]" plain language. *See Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 597 U.S. at 31–32, 142 S.Ct. 2111); *see also, e.g., Range v. Attorney General*, 69 F.4th 96, 101 (3d Cir. 2023) ("We begin with the threshold question: whether Range is one of 'the

people' who have Second Amendment rights."). As a result, *Vongxay* never decided whether to proceed to *Bruen*'s second step, which would have required the Government to prove that § 922(g)(1)'s lifetime ban on felons possessing firearms imposed a "comparable burden" on the Second Amendment right that was "comparably justified" compared to historical examples of firearm regulations—the "how and why" of *Bruen*'s "analogical inquiry." 597 U.S. at 29, 142 S.Ct. 2111; *compare United States v. Jackson*, 69 F.4th 495, 501–06 (8th Cir. 2023) (surveying historical examples and concluding § 922(g)(1) comported with this Nation's history of firearm regulation), *with Range*, 69 F.3d at 103–06 (surveying the same history but concluding the opposite).

The dissent does not dispute that *Vongxay* never performed the textual "person," "arms," and "conduct" analysis at *Bruen*'s first step, nor the historically focused "reasoning by analogy" approach required at *Bruen*'s step two. But none of these omissions should matter, the dissent argues, because *Heller* read the Second Amendment's "the people" as "exclu[ding] ... felons" and *Bruen* "implicitly endorsed" that reading when it made the (unremarkable) observation that the petitioners in that case—two "ordinary, law-abiding, adult citizens"—were indisputably "part of 'the people.' " 597 U.S. at 31, 142 S.Ct. 2111; Dissent at ——, ——. So there is "harmon[y]" between *Bruen* and *Vongxay* after all. Dissent at —— – ——.

The dissent's post-hoc reading of *Bruen* and *Heller* finds no support in either case. The Supreme Court "has *never* suggested that felons are *not* among 'the people' within the plain meaning of the Second Amendment." *United States v. Perez-Garcia*, 96 F.4th 1166, 1175 (9th Cir. 2024) (emphasis added). Quite the opposite, *Heller* defined "the people" in the broadest of terms: the phrase "unambiguously refer[red]" to "all Americans," not "an unspecified subset." 554 U.S. at 581, 128 S.Ct. 2783. More importantly, *Bruen* ratified that broad definition, quoting *Heller*'s language directly to hold that "[t]he Second Amendment guarantee[s] to '*all Americans*' the right to bear commonly used arms in public." 597 U.S. at 70, 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 581, 128 S.Ct. 2783) (emphasis added).

In sum, *Vongxay*'s wholesale omission of *Bruen*'s two-step methodology is "clearly irreconcilable" with *Bruen*'s "mode of analysis" for analyzing Second Amendment challenges. *Miller*, 335 F.3d at 900. We would be remiss, however, to ignore *Vongxay*'s affirmative reasons for upholding § 922(g)(1). We do that below. Because *Vongxay*'s rationale "rested

on ... at least one assumption" about the propriety of felon firearm bans, none of which continue to have any purchase in a post-*Bruen* world, this is a separate basis for parting ways with *Vongxay* under *Miller v. Gammie*. *See Ortega-Mendez*, 450 F.3d at 1020.

### 2.

*Vongxay* concluded that § 922(g)(1) comported with the Second Amendment because that was what we held in *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005). *Vongxay*, 594 F.3d at 1116. But "[t]he reasoning upon which *Younger* was based—that the Second Amendment does not give individuals a right to bear arms—was *invalidated* by *Heller*," *id.* (emphasis added), and again by *Bruen*, which expressly reaffirmed *Heller*'s holding that "the Second Amendment[ ] ... 'guarantees the *individual* right to possess and carry weapons in case of confrontation,' " 597 U.S. at 33, 142 S.Ct. 2111 (emphasis added) (quoting *Heller*, 554 U.S. at 592, 128 S.Ct. 2783). *Vongxay*'s reliance on *Younger* is therefore "clearly irreconcilable" with *Bruen*—separate and apart from *Vongxay*'s failure to apply *Bruen*'s methodology. *See Murray v. Mayo Clinic*, 934 F.3d 1101, 1105–06 (9th Cir. 2019).

**\*6** While concluding that "*Younger* control[led]" and the "legal inquiry end[ed]" with that case, *Vongxay* also turned to two Fifth Circuit, pre-*Heller* decisions—*United States v. Everist*, 368 F.3d 517 (5th Cir. 2004) and *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001)—which purportedly "len[t] credence to the ... viability of *Vongxay*'s holding" in a post-*Heller* (but pre-*Bruen*) world. *Vongxay*, 594 F.3d at 1116, 1117. *Vongxay* endorsed, specifically, *Everist*'s holding that § 922(g)(1) was constitutional "as a 'limited and narrowly tailored exception to the freedom to possess firearms, reasonable in its purposes and consistent with the right to bear arms.' " *Id.* at 1116–17 (quoting *Everist*, 368 F.3d at 519 (quoting *Emerson*, 270 F.3d at 261)). This was "particularly instructive for [a] post-*Heller* analys[is]" of § 922(g)(1), *Vongxay* reasoned, because the Fifth Circuit had recognized, "even before *Heller*," that the right to keep and bear arms was an individual right, and yet still determined that "felon [firearm] restrictions" were "permissible ... under heightened scrutiny." 594 F.3d at 1117 (citing *Everist*, 368 F.3d at 519).

*Vongxay*'s dependence on *Emerson* and *Everist* is untenable post-*Bruen*. "*Emerson* applied heightened—i.e., intermediate

—scrutiny" to uphold a different law—18 U.S.C. § 922(g)(8)—against a Second Amendment challenge. [2] *United States v. McGinnis*, 956 F.3d 747, 759–60 (5th Cir. 2020). Relying exclusively on *Emerson, Everist* applied the same "means-end" scrutiny approach to § 922(g)(1) and similarly held that law was a "narrowly tailored" and "reasonable" regulation on the Second Amendment right. *Everist*, 368 F.3d at 519 (quoting *Emerson*, 270 F.3d at 261). *Bruen*, as we know, "expressly repudiated the ... means-end scrutiny ... embodied in *Emerson*" and *Everist. See United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023), *cert. granted*, ––– U.S. ––––, 143 S. Ct. 2688, 216 L.E.2d 1255 (2023). Thus, as with *Younger, Everist*'s reasoning—and the reasoning of the precedent on which it stood (*Emerson*)—were abrogated by *Bruen. Vongxay*'s reliance on these cases is clearly irreconcilable with *Bruen. See Murray*, 934 F.3d at 1105–06.

The Government and the dissent remind us repeatedly that, while *Vongxay* relied on *Everist* and *Emerson, Vongxay* never itself applied the now defunct means-end scrutiny approach to uphold § 922(g)(1). Dissent at –– ––––. That counts for little under *Miller* and its progeny because when, as here, the prior circuit decision in question imports the reasoning of a previous case by citing it with approval, we ask simply whether *that* earlier case's reasoning is "clearly irreconcilable" with subsequent higher authority. *See id.* ("In *Head*[ *v. Glacier Northwest Inc.*, 413 F.3d 1053 (9th Cir. 2005)], we relied on the reasoning of our sister circuits ... [but] *Gross*[ *v. FBL Financial Services, Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)] and *[University of Texas Southwestern Medical Center v. ]Nassar*[, 570 U.S. 338, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)] undercut the reasoning set forth by our sister circuits [in those cases]."). What matters is that *Vongxay* still *endorsed* the Fifth Circuit's application of means-end scrutiny to § 922(g)(1) because it cited *Everist* for the proposition that, although there is an individual right to bear arms, felon restrictions are permissible even under *heightened scrutiny.*" *Vongxay*, 594 F.3d at 1117 (emphasis added) (citing *Everist*, 368 F.3d at 519).

*Vongxay* lastly took comfort in the *Heller* Court's remark that "nothing in [its] opinion should be taken to cast doubt" on certain "longstanding" laws restricting the Second Amendment right, such as laws "prohibit[ing] ... the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626, 128 S.Ct. 2783. In a footnote, *Heller* labeled these and other examples as "presumptively lawful." *Id.* n.26. *Vongxay* took this to mean that felon firearm bans were "categorically different" from other restrictions on the Second

Amendment right, which "buttressed" the conclusion that § 922(g)(1) was constitutional. 594 F.3d at 1115, 1116.

**\*7** "Simply repeat[ing] *Heller*'s language" about the "presumptive[ ] lawful[ness]" of felon firearm bans will no longer do after *Bruen. See Pena v. Lindley*, 898 F.3d 969, 1007 n.18 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part) (citing *Vongxay*, 594 F.3d at 1115). *Bruen* expressly "require[s] courts to assess whether" § 922(g)(1), *id.* at 26, 142 S.Ct. 2111, like "*any* regulation infringing on Second Amendment rights[,] is consistent with this nation's historical tradition of firearm regulation," *Perez-Garcia*, 96 F.4th at 1175 (citations omitted). It would pay lip service to this mandate if we continued to defer (as *Vongxay* did) to *Heller*'s footnote, not least because the historical pedigree of felon firearm bans was never an issue the *Heller* Court purported to resolve. While referring to such laws and others as "longstanding," the Court "fail[ed] to cite any colonial analogues," *Heller*, 554 U.S. at 721, 128 S.Ct. 2783 (Breyer, J., dissenting), and clarified that it was "not providing [an] extensive historical justification" for felon firearm bans because *Heller* was its "first in-depth examination of the Second Amendment," not an attempt "to clarify the entire field," *id.* at 635, 128 S.Ct. 2783. "[T]here w[ould] be time enough to expound upon the historical justifications for [these and other] exceptions," *Heller* promised, "if and when th[ey] ... come before us." *Id.*; *see also Vongxay*, 594 F.3d at 1117 n.4 (acknowledging *Heller* "anticipated the need for such historical analy[is]"). The Court has yet to explore this country's history of banning felons from possessing firearms. [3] Until then, we can no longer "assum[e]," by way of *Heller*'s footnoted caveat, the "propriety of [every] felon firearm ban" that comes before us. *See United States v. Phillips*, 827 F.3d 1171, 1175 (9th Cir. 2016). "Nothing allows us to sidestep *Bruen* in th[is] way." [4] *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023); *see also Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) ("*Bruen* clarified the appropriate legal framework to apply when a ... statute [is challenged] under the Second Amendment.").

Had the Court in *Bruen* endorsed simply deferring to *Heller*'s "presumptively lawful" footnote, the outcome of that case would have been much different. "[L]aws forbidding the carrying of firearms in sensitive places" were another one of the categories of " 'longstanding' ... and 'presumptively lawful' regulatory measures" that *Heller*'s footnote mentioned. *Jackson v. City & County of San Francisco*, 746 F.3d 953, 959 (9th Cir. 2014) (quoting *Heller*, 554 U.S. at 626–27, 627 n.26, 128 S.Ct. 2783); *see Bruen*,

597 U.S. at 30, 142 S.Ct. 2111. But rather than go along with New York's "attempt[ ] to characterize [its] proper-cause requirement as a [longstanding] 'sensitive-place' " regulation under *Heller*, the *Bruen* Court rejected, as having "no historical basis," the argument that "New York [could] effectively declare the island of Manhattan a 'sensitive place' " where public carry could be categorically banned. *Id.* at 30–31, 142 S.Ct. 2111. As with any other firearm regulation challenged under the Second Amendment, *Bruen* clarified, courts must now analyze "sensitive place" laws by analogizing them to a sufficiently comparable historical counterpart. *See id.* at 30, 142 S.Ct. 2111.

**\*8** It would be "fundamentally inconsistent" with *Bruen*'s analytical framework to treat felon firearm bans any differently, as nothing in the majority opinion implies that we can jettison *Bruen*'s test for one "presumptively lawful" category of firearm regulations but not others (e.g., sensitive place regulations). *See Rodriguez*, 728 F.3d at 979. And far from what the dissent suggests, applying *Bruen* to laws like § 922(g)(1) will not "uproot" any "longstanding prohibitions" on felons possessing firearms. Dissent at ——. To the extent any such "longstanding" tradition exists, *Bruen* would require us to *uphold* § 922(g)(1). But to do that, we must first flesh out what the relevant tradition is and how it compares to the law before us. That is the whole point of the "analogical inquiry" at *Bruen*'s second step, which played no role in *Vongxay*'s reasoning.

### 3.

The Government understandably downplays *Vongxay*'s heavy reliance on prior cases that are clearly inconsistent with *Bruen*. *See also* Dissent at —— – ——, ——. It also concedes by omission that *Vongxay* did not apply the two-step textual and historical methodology that *Bruen* requires. The Government argues instead that (if you squint hard enough) it is clear *Bruen* endorsed *Vongxay*'s "conclusion" that Congress may categorically disarm all felons for life because the Court referred to the petitioners in *Bruen* as "law abiding" and "responsible" citizens not once, not twice, but 14 times.

First, whether *Vongxay* reached the right "conclusion" is irrelevant under *Miller* if "th[at] conclusion [can] no longer [be] 'supported for the reasons stated' in th[e] decision." *Rodriguez*, 728 F.3d at 979 (quoting *United States v. Lindsey*, 634 F.3d 541, 551 (9th Cir. 2011)); *see also Langere*, 983 F.3d at 1121 ("[D]eference [to intervening

Supreme Court decisions] *extends to the reasoning* of ... the decisions ... not just their holdings.") (emphasis added). Because *Vongxay*'s *rationale* for holding § 922(g)(1) constitutional is incompatible with *Bruen*, *Vongxay*'s holding cannot control.

Second, we do not think that the Supreme Court, without any textual or historical analysis of the Second Amendment, intended to decide the constitutional fate of so large a population in so few words and with such little guidance. *See Range*, 69 F.4th at 102 ("[T]he phrase 'law-abiding, responsible citizens' is as expansive as it is vague."); Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1595 (2022) ("[R]ecent scholarly estimates of the number of former felons range from 19 million to 24 million.") (internal citations omitted). "[T]he criminal histories of the plaintiffs ... in *Bruen*," after all, "were not at issue in th[at] case," *Range*, 69 F.4th at 101, and "[i]t is inconceivable that [the Supreme Court] would rest [its] interpretation of the basic meaning of any guarantee of the Bill of Rights upon such ... dictum in a case where the point was not at issue and was not argued," *Heller*, 554 U.S. at 625 n.25, 128 S.Ct. 2783. So we agree with the Third Circuit that *Bruen*'s scattered references to "law-abiding" and "responsible" citizens did not implicitly decide the issue in *this* case. *Range*, 69 F.4th at 101; *see United States v. Johnson*, 256 F.3d 895, 916 (9th Cir. 2001) (separate opinion of Kozinski, J., Trott, T.G. Nelson, Silverman, JJ.) (statements "uttered in passing" and "made ... without analysis" do not bind future panels).

\* \* \*

*Vongxay* did not apply anything that resembles the analytical steps of *Bruen*'s "mode of analysis" to determine whether § 922(g)(1) was constitutional under the Second Amendment. *Miller*, 335 F.3d at 900 (internal citations omitted). *Vongxay* instead relied first on prior decisions from this circuit and others, the reasoning of which does not square with *Bruen*, and then turned to *Heller*'s passing footnote referring to "longstanding" felon firearm bans as "presumptively lawful," which the *Heller* Court made without "providing [any] extensive historical justification," *Heller*, 554 U.S. at 635, 128 S.Ct. 2783. We must therefore apply *Bruen*'s two-step framework to reconsider § 922(g)(1)'s constitutionality.

### B.

**\*9** Step one of *Bruen* asks the "threshold question," *Range,* 69 F.4th at 101, whether "the Second Amendment's plain text covers" (1) the individual, (2) the type of arm, and (3) the "proposed course of conduct" that are at issue, *Bruen,* 597 U.S. at 19, 31–32, 142 S.Ct. 2111. Here, as in *Bruen,* it is undisputed that the Second Amendment protects the arm in this case (a handgun) and the conduct involved (simple possession). *See id.* at 31–32, 142 S.Ct. 2111. All that is left for us to decide is the first textual element: whether Duarte is among "the people" to whom the Second Amendment right belongs.

On that issue, Duarte argues that "the people" in the Second Amendment means all American citizens, which includes him. Look no further than the Court's textual analysis of "the people" in *Heller,* where the Court construed that phrase as "unambiguously refer[ring]" not to any "unspecified subset" of people but to "all members of the national community," which includes "all Americans." *Id.* at 580–81, 128 S.Ct. 2783; *see also Bruen,* 597 U.S. at 70, 142 S.Ct. 2111 (ratifying *Heller*'s "all Americans" definition of "the people"). Regardless whether Duarte is an American citizen, the Government responds, the Second Amendment excludes felons from "the people" because the right to keep and bear arms was a qualified "political" right at the Founding reserved for members of the "virtuous citizenry." The right to bear arms, in other words, was no different from the right to vote, sit on a jury, or run for office, all of which state legislatures historically denied felons because their conduct had proved they were not upright or moral citizens.

Duarte is one of "the people" because he is an American citizen. *Heller* resolved this textual question when it held that "the people" includes "all Americans" because they fall squarely within our "national community." *Id.* at 580–81, 128 S.Ct. 2783. *Bruen* expressly reaffirmed that reading. 597 U.S. at 70, 142 S.Ct. 2111 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.") (quoting *Heller,* 554 U.S. at 581, 128 S.Ct. 2783). Our own analysis of the Second Amendment's text and history also confirms that the original public meaning of "the people" in the Second Amendment included, at a minimum, all American citizens. We therefore reject the Government's position that "the people," as used in the Second Amendment, refers to a narrower, "unspecified subset" of virtuous citizens. *See Heller,* 554 U.S. at 580, 128 S.Ct. 2783.

### 1.

In *Heller,* "the people"—the "holder of the [Second Amendment] right"—was the starting point of the Court's textual analysis. *Id.* at 581, 128 S.Ct. 2783. The Court began by tracking that phrase's use across various provisions in the Constitution. While the preamble, Article I, § 2, and the Tenth Amendment "refer[red] to 'the people' acting collectively," they "deal[t] with the exercise or reservation of powers, not rights." *Id.* at 579–80, 128 S.Ct. 2783. Of those provisions that, like the Second Amendment, referred to the "the people" in the context of individual rights—the First, Fourth, and Ninth Amendments—the phrase was used as a "term of art" that "unambiguously refer[red] to all members of" the "political" or "national community," not "an unspecified subset." *Id.* at 580, 128 S.Ct. 2783. The Court then closed this part of its textual analysis by concluding that there is "a strong presumption that the Second Amendment right is exercised individually and belongs to *all Americans.*" *Id.* at 581, 128 S.Ct. 2783 (emphasis added).

The Government argues that the Court in *Heller* never meant to define the scope of "the people" when it said those words. We are urged to think about it less as a statement of law and more as a "comment" the *Heller* Court made as a warmup to its ultimate conclusion "[t]hat the [Second] Amendment confers an individual right unrelated to militia service." If the court wants guidance from *Heller* as to who "the people" are, we should focus instead on *Heller*'s concluding remarks at the tail-end of the opinion, where the Court stated that "whatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller,* 554 U.S. at 635, 128 S.Ct. 2783.

**\*10** The Court's textual analysis of "the people" in *Heller* hardly reads as a "mere[ ] ... prelude to another[,] [more important] legal issue that command[ed] the [Court's] full attention." *Johnson,* 256 F.3d at 914–16; *see Range,* 69 F.4th at 101. The Second Amendment's use of "the people" to "descri[be] the holder of th[e] right" was "[t]he first salient feature of the [Amendment's] operative clause" that dominated the *Heller* Court's textual analysis—the second being the Amendment's phrase "to keep and bear arms," which described "the substance of the right." *Heller,* 554 U.S. at 580–81, 128 S.Ct. 2783. Thus, defining who "the people" were and the "substance" of the right they held were both equally necessary to *Heller*'s holding. *See id.* at

581, 128 S.Ct. 2783 ("We move now from the holder of the right—'the people'—to the substance of the right: 'to keep and bear Arms.' "). Only after "[p]utting ... these [two] textual elements together" did the Court conclude that the "[m]eaning" of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592, 128 S.Ct. 2783 (emphasis added).

So we agree with Duarte that *Heller* read "the people" in the Second Amendment as "unambiguously refer[ring] ... not to an unspecified subset" but to "all Americans," who are indisputably "part of the national community." *Id.* at 580–81, 128 S.Ct. 2783; *see also Bruen,* 597 U.S. at 70, 142 S.Ct. 2111 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.") (quoting *Heller,* 554 U.S. at 581, 128 S.Ct. 2783); *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 767–68, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) ("[W]e concluded[ ] [in *Heller* that] citizens must be 'permitted "to use [handguns] for the core lawful purpose of self-defense." ' ") (citing *Heller,* 554 U.S. at 630, 128 S.Ct. 2783). With that, we join the growing number of circuits to give authoritative weight to *Heller*'s "national community" definition for "the people."[5]

### 2.

Our own analysis of the Second Amendment's text, "as informed by [its] history," confirms that "the people" included, at a minimum, all American citizens—without qualification. *Bruen,* 597 U.S. at 19, 142 S.Ct. 2111. Mindful that "the Constitution was written to be understood by the voters," we begin with the ' 'normal and ordinary' meaning of the Second Amendment's language." *Heller,* 554 U.S. at 576, 128 S.Ct. 2783 (quoting *United States v. Sprague,* 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931)). We also consider the same pre-and post-ratification sources that *Heller* looked to because when it comes "to determin[ing] the *public understanding* of a legal text in the period after its enactment or ratification," the historical record serves as "a critical tool of constitutional interpretation." *Bruen,* 597 U.S. at 20, 142 S.Ct. 2111 (emphasis in original) (quoting *Heller,* 554 U.S. at 605, 128 S.Ct. 2783).

What we gather from history is that ordinary English speakers at the Founding understood the "people" to refer to "the whole Body of Persons who live in a Country[ ] or make up a Nation." N. Bailey, *An Universal Etymological English*

*Dictionary* 601–02 (1770). The "most useful and authoritative [contemporaneous-usage] dictionaries" of the Founding-era uniformly defined the term this way.[6] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 419 (1st ed. 2012). This broad definition—with its focus on residency—largely overlapped with the commonly understood meaning of "citizens" at that time. *Compare People,* Webster, *supra,* at 600 ("The body of persons who compose a community, town, city, or nation"), *with e.g., Citizen,* Dyche, *supra,* at 156 ("[A] freeman or inhabitant of a city or body corporate."). Other Founding-era sources likewise used the two terms synonymously. *See, e.g.,* THE FEDERALIST NO. 2, at 10 (John Jay) (Jacob E. Cooke ed. 1961) ("To all general purposes we have uniformly been one people each individual citizen everywhere enjoying the same national rights, privileges, and protection."); THE FEDERALIST NO. 14 (James Madison) ("Hearken not to the unnatural voice which tells you that the people of America[ ] ... can no longer be fellow citizens of one great, respectable, and flourishing empire."); *Douglass v. Stephens,* 1 Del. Ch. 465, 467 (1821) ("[T]he people of the United States ... resist[ed] the ... British King and Parliament .... [T]hey knew that they were practically, as well as legally, fellow-citizens ... enjoying every right and privilege indiscriminately with the inhabitants.").

**\*11** This notion that one's status as a "citizen" signified his membership among "the people" traces its roots to English common law. In his Commentaries on the Laws of England, William Blackstone explained that every "[n]atural-born subject[ ]" of England "fall[s] under the denomination of the *people*" because his birth within the realm creates an "intrinsic" duty of allegiance, a "tie ... which binds [him] to the king." 2 William Blackstone, *Commentaries* \*366 (St. George Tucker ed. 1803) (1767); *see also* William Blackstone, *An Analysis of the Laws of England* 24 (6th ed. 1771) ("Allegiance is the duty of all subjects; being the reciprocal tie of *the People* to the Prince.") (emphasis added). But this "tie" went both ways. "[B]y being born within the king's" realm, Blackstone continued, all "natural-born subjects ... acquire" a "great variety of rights," *id.* at \*371, including "the fundamental right[ ] of Englishmen," to "hav[e] arms for their defence," *see Heller,* 554 U.S. at 594, 128 S.Ct. 2783 (citing 1 Tucker's Blackstone, *supra,* at \*136, \*139–40); *Jimenez-Shilon,* 34 F.4th at 1047 (citations omitted). "[T]he colonists considered themselves to be vested with th[ese] same fundamental rights" because, as British subjects, they counted themselves among "the People of Great Britain." *McDonald,* 561 U.S. at 816, 817, 130 S.Ct.

3020 (Thomas, J., concurring in part and concurring in judgment) (quoting The Massachusetts Resolves (Oct. 29, 1765), reprinted in Prologue to Revolution: Sources and Documents on the Stamp Act Crisis, 1764–1766, p.56 (E. Morgan ed. 1959)).

That "the people" referred (at a minimum) to all citizens, and that the "right of the people" to keep and bear arms was a fundamental right of *every* citizen, is also "confirmed by [the] analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment." *Heller*, 554 U.S. at 600, 128 S.Ct. 2783. The "most relevant" of these examples are the ten "state constitutional provisions written in the [late] 18th century or the first two decades of the 19th." *Id.* at 582, 128 S.Ct. 2783. While three of those states—Indiana, Missouri, and Ohio—described the Second Amendment right as belonging to "the people," Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 209 (2006), six states—Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania—expressly conferred it to "the citizens" or "*every* citizen." [7] Tennessee, in addition, described the right as belonging to all "freemen," another term for "citizens." TENN. CONST. art. I, § 26; *see, e.g.*, *Citizen*, Samuel Johnson, *A Dictionary of the English Language* 297 (6th ed. 1785) ("A freeman of a city; not a foreigner; not a slave."); *see also Simpson v. State*, 13 Tenn. 356, 360 (1833) ("By this clause of the constitution, an express power is ... secured to *all the free citizens* of the state to keep and bear arms for their defence.") (emphasis added).

"That of the[se] ... state constitutional protections ... enacted immediately after 1789, at least seven unequivocally protected [every] individual *citizen's* right to self-defense is strong evidence that this is how the founding generation conceived of the right." *Heller*, 554 U.S. at 603, 128 S.Ct. 2783. "These provisions," after all, offer "the most analogous linguistic context" for discerning how the public understood the Second Amendment right. *Id.* at 585–86, 128 S.Ct. 2783. And "[i]t is clear from th[eir] formulations that," when describing the holder of the right, the Founding generation used "the people" and "the citizens" interchangeably. *Id.* at 585, 128 S.Ct. 2783.

The "three important founding-era legal scholars [to] interpret[ ] the Second Amendment"—William Rawle, Joseph Story, and St. George Tucker—likewise equated "the people" with "citizens" and described the right to keep and bear arms as an all-citizens' right. *Id.* at 605, 128 S.Ct. 2783.

In his "influential treatise," Rawle spoke of "[the] people [who are] permitted and accustomed to bear arms ... [as] properly consist[ing] of armed citizens." *Id.* at 607, 128 S.Ct. 2783 (quoting W. Rawle, *A View of the Constitution of the United States of America* 140 (1825)) (emphasis added). Story similarly wrote that "[t]he right of *the citizens* to keep and bear arms has justly been considered as the palladium of the liberties ... [I]t offers a strong moral check against the ... arbitrary power of rulers ... [and] enable[s] *the people* to resist and triumph over them." *Heller*, 554 U.S. at 607–08, 128 S.Ct. 2783 (quoting 2 J. Story, *Commentaries on the Constitution of the United States* § 1897, pp. 620–21 (4th ed. 1873)) (emphasis added). And Tucker, in his notes to Blackstone's Commentaries, described the holder of the arms right mostly broadly of all: "[A]ll men, without distinction, ... are absolutely entitled ... [to] th[e] right of self-preservation." 2 Tucker's Blackstone, *supra*, at 145–46 n. 42 (1803) (emphasis added); *see Heller*, 554 U.S. at 594–95, 128 S.Ct. 2783 (citing *id.*).

**\*12** Mid-19th-century cases interpreting the Second Amendment carried on this unbroken tradition of referring to the right to keep and bear arms as every citizen's right. *See, e.g., Heller*, 554 U.S. at 612, 128 S.Ct. 2783 (quoting *United States v. Sheldon*, in 5 Transactions of the Supreme Court of the Territory of Michigan 337, 346 (W. Blume ed. 1940) (" 'The constitution of the United States also grants to the citizen the right to keep and bear arms.' ")); *State v. Chandler*, 5 La. Ann. 489, 490 (1850) (describing the Second Amendment as protecting every "man's right to carry arms ... 'in full open view' "). The Georgia Supreme Court's decision in *Nunn v. State*, 1 Ga. 243, 251 (1846), for instance—a case that "perfectly captur[ed]" the import of the Second Amendment's text—described the right as belonging to "the *whole people*, old and young, men, [and] women ...." *Heller*, 554 U.S. at 612, 128 S.Ct. 2783 (quoting *id.*) (emphasis added).

We will stop there, although we could go on. *See McDonald*, 561 U.S. at 773–74, 130 S.Ct. 3020 ("[T]he Civil Rights Act of 1866, ... which was considered at the same time as the Freedmen's Bureau Act, similarly sought to protect the right of *all citizens* to keep and bear arms.") (emphasis added). We are confident that, "by founding-era consensus," the "right of the people" to keep and bear arms was publicly understood as the fundamental right of every citizen. *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012).

### 3.

Against this weight of evidence, the Government tells us that "the people" protected by the Second Amendment historically included not all citizens but rather a subset of them— namely, members of the "virtuous citizenry." As its one and only example from history, the Government quotes the most favorable language from 19th-century commentator Thomas Cooley's "massively popular" Treatise on Constitutional Limitations. *Heller*, 554 U.S. at 616, 128 S.Ct. 2783. In that work, Cooley wrote that "the people, in the legal sense, must be understood to be those who ... are clothed with political rights," such as the right of "elective franchise." Thomas M. Cooley, *A Treatise on the Constitutional Limitation Which Rest upon the Legislative Power on the States of the American Union* ch. III, 39 (4th ed. 1878). When used "in this connection," he continued, "[c]ertain classes have been almost universally excluded" from "the people," such as the "slave, ... the woman, ... the infant, the idiot, the lunatic, *and the felon.*" *Id.* at 36, 37 (emphasis added). "The theory" was that these groups "lack[ed] either the intelligence, ... the liberty of action," or, in the case of felons, "the virtue" that was "essential to the proper exercise of the elective franchise." *Id.* at 37. So they "are compelled to submit to be ruled by an authority in the creation of which they ha[d] no choice." *Id.* at 36.

Cooley was referring to the "idiomatic" meaning of "the people" used in select parts of the Constitution that "deal with the exercise or reservation of [the] powers, not [the individual] rights" of "the people." *See Heller*, 554 U.S. at 579–80, 128 S.Ct. 2783. Indeed, the notion that the right to vote was among the "natural right[s]" of "the people" was, in Cooley's view, "utterly without substance" because it "d[id] not exist for the benefit of the individual, but for the benefit of the state itself." Cooley, *General Principles of Constitutional Law in the United States of America* ch. XIV, § II at 248–49 (1880); *see also Kanter v. Barr*, 919 F.3d 437, 462 (7th Cir. 2019) (Barrett, J., dissenting) ("For example, the right to vote is held by individuals, but they do not exercise it solely for their own sake; rather, they cast votes as part of the collective enterprise of self-governance."). When used to describe the fundamental rights of individuals, as opposed to their powers, Cooley clarified that "the people" took on the much broader "all-citizens" definition that we have described all along. He explained this difference in meaning when discussing the First Amendment in his 1880 work, General Principles of Constitutional Law:

**\*13** The first amendment to the Constitution further declares that Congress shall make no law abridging the right of the people peaceably to assemble and to petition the government for a redress of grievances.... When the term *the people* is made use of in constitutional law or discussions, it is often the case that those only are intended who have a share in the government through being clothed with the elective franchise ... *But in all the enumerations and guaranties of rights the whole people are intended*[.] ... In this case, therefore, *the right to assemble is preserved to all the people, and not merely to the electors, or to any other class or classes of the people.*

*Id.* at 267 (emphasis added). So we add Cooley to the already long list of influential writers who understood "the people," in the rights' context, to mean the whole body of citizens, and the "right of the people to keep and bear arms" as every citizen's right.

\* \* \*

"[W]ith respect to [whom] the right to keep and bear arms" belongs, "[n]othing in the Second Amendment's text draws a ... distinction" between those who are virtuous and those who are not. *See Bruen*, 597 U.S. at 32, 142 S.Ct. 2111 (emphasis added) (finding no distinction between public versus private carry in the phrase "keep and bear arms"). Because Duarte's status as an American citizen places him among "the people" protected by the Second Amendment's "bare text," "[t]he Second Amendment ... presumptively guarantees" his right to possess a firearm for self-defense. *Bruen*, 597 U.S. at 33, 44 n.11, 142 S.Ct. 2111. The Government now "shoulder[s] the burden of demonstrating" at step two of *Bruen* that § 922(g)(1) "is consistent with the Second Amendment's ... historical scope." [8] *Id.* at 44 n.11, 142 S.Ct. 2111.

### C.

At *Bruen*'s second step, the Government must prove that it "is consistent with this Nation's historical tradition of firearm regulation" for Congress to ban permanently, by making it a felony, a non-violent offender like Duarte from possessing a firearm even after he has already served his terms of incarceration. *See id.* at 34, 142 S.Ct. 2111. Because "[b]ans on convicts possessing firearms were unknown [in the United States] before World War I," *Chovan*, 735 F.3d at 1137 (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698, 708 (2009)), the Government must identify for us "a well-established and representative historical *analogue*" to § 922(g)(1) that can justify the law's application to Duarte, *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111. In assessing whether the Government has met its burden, the two "central considerations" that guide our analysis are "how and why" the Government's proposed analogues burdened the Second Amendment right. *Id.* (citations omitted). Did these historical examples, we must ask, "impose a comparable burden on the right of armed self-defense" (*Bruen*'s "how") that was "comparably justified" (*Bruen*'s "why") as compared to § 922(g)(1)? *Id.* at 29, 142 S.Ct. 2111.

One final point of order. While the Government does not have to find for us a historical "dead ringer" for § 922(g)(1), a law that "remotely resembles" a felon firearm ban is not enough. *Id.* at 30, 142 S.Ct. 2111. We are looking for something in between these two endpoints. On that score, *Bruen* offers some additional guidance. If the law at issue is a "distinctly modern firearm regulation[ ]" because it addresses a societal problem "unimaginable at the founding," the Government's historical analogues need only be "relevantly similar" to the challenged law. *Id.* at 28–29, 142 S.Ct. 2111; *see Perez-Garcia*, 96 F.4th at 1182; *Alaniz*, 69 F.4th at 1129–30.

**\*14** Section 922(g)(1), however, takes aim at "[ ]gun violence" generally, which is a "problem that has persisted [in this country] since the 18th century." *Bruen*, 597 U.S. at 26, 27, 142 S.Ct. 2111. And § 922(g)(1) "confront[s] that problem" with "a flat ban on the possession of [ ]guns" by the formerly incarcerated, which no one here disputes is something "that the Founders themselves could have adopted." *Id.* at 27, 142 S.Ct. 2111. Thus, the fact that the "[t]he Founding generation *had no laws* limiting gun possession by ... people convicted of crimes," Adam Winkler, *Heller's Catch-22*, 56 UCLA Law Rev. 1551, 1563 (2009)

(emphasis added)—while not fatal to the Government's case —means that "the lack of a ... historical regulation" that is "distinctly similar" to § 922(g)(1) is strong if not conclusive "evidence" that the law "is inconsistent with the Second Amendment," *Bruen*, 597 U.S. at 27, 142 S.Ct. 2111; *see also Baird*, 81 F.4th at 1047 ("Because states in 1791 and 1868 also grappled with general gun violence, California must provide analogues that are 'distinctly similar.' "); *Range*, 69 F.4th at 103 (similar). We turn now to the Government's evidence.

### 1.

The Government's first proposed category of historical analogues are not firearm regulations per se but a trio of draft proposals that certain members of New Hampshire's, Massachusetts's, and Pennsylvania's state conventions recommended adding to the Constitution prior to its ratification. New Hampshire's convention offered language providing that "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891). "Samuel Adams and other delegates unsuccessfully urged the Massachusetts convention to recommend" adding a provision to the Constitution that it "be never construed to authorize Congress to ... prevent the people of the United States, who are peaceable citizens, from keeping their own arms." Marshall, *supra*, at 713 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 674–75 (1971) (emphasis added)). A minority of Pennsylvania's convention lastly proposed language that read: "[T]he people have a right to bear arms for the defense of themselves ... and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." 2 Schwartz, *supra*, at 665 (emphasis added).

"It is dubious" at best whether several, rejected "proposals [made] in the state conventions," *Heller*, 554 U.S. at 603, 128 S.Ct. 2783, can—consistent with *Bruen*'s second step— amount to a "well-established and representative" national tradition of regulating firearms, *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111; *see also Heller*, 554 U.S. at 590, 128 S.Ct. 2783 ("It is always perilous to derive the meaning of an adopted provision from [ ]other provision[s] deleted in the drafting process."). None of the proposals, obviously, found its way into the Second Amendment. The two most restrictive ones (Pennsylvania's and Massachusetts's) failed to carry a majority vote within their own states. *See* Don B. Kates, Jr.,

*Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 222 (1983). And neither of those two states, we add, incorporated the language of its proposal into the Second Amendment provision of *its own* constitution. [9] *See, e.g.,* PA. CONST. art. 1, § 21 (1790); MASS. CONST. pt. 1, art. 17 (1780); *see* Volokh, *supra*, at 208. All told, a handful of failed proposals "deleted in the drafting process," *Heller*, 554 U.S. at 590, 128 S.Ct. 2783, without more, offers "too dim a candle," to illuminate "how and why" the Founding generation restricted the Second Amendment right, *see Folajtar v. Attorney General*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting). "But even assuming that this legislative history is relevant," *Heller*, 554 U.S. at 603, 128 S.Ct. 2783; *see Perez-Garcia*, 96 F.4th at 1188, we agree with now-Justice Barrett that "[t]he common concern [among] all three" of the proposals was "not about felons in particular or even criminals in general" but those whose conduct "threatened violence and the risk of public injury," *Kanter*, 919 F.3d at 456 (Barrett J., dissenting).

 **\*15** Start with New Hampshire's proposal. It empowered Congress to disarm only those who "are or have been in actual rebellion," which was a crime against the state that denoted violence. *Id.* at 456 (citing *Rebellion*, 2 New Universal Etymological English Dictionary (4th ed. 1756) (defining "rebellion" as "traitorous taking up [of] arms, or a tumultuous opposing [of] ... the nation")). Adams's proposal in the Massachusetts convention permitted disarming only citizens who were not "peaceable," a term that at the time meant "[f]ree from war; free from tumult"; "[q]uiet; undisturbed"; "[n]ot violent; not bloody"; "[n]ot quarrelsome; not turbulent." Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773), *quoted in Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). "Far from banning the [possession] of ... firearms" by any class of criminal, Adams's proposal "merely [sought to] codif[y] the existing common-law" tradition of disarming those who "b[ore] arms to terrorize the people, as had [been done since] the Statute of Northampton" in 1328. *See Bruen*, 597 U.S. at 46–47, 142 S.Ct. 2111; *compare id.* (citing Massachusetts's colonial law "authoriz[ing] justices of the peace to arrest 'all Affrayers, Rioters, Disturbers, or Breakers of the Peace' ") (1692 Mass. Acts and Laws no. 6, pp 11–12), *with Kanter*, 919 F.3d at 455 (Barrett J. dissenting) ("Those who 'breach[ed] the peace' caused '[a] violation of the public peace, as by a riot, affray, or any tumult which [wa]s contrary to law, and destructive to the public tranquility.' ") (quoting Noah Webster, *An American Dictionary of the English Language* (1828)). Only the Pennsylvania minority's proposal—which would have

allowed disarming those "for *crimes committed*, or [for] real danger of public injury"—comes close to "suggest[ing]" the categorical disarmament of all lawbreakers. *Perez-Garcia*, 96 F.4th at 1188. *But see Bruen*, 597 U.S. at 66, 142 S.Ct. 2111 ("[W]e will not give disproportionate weight to a single state statute and a pair of state-court decisions."). But when read together with the remaining clause "or [for] real danger of public injury," the more plausible interpretation is that "crimes committed" referred to a narrower "subset of crimes [that] suggest[ed] a proclivity for violence." *Kanter*, 919 F.3d at 456 (Barrett J., dissenting); Scalia, *supra*, at 112 (explaining that "or," when "set off by commas," "introduces a definitional equivalent").

On balance, then, the draft proposals allude to a possible tradition of disarming a narrow segment of the populace who posed a risk of harm because their conduct was either violent or threatened future violence. That does not offer a "distinctly similar" justification for an across-the-board disarming of non-violent offenders like Duarte. *Bruen*, 597 U.S. at 26, 142 S.Ct. 2111. We move on to the Government's second category of historical analogues.

### 2.

The Government next refers us to 17th-to early 19th-century colonial and American laws that disarmed groups whom the Founding generation, according to the Government, "deemed untrustworthy based on [their] lack of adherence to the rule of law." At the height of the Revolutionary War, British Loyalists who refused to swear allegiance to the new republic were dispossessed of their firearms. *Infra* Part a. Catholics were disarmed in England once the Protestants seized power after the Glorious Revolution; several colonies passed similar Catholic-disarmament laws during the French and Indian War. *Infra* Part b. Bans on selling arms to Indians were a matter of course in the early American colonies. *Infra* Part c. And Blacks, free and enslaved alike, were routinely deprived of their arms. *Infra* Part d. Repugnant as these laws are by modern standards, the Government maintains that they represent a longstanding tradition in this country of disarming groups whom legislatures thought were "unwilling" to comply with the law.

Laws that disarmed British Loyalists, Catholics, Indians, and Blacks fail both the "why" and "how" of *Bruen*'s analogical test. First, the "why." There is a solid basis in history to infer that states could lawfully disarm these groups because

they "were written out of 'the people' " altogether. *Rahimi, 61 F.4th at 457*. But Duarte is an American citizen and counts among "the people" by both modern and Founding-era standards. And insofar as legislatures passed these laws to prevent armed insurrections by dangerous groups united along political, ideological, or social lines, the Government offers no historical evidence that the Founding generation perceived formerly incarcerated, non-violent criminals as posing a similar threat of collective, armed resistance.

As to the nature of the burden on the Second Amendment right (the "how" under *Bruen*) most of the historical examples we have seen were far less reaching than § 922(g)(1). During the American Revolution, states generally allowed British Loyalists to regain their arms once they swore loyalty to the new republic. *Infra* Part C.2.a. Catholics still retained "such necessary weapons" for their own self-defense. *Bruen, 597 U.S. at 45 n.12, 142 S.Ct. 2111* (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)). Many colonial-era firearm regulations targeting Indians did not even disarm this group but instead banned the *sale* of arms *to them.Infra* Part C.2.c. Even laws prohibiting Blacks from possessing arms still allowed for (albeit narrow) exceptions. *Infra* Part C.2.d. What this all tells us is that the burden on the Second Amendment right under these laws did not persist for life for these groups. It was subject to certain need-based or case-specific exemptions or could end altogether when evidence undermined the justification for the disability. That stands in stark contrast to § 922(g)(1)'s lifelong, no-exception, categorical ban. The Government's proffered analogues are thus not "distinctly similar" to § 922(g)(1) in both "how and why" these laws burdened the Second Amendment right.

### a. Laws disarming British Loyalists or "disaffected" persons.

**\*16** When the Revolutionary War was in full swing, early state legislatures routinely condemned "disaffected" persons as "enem[ies] to the American cause," who "spread [their] disaffection" from within to the detriment of the war effort. Act of 1779, 9 *The Statutes at Large of Pennsylvania from 1682 to 1801* 441 (1903). "[T]here [wa]s great reason to believe" that "dangerous and disaffected" persons "communicate[d] intelligence to the [British] enemy," and were inclined to either join or support an insurrection should one arise. Act of 1778, 1 *Laws of the State of New York Passed at the Sessions of the Legislature* 50 (1777-1784); Act of 1780, 10 *Statutes at Large; Being a Collection of All the Laws*

of Virginia, from the First Session of the Legislature in the Year 1619 310–11 (Hening ed. 1822) ("[C]omit[ting] to close confinement[ ] any person ... suspect[ed] of disaffection" in the event of invasion or insurrection). So much so did this class of people concern the new nation that the Continental Congress "recommended ... disarm[ing] persons 'who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies.' " Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 264 (2020) (quoting 1 *Journals of the Continental Congress, 1774-1789*, at 285 (1906)). Six of the states heeded this advice by enacting oath-or-disarmament laws, which stripped individuals of their arms if they refused to "renounc[e] all allegiance to the now-foreign sovereign George III in addition to swearing allegiance to one's State." [10] Marshall, *supra*, at 724–25.

The Government would have us conclude that the reason the states disarmed "disaffected" persons was "because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact." That is far too generalized an abstraction to draw and ignores the historical context in which these laws were passed. *See Bruen*, 597 U.S. at 42, 142 S.Ct. 2111 (noting 16th century "royal efforts at suppress[ing] ... handguns" arose not because of "concerns about their safety but rather their inefficacy").

The states passed these laws during "the darkest days of an existential domestic war" between the newly formed republic and Great Britain. Marshall, *supra*, at 725. "[N]on-associat[ors]," the thinking went, not only "refuse[d] ... to defend, by arms, th[e] United Colonies," 1 *Journals of the Continental Congress, 1774-1789*, at 285 (1906), but might also "take up arms *against* America" in "th[is] present unhappy dispute," *see* Resolution of the Council of Safety, Jan. 18, 1776, 1 *The Revolutionary Records of the State of Georgia* 101 (Candler ed. 1908) (emphasis added). Confiscating their weapons—for the time being—was thought both reasonable and necessary to preserve the new nation. *See* Greenlee, *supra*, at 265 ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them."); *Perez-Garcia, 96 F.4th at 1187* ("The justification was always that those being disarmed were dangerous.") (quoting Greenlee, *supra*, at 265).

**\*17** The laws targeting disaffected persons, for example, certainly read like emergency wartime measures. *See, e.g.,*

1778 Act of Va., 10 *Statutes at Large, supra,* at 310–11 (calling for the confinement of disaffected persons "in this time of public[ ] danger, when a powerful and vindictive enemy are ravaging our southern sister states"); 1779 Act of Pa., 9 *Statutes at Large, supra,* at 441 (calling for the "temporary suspension of law" in this "time[ ] of public danger" and confining suspected Loyalists). And there is good reason to think they were, in famed commentator St. George Tucker's words, "merely temporary." 2 Tucker's Blackstone, *supra,* at *368 n.2 (discussing Virginia's 1777 oath-or-disarmament law); *see also* Marshall, *supra,* at 726 ("[T]here is good reason to consider the[se] [laws] not to have survived through the Founding in anything like their original form."). It lastly bears emphasis that only male inhabitants who qualified for militia service—i.e., men of fighting age—had to swear an oath. Most states, in other words, disarmed those who were not just sympathetic to the prospect of a domestic, armed uprising, but physically capable of joining one. *E.g.,* 1776 Act of Mass., 5 *Acts and Resolves, supra,* at 479 (1886) (requiring "every male person above sixteen" to swear the oath and disarming those who "neglect[ed] or refuse[d]"); 1777 Act of Va., 9 *Statutes at Large, supra,* at 282 (same); Act of 1777, 24 *The State Records of North Carolina, supra,* at 88 (similar); Act of 1776, 7 *Records of the Colony of Rhode Island, supra,* at 566 (1862) (same); 1777 Act of Penn., 9 *Statutes at Large, supra,* at 111.

There is just as good reason to conclude that "disaffected" persons could be disarmed *in toto* because they fell outside "the people" and were therefore deemed to have no fundamental rights. *See Jimenez-Shilon,* 34 F.4th at 1048. Since "an individual's undivided allegiance to the sovereign" was a "precondition" to his "membership in the political community," British Loyalists "renounced" their place among "the [American] people" by refusing to swear a loyalty oath. *Jimenez-Shilon,* 34 F.4th at 1048 (quoting *United States v. Perez,* 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring) (internal quotations omitted)).

At least several states explicitly justified disarming Loyalists along these lines. North Carolina, for example, explained that it is "the Duty of every Member of Society to give proper Assurance of fidelity to the Government from which he enjoys protection." Act of 1777, 24 *The State Records of North Carolina, supra,* at 88. Those who abstain from swearing allegiance, "by their refusal ... to do [so]," "proclaim that they should no longer enjoy the *Privileges* of *Freemen* [i.e., citizens] of the ... State." *Id.* (emphasis added). Pennsylvania, Virginia, and Maryland similarly invoked

this idea of a "reciprocal" relationship of "allegiance and protection" between the citizen and state. 1777 Act of Va., 9 *Statutes at Large, supra,* at 281; 1778 Act of Pa., 9 *Statutes at Large, supra,* at 111; Act of 1777, 203 *Hanson's Laws of Maryland, supra,* at 187; Churchill, *supra,* at 160 ("Noting that 'in every free state, allegiance and protection are reciprocal,' Maryland['s] ... test oath barred those refusing from ... keeping arms."). By refusing to promise the former, the "disaffected" person swore off "the benefits of the latter." *E.g.,* 1777 Act of Va., 9 *Statutes at Large, supra,* at 281.

It is no small coincidence either that these "loyalty" oaths were precursors to the 1795 naturalization oath that the First Congress later required resident aliens to swear as a condition for American citizenship. *Compare* 2 Tucker's Blackstone, *supra,* at *368 n.2 (quoting Virginia's oath-or-disarmament law), *with id.* at *374 n.12 (quoting 1795 federal naturalization law). Thus, "[t]o refuse [that oath in 1777] was to declare oneself [not only] a resident alien of the new nation," but, "given the war," a "resident *enemy* alien" who sympathized with a foreign belligerent power. Marshall, *supra,* at 725 (emphasis added); *see also* Thomas Jefferson, NOTES ON THE STATE OF VIRGINIA 163 (Lilly & Wait eds., 1832) ("By our separation from Great Britain, British subjects became aliens, and being at war, they were alien enemies."). Consistent with that status change, disarmament was just one "part of a wholesale stripping of rights and privileges" that followed from refusing to swear allegiance. Marshall, *supra,* at 725. Many states, for example, sent suspected Loyalists to the "gaol," where they were held without bail until they recited the oath. *See, e.g.,* 1779 Act of Pa., 9 *Statutes at Large, supra,* at 442; 1777 Act of Va., 9 *Statutes at Large, supra,* at 282–83. Virginia went one step further, barring oath-recusants from "suing for any debts ... [and] buying lands, tenements, or hereditaments." 1777 Act of Va., 9 *Statutes at Large, supra,* at 282; *see also* NOTES ON THE STATE OF VIRGINIA, *supra,* at 162 ("By our laws, ... no alien can hold lands, nor alien enemy maintain an action for money, or other moveable thing."). North Carolina outright banished those who refused their oath and declared anyone so banished who returned to the state "guilty of Treason." Act of 1777, 24 *The State Records of North Carolina, supra,* at 89. The few "permitted ... to remain in the State" were not allowed to *leave* without express "[p]ermission ... obtained from the Governor and Council." *Id.* Thus, "[b]y refusing to take an oath of allegiance," disaffected persons "forfeited [not just] the state's protection of their right to arms," *Jimenez-Shilon,* 34 F.4th at 1048, but other fundamental rights considered intrinsic to one's membership among "the

people," *see Corfield v. Coryell*, 6 F. Cas. 546 (C.C.E.D. Pa. 1823) (enumerating certain "fundamental" rights of citizens as including "[t]he right ... to pass through ... in any other state, ... to institute and maintain actions of any kind[,] ... [and] to take, hold and dispose of property").

**\*18** When viewed through this lens, the Government's analogy to laws disarming Loyalists fails the "why" of *Bruen*'s second step. Insofar as these laws were meant as "merely temporary" measures, 2 Tucker's Blackstone, *supra*, at \*368 n.2, that "disarm[ed] [a] narrow segment[ ] of the population" because they "threaten[ed] ... the public safety," that does not justify *permanently* disarming *all non-violent* felons today, *see Perez-Garcia*, 96 F.4th at 1189 (citing *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting)). And if disarming the British Loyalist naturally followed because he swore himself out of "the people" by refusing his oath of allegiance, that reasoning does not carry over to the non-violent offender who served his prison term. The Government offered no evidence demonstrating that a former non-violent convict forever forfeited his legal status as one of "the people" merely because he sustained a criminal conviction. **11**

Nor did "how" these laws burden the Second Amendment right come close to approximating § 922(g)(1)'s lifetime, no-exception ban. *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111. The laws themselves were short-lived, as we mentioned earlier, but so was their burden on the Second Amendment right. Of the "disaffected" who were disarmed, they could normally regain their arms upon demonstrating they were not, in fact, "disaffected" to the American cause. Massachusetts, for instance, provided that disaffected persons could "receive their arms again ... by the order of" the "committees of correspondence, inspection or safety." Act of Mass. (1775–76), 5 *Acts and Resolves, supra*, at 484. Rhode Island similarly contemplated that those who refused their loyalty oath could still keep their weapons by providing "satisfactory reasons" for their recusal. 1776 Act, 7 *Records of the Colony of Rhode Island* 567 (Bartlett ed. 1862). Connecticut's law spoke most directly to the principle that disaffected persons were not disarmed for life, qualifying that he who was found "inimical" to the States would be disarmed only "until such time as he could prove his friendliness to the liberal cause." G.A. Gilbert, *The Connecticut Loyalists*, 4 AM. HISTORICAL REV. 273, 282 (1899); *see* Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut, supra*, at 193; *see also* Journal of the Council of Safety, 1 *The Public Records of the State of Connecticut* 329 (Hoadly ed. 1894)

(releasing "George Folliot of Ridgfield" from custody after he swore to take an oath of loyalty).

**b. Laws disarming Catholics or "Papists."**

Laws disarming Catholics fare arguably worse as historical analogues to § 922(g)(1) because the Government "point[s] to only three [such] restrictions." *See Bruen*, 597 U.S. at 46, 142 S.Ct. 2111. In 1756, Pennsylvania's and Maryland's colonies each enacted militia laws that seized arms belonging to any "Papist or reputed Papist" and barred them from enlisting in the local militia. 3 *Pennsylvania Archives* 131–32 (Samuel Hazard ed. 1853); 52 *Proceedings and Acts of the General Assembly, 1755-1756* 454 (Raphael Semmes ed. 1946). The Virginia colony, that same year, required "any Person ... suspected to be[ ] a Papist" "to swear allegiance to Hanoverian dynasty and to the Protestant succession." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007). No Catholic "so refusing ... [could] have any Arms, Weapons, Gunpowder, or Ammunition." Act of 1756, 7 *Statutes at Large* 35–36 (Hening ed. 1820).

**\*19** It is "doubt[ful] that *three* colonial regulations" prove that disarming Catholics as a class ever became a "well-established" tradition in this country. *See Bruen*, 597 U.S. at 46, 142 S.Ct. 2111 (emphasis in original). The practice appears instead to have been more of an English novelty that began when "the deposed King James II ... disarm[ed] Protestants while arming ... Roman Catholics." Marshall, *supra*, at 722–21. Indeed, the inhabitants of Virginia, Pennsylvania, and Maryland were still British subjects when they passed their Catholic-disarmament laws, and they did so at the height of the French and Indian War, "which was perceived by many ... as a war between Protestantism and Catholicism." Greenlee, *supra*, at 263. Following independence, the custom did not seem to secure a strong enough foothold on this side of the Atlantic to mature into a longstanding tradition of firearm regulation. We are unaware of any post-ratification laws disarming Catholics as a class. *See id.* at 721 ("Like the game laws, the English exclusion of subjects based on religion ha[d] no place within the Second Amendment, as early commentators also celebrated."); *see also Bruen*, 597 U.S. at 35, 142 S.Ct. 2111 ("[C]ourts must be careful when assessing evidence concerning English common-law ... English common-law

practices ... cannot be indiscriminately attributed to the Framers of our own Constitution.").

We are not even sure that disarming Catholics was that prevalent in England. "[T]hese laws are seldom exerted to their utmost rigour," Blackstone wrote, and "if they were, it would be very difficult to excuse them." *See* 5 Tucker's Blackstone, *supra*, at 57; *see id.* at 55–56 (summarizing arms restrictions and other anti-Catholic English laws); *see also Bruen,* 597 U.S. at 58, 142 S.Ct. 2111 ("[R]espondents offer little evidence that authorities ever enforced surety laws."). Episodes like the foiled Gunpowder Plot of 1605, where Guy Fawkes led fervent Catholics in a conspiracy to kill King James I and blow up both Houses of Parliament, Laura K. Donohue, *The Original Fourth Amendment,* 83 U. Chi. L. Rev. 1181, 1210–11 (2016), "obliged parliament to counteract so dangerous a spirit by laws of a great, and then perhaps necessary, severity," 5 Tucker's Blackstone, *supra,* at 57. Thus, Blackstone explained, these laws "are rather ... accounted for ... from their history, and the urgency of the times which produced them, than to be approved ... as a standing system of law." *Id.*

In any event, the "why" behind these laws does not justify disarming non-violent felons as a class. In theory, Catholics "acknowledge[ed] a foreign power, superior to the sovereignty of the kingdom." *Id.* at 55. Catholics "c[ould not] complain if the laws of th[e] kingdom will not treat them upon the footing of good subjects," Blackstone wrote, when their "separation" from the Church of England was "founded [not] only upon [a] difference of [religious] opinion" but a "subversion of the civil government." *Id.* at 54–55. Taking away their guns thus followed "the same rationale" for stripping suspected loyalists of their arms during the American Revolution. Marshall, *supra,* at 724. The only difference was the "religious overlay." *Id.* While one's "disaffection" to American independence went together with supporting the British, "being Roman Catholic was equated with supporting [the deposed Catholic king] James II," was "presumptive [with] treason," and made one "effectively a resident enemy alien liable to violence against the [protestant] king" George II. *Id.*

Nor can we say that the burdens these laws imposed on the Second Amendment right were as heavy as § 922(g)(1)'s no-exception, lifetime ban. In England, "[e]ven Catholics, who [technically] fell beyond protection of the right to have arms, ... were at least allowed to keep 'such necessary Weapons as shall be allowed ... by Order of the Justices

of the Peace ... for the Defence of his House or Person.' " *Bruen,* 597 U.S. at 45 n.12, 142 S.Ct. 2111 (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)). Maryland's and Virginia's laws included the same self-defense exception. 1756 Act of Va., 7 *Statutes at Large,* at 35 (Hening ed. 1820); 1756 Act of Md., 52 *Proceedings and Acts of the General Assembly, 1755-1756* 448 (Raphael Semmes ed. 1946) (similar). That Virginia, for example, thought it was "dangerous at th[e] time to permit Papists to be armed," yet still allowed for a professed Catholic to possess arms for self-defense, suggests that even a suspected traitor to the English crown still retained his fundamental right to protect himself with a firearm. 1756 Act of Va., 7 *Statutes at Large, supra,* at 35.

### c. Laws disarming Indians.

**\*20** Like Catholics and Loyalists, Indians, while not traitors, "had always been considered [members of a] distinct, independent political communit[y]," with whom the colonies were frequently at war. *Worcester v. State of Ga.,* 31 U.S. 515, 519, 6 Pet. 515, 8 L.Ed. 483 (1832). Indians, simply put, "w[ere] [not] ... citizen[s] of the British colonies" and were not "entitled to the [same] rights of English subjects," so they could be disarmed as a matter of course. *Jimenez-Shilon,* 34 F.4th at 1047 (quoting Joyce Lee Malcom, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1994)). And to the extent they were, it was generally during times of conflict. [12] In a similar vein, to *sell* Indians arms during wartime was to provide material aid to the enemy, a capital crime in many cases. *See, e.g.,* 1675 Act of Va., 2 *Statutes at Large* 326–27, 336 (Hening ed. 1823). Thus, colonial assemblies justified barring the sale of arms to Indians not because they were "deemed untrustworthy based on lack of adherence to the rule of law," but because they were foreign combatants with whom the colonists were engaged in an ongoing and violent military conflict.

For example, one 1675 Virginia law, after condemning "the sundry mur[d]ers, rapines and many depredations lately committed and done by Indians on the inhabitants of this country," resolved that "a war[ ] be declared ... against all such Indians," and warned that "any person ... within this colony ... presum[ing] to trade ... with any Indian any powder, shot[ ] or arm[s] ... shall suffer death without benefit[ ] of clergy." 2 *Statutes at Large, supra,* at 326–27, 336. New York and Massachusetts similarly denounced "the dangerous practice of selling [g]uns ... [to] the Indians" as causing "the

destruction of the Christians" and as "very poisonous and destructive to the English." Ordinance of 1645, *Laws and Ordinances of New Netherland, 1638–1674* 47 (O'Callaghan ed. 1868); Act of 1676, 11 *Records Of The Colony Of New Plymouth In New England* 242–43 (Pulsifer ed. 1861). Anyone "daring to trade" any arms or "munitions of War" with them was to be executed. *Id.* "[T]he eastern Indians have broke[n] and violated all treaties and friendship made with them," one 1721 New Hampshire law remarked. 1721 Act, *Acts and Laws of His Majesty's Province of New Hampshire* 164 (1771). "[T]herefore [be] it enacted ... [t]hat whoever shall ... supply them with any ... guns, powder shot[ ], [or] bullets ... [shall] pay the sum of five hundred pounds, and suffer twelve months imprisonment." *Id.* Thus, even those colonies punishing the sale of arms to Indians less harshly still justified these measures as designed to prevent the arming of a foreign enemy.

The nature of the burden imposed by these laws was also different in kind from how § 922(g)(1) operates. Most colonial enactments targeting Indians regulated a different type of conduct. *See Bruen*, 597 U.S. at 47, 142 S.Ct. 2111. Rather than ban Indians from *possessing* firearms, the laws prohibited the *sale* of arms to them by colonial residents. *E.g.*, 1675 Act of Va., 2 *Statutes at Large, supra*, at 326–27, 336. They also referred to licensing requirements and implied that those with proper credentials could still trade arms with Indians. Pennsylvania's 1676 sale-of-arms ban, for instance, prohibited persons from "sell[ing] giv[ing] or barter[ing] ... any gun ... to any Indian" "without *license first* ... [being] obtained under the Governor's hand and Seal." Act of 1676, *Charter to William Penn, and Laws of the Province of Pennsylvania* 32 (Staughton et al., 1879) (emphasis added); *see also* Act of 1763, Pa. Laws 319, § 1 (prohibiting sale of "guns ... or other warlike stores *without license*") (emphasis added). Georgia similarly outlawed selling arms to Indians in 1784 but only at any "place ... [other] than at stores or houses *licensed for that purpose.*" Act of Feb. 1784, *Digest of Laws of the State of Georgia* 288–89 (Watkins ed. 1800) (emphasis added); *see also* Act of 1645, *Laws and Ordinances of New Netherland, 1638–1674* 47 (O'Callaghan ed. 1868) (prohibiting the sale of "munitions of War" to Indians "without express permission").

### d. Laws disarming Slaves and free Blacks.

**\*21**  The by-now-familiar reasons for disarming Loyalists, Catholics, and Indians also motivated laws disarming Slaves

and free Blacks as a class. Slaves, by definition, fell outside "the people" entitled to Second Amendment protection. *E.g.*, *Citizen*, Samuel Johnson, *A Dictionary of the English Language* 297 (6th ed. 1785) ("A freeman of a city; not a foreigner; not a slave"). And "free blacks, like that of Tories and Roman Catholics, ... were considered ... non-citizens or, at best, second class citizens." Marshall, *supra*, at 726. At the time, they enjoyed any right to arms solely as a matter of legislative grace. *See e.g.*, *State v. Newsom*, 27 N.C. 250, 254 (1844) (concluding that "free people of color cannot be considered as citizens in the largest sense of the term" and the state therefore has "the power to say ... who, of this class of persons, shall have a right to a licence [to keep arms], or whether they shall"). "[T]he external danger of Indian attack[s]," moreover, "was consistently matched" by the "equivalent fear" (especially in the South) of "indentured servants and slaves as a class," Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607–1794*, 16 Law & Hist. Rev. 567, 581 (1998)—hence why states like Virginia, Georgia, South Carolina, and North Carolina commonly justified disarming Blacks based on the threat of violence they posed as a collective group. [13] *See also Heller*, 554 U.S. at 611–12, 128 S.Ct. 2783 (citing *Waters v. State*, 1 Gill 302, 309 (Md. 1843) for the proposition that "free blacks were treated as a 'dangerous population,' " prompting " 'laws ... to prevent their migration into th[e] State; to make it unlawful for them to bear arms; [and] to guard even their religious assemblages with peculiar watchfulness' ").

And as with every other historical analogue the Government relies on, laws disarming Blacks still allowed for certain case-specific exceptions. Virtually every law that we found contained exemptions for slaves who were armed but had in their possession a "ticket or license ... from his or her master." 1768 Act of Ga., *A Compilation of the General and Public Statutes of the State of Georgia* 594 (Cobb ed. 1859). This was basically a certificate authorizing them to possess firearms for some limited purpose—usually to hunt and kill game. [14] To be clear, the notion that Blacks as a class were equally entitled to the right to possess arms for self-defense arguably did not enter the public conscience until Reconstruction. *See Bruen*, 597 U.S. at 60, 142 S.Ct. 2111 (surveying the "outpouring of discussion ... [during Reconstruction regarding] whether and how to secure constitutional rights for newly free slaves"). But what these and other exemptions demonstrate is that categorical bans on certain groups possessing arms gave way when the justifications for disarming them no longer existed. The slave "carrying his master's arms to or from

his ... plantation" did not pose the same threat under the law as the slave who carried a gun after sundown. *See, e.g.*, 1768 Act of Ga., *A Compilation of the General and Public Statutes of the State of Georgia* 594 (Cobb ed. 1859). The Massachusetts merchant in 1668 presumably could not sell arms to *every* Indian but he could sell to "Indians *not in hostility* with ... any of the English." 1668 Act, *Colonial Laws of Massachusetts* 240–41 (1672) (emphasis added). The "Papist" in 1756 Virginia kept his arms if he swore allegiance to the protestant King George III, 1756 Act, 7 *Statutes at Large, supra*, at 35–36, because this proved his Catholic faith "was founded only upon [the] difference of [religious] opinion," not "the subversion of civil government," 5 Tucker's Blackstone, *supra*, at 54–55. And the British Loyalist in 1777 Connecticut was disarmed only "until such time as he could prove his friendliness to the liberal cause." Act of Dec. 1775, *The Public Records of the Colony of Connecticut* 193 (Hoadly ed. 1890).

**\*22** § 922(g)(1) has no analogous exceptions for the class it targets and thus "bears little resemblance" to the class-based firearm prohibitions "in effect at [or near] the time the Second Amendment was ratified." *Cf. United States v. Booker,* 644 F.3d 12, 24 (1st Cir. 2011). "[O]riginally intended to keep firearms out of the hands of *violent*" offenders, Greenlee, *supra*, at 274 (emphasis added), § 922(g)(1) is now far broader and far less case-specific than "its earlie[r] incarnation [codified] as the Federal Firearms Act of 1938," *Booker,* 644 F.3d at 24. Its predecessor "initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary." *Id.* In its present form, the law now "encompasses those who have committed *any* nonviolent felony or qualifying state-law misdemeanor"—an "immense and diverse category." *Kanter,* 919 F.3d at 466 (Barrett, J., dissenting); *id.* ("[Section 922(g)(1)] includes everything from ... mail fraud, to selling pigs without a license in Massachusetts, redeeming large quantities of out-of-state bottle deposits in Michigan, and countless other state and federal offenses.")

In sum, the burdens and justifications (*Bruen*'s "how" and "why") for laws disarming disfavored groups at the Founding are not "distinctly similar" to § 922(g)(1) to justify its blanket ban on non-violent felons possessing firearms. *Bruen,* 597 U.S. at 30, 142 S.Ct. 2111 ("[C]ourts should not uphold every modern law that remotely resembles a historical analogue because doing so risk[s] endorsing outliers that our ancestors would never have accepted."). We turn now to the Government's final body of historical evidence.

**3.**

According to the Government, the Founding generation "would have understood" that the 18th-century felon had no right to possess a firearm because, historically, he faced death and total estate forfeiture for his crimes. Citing colonial and Founding era laws declaring miscellaneous offenses as either capital crimes or ones that resulted in civil forfeiture, the Government argues that these were the default penalties for committing a felony at that time. Since felons at the Founding were punished this harshly, the Government contends, it is consistent with our nation's history to disarm *permanently* the *modern-day* felon because that is far less severe a penalty. We reject this line of reasoning.

First, the history of punishing felonies at the Founding is far more nuanced than the Government lets on; the notion that *all* felons (violent and non-violent alike) were historically put to death or stripped of their estates is "shaky" to begin with. *Kanter,* 919 F.3d at 459 (Barrett J., dissenting). Founder James Wilson, for example, explained that while, in theory, "the idea of [a] felony [wa]s very generally ... connected with capital punishment," in practice, this "inference[ ] ... [wa]s by no means entitled the merit of critical accuracy." *James Wilson's Lectures on Law* Part 3, Chap. I (1791). In England, "few felonies, indeed, were punished with death." *Id.* And on this side of the Atlantic, a "felony" in late 18th-century America was likewise "a term of loose signification." THE FEDERALIST NO. 42 (James Madison). What counted as one, and how it was punished, was "not precisely the same in any two of the States; and varie[d] in each with every revision of its criminal laws." *Id.* As a result, there were "many felonies" on the books in the late 18th-and early 19th-century, "not one punished with forfeiture of estate, and but a very few with death." [15] 6 Nathan Dane, *Digest of American Law* 715 (1823).

**\*23** Second, today's felon, in many respects, resembles nothing of his Founding-era counterpart, despite bearing the same label. Even as the newly formed states filled the pages of their penal codes with new felonies each passing year, "[t]he felony category" at the Founding still remained "a good deal narrower [then] than now." *Lange v. California,* ––– U.S. ––––, 141 S. Ct. 2011, 2023, 210 L.Ed.2d 486 (2021). The upshot is that "[m]any crimes classified as misdemeanors, or nonexistent, at common law are ... felonies" today. *Tennessee v. Garner,* 471 U.S. 1, 14, 105 S.Ct. 1694,

85 L.Ed.2d 1 (1985). Indeed, at least one of Duarte's prior felonies—vandalism—almost certainly would have been a misdemeanor. *United States v. Collins*, 854 F.3d 1324, 1333 (11th Cir. 2017) (explaining "the closest common-law offense for damaging another's property" was "malicious mischief," which was punishable by a fine); *see, e.g.*, Act of 1772, *An Abridgment of the Laws of Pennsylvania* 357 (Purdon ed. 1811) ("[A]ny person or persons [who] shall maliciously and voluntarily break ... any brass or other knocker affixed to such door ... [shall] pay the sum of twenty-five pounds.").

So not all felonies now were felonies then, and many felonies then were punishable by a term of years—not execution, civil forfeiture, or life in prison. Nevertheless, it may well be that "the 18th-and 19th-century" laws traditionally punishing *certain* felonies with death, estate forfeiture, or a life sentence are the closest things to "longstanding" felon firearm bans that *Heller* had in mind. *See Bruen*, 597 U.S. at 30, 142 S.Ct. 2111; *see also Phillips*, 827 F.3d at 1174 n.1 (citing *Chovan*, 735 F.3d at 1144 (Bea, J., concurring)). We might then venture to "assume it settled that *these*" offenses were of a kind the Founding generation thought serious enough to warrant the permanent loss of the offender's Second Amendment right. *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111 (emphasis added); *see also id.* ("[A]ssum[ing] it settled" that the "relatively few 18th-and 19th-century 'sensitive places' " (schools, polling places, courthouses, etc.) were "the[ ] locations ... where arms carrying could be prohibited consistent with the Second Amendment."). And it would lastly stand to reason that we "c[ould] use ... th[ese] historical regulations" as "analogies," *id.* at 31, 142 S.Ct. 2111, to "largely *modern* crimes" that may not "closely" resemble their historical counterparts but still share with them enough "relevant[ ] similar[ities]" to justify permanent disarmament for committing such new-age offenses, *see Alaniz*, 69 F.4th at 1129–30 (emphasis added) ("Like burglary or robbery, [modern-day] drug trafficking plainly poses substantial risks of confrontation that can lead to immediate violence.").

That would all seem to be in step with *Bruen.* Yet the Government would have us go much further. We are asked to hold that "Congress[ ] ... [can] define any ... crime as a felony and thereby use it as the basis for a § 922(g)(1) conviction." *Phillips*, 827 F.3d at 1176 n.5 (emphasis added).

This, in our view, "expand[s]" the historical felony category "far too broadly." *Bruen*, 597 U.S. at 31, 142 S.Ct. 2111. "Put simply, there is no historical basis" for Congress "to effectively declare" that committing "a[ny] crime punishable

by imprisonment for a term exceeding one year," § 922(g)(1), will result in permanent loss of one's Second Amendment right "simply because" that is how we define a felony today, *Bruen*, 597 U.S. at 31, 142 S.Ct. 2111 ("New York [cannot] ... declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department."); *see also Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting) ("The majority's extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label."). To accept the Government's position would "in effect exempt" from Second Amendment protection entire categories of people whose crimes were misdemeanors or did not exist at the Founding. *See Bruen*, 597 U.S. at 30, 142 S.Ct. 2111. As one commentator put it, "someone who shoplifts three times in seven years [in West Virginia] ... twice operates a recording device in a movie theater [in Utah] ... [or] release[s] a dozen heart-shaped balloons [as] a romantic gesture [in Florida]" will earn a lifetime ban on possessing a firearm under § 922(g)(1) because it is apparently a felony to do any of those things in those respective states. Greenlee, *supra*, at 269 (citations omitted). That, in our view, is a bridge too far.

**\*24** A more faithful application of *Bruen* requires the Government to proffer Founding-era felony analogues that are "distinctly similar" to Duarte's underlying offenses and would have been punishable either with execution, with life in prison, or permanent forfeiture of the offender's estate. *See Bruen*, 597 U.S. at 27, 142 S.Ct. 2111. Our pre-*Bruen* decision in *Phillips* largely endorsed this approach. After "assuming the propriety of felon firearm bans," as *Vongxay* required, we still canvassed the history to determine whether "Phillips's predicate conviction for misprision of felony c[ould] constitutionally serve as the basis for a felon ban" under § 922(g)(1). *Phillips*, 827 F.3d at 1175. "[T]here [w]as little question" that it could, we explained, because the Founding generation had labelled Phillips's crime a "felony" ever since the First Congress passed the Crime Act of 1790. *See id.* at 1175–76 (citing 1 Stat. 113, Sec. 6). True, we did not ask whether misprision of felony was a capital or life-sentence offense back then. But this was only because *Bruen* had not yet clarified that "how" a historical analogue burdens a Second Amendment right is a "central consideration[ ] that" courts must weigh when reviewing the history. *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111 (citations omitted). With that minor tweak, our approach today conforms with both *Phillips* and *Bruen*.

Here, Duarte's underlying vandalism conviction, we have explained, likely would have made him a misdemeanant at the Founding. *See infra* at ——. Duarte's second predicate offense—felon in possession of a firearm, Cal. Pen. Code § 29800(a)(1)—was a nonexistent crime in this country until the passage of the Federal Firearms Act of 1938. *See Range,* 69 F.4th at 104. As for Duarte's remaining convictions—drug possession and evading a peace officer—we do not know whether either crime traces back to an analogous, Founding-era predecessor because the Government failed to proffer that evidence.[16] Based on this record, we cannot say that Duarte's predicate offenses were, by Founding era standards, of a nature serious enough to justify permanently depriving him of his fundamental Second Amendment rights. The Government therefore failed to demonstrate that applying § 922(g)(1)'s lifetime firearm ban to Duarte fits within any "longstanding" tradition of "prohibit[ing] ... the possession of firearms by felons." *Heller,* 554 U.S. at 626, 128 S.Ct. 2783.

## IV.

We do not base our decision on the notion that felons should not be prohibited from possessing firearms. As a matter of policy, § 922(g)(1) may make a great deal of sense. But "[t]he very enumeration of the [Second Amendment] right" in our Constitution "takes out of [our] hands ... the power to decide" for which Americans "th[at] right is *really worth* insisting upon." *Heller,* 554 U.S. at 634, 128 S.Ct. 2783 (emphasis added).

Duarte is an American citizen, and thus one of "the people" whom the Second Amendment protects. The Second Amendment's plain text and historically understood meaning therefore presumptively guarantee his individual right to possess a firearm for self-defense. The Government failed to rebut that presumption by demonstrating that permanently depriving Duarte of this fundamental right is otherwise consistent with our Nation's history. We therefore hold that § 922(g)(1) violates Duarte's Second Amendment rights and is unconstitutional as applied to him.

## REVERSED; CONVICTION VACATED.

M. SMITH, Circuit Judge, dissenting:
Whether felons have a Second Amendment right to bear arms is settled in our circuit. They do not. *United States v. Vongxay,*

594 F.3d 1111, 1115 (9th Cir. 2010). Until an intervening higher authority that is clearly irreconcilable with *Vongxay* is handed down, we, as a three-judge panel, are bound by that decision. *See Miller v. Gammie,* 335 F.3d 889, 893 (9th Cir. 2003).

**\*25** The Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), did not overrule *Vongxay.* Instead, *Bruen* reiterates that the Second Amendment right belongs only to law-abiding citizens. Duarte's Second Amendment challenge to 18 U.S.C. § 922(g)(1), as applied to nonviolent offenders, is therefore foreclosed. Accordingly, I respectfully dissent.

\* \* \*

In *Vongxay,* we held that § 922(g)(1) does not violate the Second Amendment as applied to persons with nonviolent felony convictions. *See* 594 F.3d at 1118. There, the defendant (Vongxay) had three previous, nonviolent felony convictions: two for car burglary and one for drug possession. *Id.* at 1114. He was charged and convicted under § 922(g)(1) after a police officer found a firearm on his person outside a nightclub. *Id.* at 1113–14. Vongxay challenged his conviction on Second Amendment grounds, arguing that § 922(g)(1) "unconstitutionally limits firearm possession by categories of people who have not been deemed dangerous." *Id.* at 1116 (internal quotation marks omitted). We affirmed his conviction, holding that nothing in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), "can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)" and that felons are "categorically different from the individuals who have a fundamental right to bear arms." *Vongxay,* 594 F.3d at 1114–15. Duarte does not dispute that *Vongxay* is on point.

In our circuit, a decision of a prior three-judge panel is controlling until a superseding ruling comes from the Supreme Court or a panel of our court sitting en banc. *See Miller,* 335 F.3d at 893, 899–900. "[T]he issues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id.* at 900. When the two authorities are "clearly irreconcilable," we consider ourselves "bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Id.* The "clearly irreconcilable" requirement is "a high standard."

*Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (internal quotation marks omitted). "It is not enough for there to be 'some tension' between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to 'cast doubt' on the prior circuit precedent." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (quoting *United States v. Orm Hieng*, 679 F.3d 1131, 1140–41 (9th Cir. 2012), and *United States v. Delgado-Ramos*, 635 F.3d 1237, 1239 (9th Cir. 2011) (per curiam)). "In order for us to ignore existing Ninth Circuit precedent ... the reasoning and principles of [the later authority] would need to be so fundamentally inconsistent with our prior cases that our prior cases cannot stand." *In re Gilman*, 887 F.3d 956, 962 (9th Cir. 2018). But if we "can apply our prior circuit precedent without running afoul of the intervening authority, we must do so." *Lair*, 697 F.3d at 1207 (internal quotations marks omitted).

Nothing in the Supreme Court's decision in *Bruen* reflects a retreat from the Court's earlier statement in *Heller* that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are "presumptively lawful." *Heller*, 554 U.S. at 626, 627 n.26, 128 S.Ct. 2783; *see also McDonald v. Chicago*, 561 U.S. 742, 786, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality) (noting that the Court "made it clear in *Heller* that [its] holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' " and that the Court "repeat[s] those assurances here" (citation omitted)). To the contrary, *Bruen*'s analysis implicitly acknowledged *Heller*'s exclusion of felons from "the people" protected by the Second Amendment. *See* 597 U.S. at 31–32, 142 S.Ct. 2111 ("It is undisputed that petitioners Koch and Nash—two ordinary, *law-abiding*, adult citizens—are part of 'the people' whom the Second Amendment protects." (emphasis added) (citing *Heller*, 554 U.S. at 580, 128 S.Ct. 2783)); *see also, e.g., Heller*, 554 U.S. at 635, 128 S.Ct. 2783 ("law-abiding, responsible citizens"). *Indeed,* Bruen *repeatedly limited its definition of the scope of the right to "law-abiding" citizens, using that phrase no fewer than fourteen times throughout the opinion. See* 597 U.S. at 9, 15, 26, 29–31, 33 n.8, 38 & n.9, 60, 70–71, 142 S.Ct. 2111.[1]

**\*26** Two of the Justices whose concurrences were essential to the judgment cabined the scope of *Bruen* on this very point. Justice Kavanaugh, joined by Chief Justice Roberts, wrote separately to "underscore two important points about the limits of the Court's decision." *Id.* at 79, 142 S.Ct. 2111 (Kavanaugh, J., joined by Roberts, C.J., concurring).

His second point is germane here: "[A]s *Heller* and *McDonald* established and the Court today again explains, the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. Properly interpreted, the Second Amendment allows a variety of gun regulations." *Id.* (Kavanaugh, J., joined by Roberts, C.J., concurring) (cleaned up). Justice Kavanaugh then reiterated *Heller*'s and *McDonald*'s statements that a "prohibition[ ] on the possession of firearms by felons" is "presumptively lawful." *See id.* at 81, 142 S.Ct. 2111 (Kavanaugh, J., joined by Roberts, C.J., concurring) (citations omitted).

Justice Alito added in a separate concurrence that *Bruen* did not "disturb[ ] anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 72, 142 S.Ct. 2111 (Alito, J., concurring) (cleaned up). He made clear: "All that we decide in this case is that the Second Amendment protects the right of *law-abiding* people to carry a gun outside the home for self-defense." *Id.* at 76, 142 S.Ct. 2111 (Alito, J., concurring) (emphasis added).

Thus, *Bruen* did nothing to upend our decision in *Vongxay*. *Bruen* was a Second Amendment challenge to New York's gun licensing regime, not the felon-in-possession statute at issue in *Vongxay*; *Bruen* repeatedly emphasized that it only extended the Second Amendment right to "law-abiding citizens," a phrase it used, as noted, no fewer than fourteen times; and three Justices in the *Bruen* majority reiterated, unequivocally, that a prohibition on the possession of firearms by felons is presumptively lawful.[2] The two decisions are harmonious.

Moreover, *Vongxay*'s mode of analysis is not clearly inconsistent with that in *Heller*. *Vongxay* is a post-*Heller* decision that considered, *inter alia*, the historical scope of the Second Amendment.[3] *See Bruen*, 597 U.S. at 22, 142 S.Ct. 2111 ("*Heller* relied on text and history."); *Vongxay*, 594 F.3d at 1118. We did not reference, let alone employ, the "means-end" scrutiny that *Bruen* rejected. *See Bruen*, 597 U.S. at 19, 142 S.Ct. 2111; *Vongxay*, 594 F.3d at 1114–18. That we cited *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004), and *United States v. Emerson*, 270 F.3d 203, 260 (5th Cir. 2001), does not suggest otherwise. *See Vongxay*, 594 F.3d at 1116–17. Rather, we cited these Fifth Circuit cases merely as examples from our "examination of cases from other circuits and of historical gun restrictions [that] lends credence to the post-*Heller* viability of" *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005), in which we held that § 922(g)(1)

is constitutional. *Vongxay*, 594 F.3d at 1116. We did not adopt their mode of analysis.

**\*27** For the reasons noted, Duarte fails to meet the "high standard" of *Miller*. *See Rodriguez*, 728 F.3d at 979. *Vongxay* is neither "clearly irreconcilable" nor "so fundamentally inconsistent" with *Bruen* that we must reject our precedent. *See Miller*, 335 F.3d at 900; *In re Gilman*, 887 F.3d at 962. To conclude otherwise is to read *Bruen* more broadly than, at a minimum, Chief Justice Roberts, Justice Alito, and Justice Kavanaugh intended. The *Bruen* majority did not fashion an entirely new Second Amendment test, instead stressing that it was applying the same "test that [the Court] set forth in *Heller*." 597 U.S. at 26, 142 S.Ct. 2111. *Bruen* rejected only "means-end scrutiny," which, again, is a mode of analysis *Vongxay* did not employ. *See id.* at 24, 26, 142 S.Ct. 2111. We are thus bound by our holding in *Vongxay*: § 922(g)(1) does not violate the Second Amendment as it applies to nonviolent felons. *See* 594 F.3d at 1118. Duarte's challenge is foreclosed, and no further inquiry is necessary.

The majority errs by discarding *Vongxay* and conducting the Second Amendment analysis of § 922(g)(1) anew. First, the majority contends that *Vongxay* is "clearly irreconcilable" with *Bruen* because of "*Vongxay*'s wholesale omission of *Bruen*'s two-step methodology." That is, we are no longer bound by *Vongxay* because "*Vongxay* did not follow the textually and historically focused 'mode of analysis' that *Bruen* established and required courts now to apply to all Second Amendment challenges."

The majority appears to suggest that *Vongxay*'s failure to apply the two-step framework set forth in *Bruen* is alone sufficient to render the decision null. But that view is not supported by *Miller* or its progeny. The *Miller* analysis focuses on the "theory" and "reasoning" underlying the decisions; the analysis turns on function, not form. *See Miller*, 335 F.3d at 900. Yet, the majority states: "Because *Bruen* had not yet clarified these particular analytical steps until after *Vongxay* was decided, *Vongxay*, predictably, failed to apply them" (cleaned up), citing our decision in *United States v. Slade*, 873 F.3d 712, 715 (9th Cir. 2017). *Slade* does not stand for such formalism. In *Slade*, we held that our decision in *United States v. Jennen*, 596 F.3d 594 (9th Cir. 2010), was clearly irreconcilable with later Supreme Court precedent because *Jennen* based its analysis on an implicit assumption that the Supreme Court thereafter expressly denounced. *See Slade*, 873 F.3d at 715. It was not the mere failure to consider "the analytical process [later] prescribed by [the Supreme

Court]" that made the two decisions clearly irreconcilable but rather *Jennen*'s incorrect legal assumption. *See id.* The circumstances here are different. We did not merely assume in *Vongxay* that a felon was excluded from "the people" whom the Second Amendment protects, nor did the Supreme Court expressly reject that view in *Bruen* (in fact, again, it implicitly endorsed the view). *Slade* is therefore inapposite, as are the other authorities cited by the majority on this issue. *See, e.g., United States v. Baldon*, 956 F.3d 1115, 1121 (9th Cir. 2020) (prior precedent rested on analytical distinction between "substantial" and "minimal" force rebuffed by intervening authority); *Swift v. California*, 384 F.3d 1184, 1190 (9th Cir. 2004) (prior precedent applied "relates to" test that Supreme Court later expressly overruled). Under *Miller*, the creation of a new test does not per se invalidate prior precedent.

Second, the majority contends that "*Vongxay*'s reliance on *Younger* is ... 'clearly irreconcilable' with *Bruen*—separate and apart from *Vongxay*'s failure to apply *Bruen*'s methodology." But *Vongxay* did not improperly rely on cases holding that the Second Amendment protected a collective rather than individual right. *Vongxay* was decided after *Heller* and recognized that *Heller* "invalidated" this court's pre-*Heller* caselaw holding that the Second Amendment did not protect an individual right. 594 F.3d at 1116. We cited *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), only to explain its pre-*Heller* precedent and cited *Younger*, 398 F.3d at 1192, for its holding: "that § 922(g)(1) does not violate the Second Amendment rights of a convicted felon." *Vongxay*, 594 F.3d at 1116. That holding was correct—even if, as *Vongxay* acknowledged, the reasoning was wrong. We then explained why *Heller* did not disturb that holding. *Id.* at 1116–18.

**\*28** Indeed, in a case decided six years after *Vongxay*, we expressly rejected the argument that *Vongxay* somehow invalidated itself by citing pre-*Heller* precedent:

> Phillips argues that *Vongxay* is not good law. He contends that it conflicted with circuit precedent when it relied, in part, on *United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), a pre-*Heller* case that held that there is no individual right to bear arms under the Second Amendment. *See Vongxay*, 594 F.3d at 1116. But *Vongxay* acknowledged *Heller*'s holding—that there is an individual right under the Second Amendment—notwithstanding the panel's assertion that it was "still bound by *Younger*." *Id.* ...

> If the panel had truly considered itself bound by *Younger* in all respects, it would not have analyzed the Second

Amendment question at all, since there would have been no claim to an individual right. If Phillips believes that *Vongxay* is inconsistent with *Heller*, his remedy in this court is to seek rehearing en banc.

*United States v. Phillips*, 827 F.3d 1171, 1174 n.1 (9th Cir. 2016). Since the majority's theory here is identical to the argument rejected in *Phillips* (except referencing *Bruen*, rather than *Heller*), it is foreclosed.

The "clearly irreconcilable" requirement of *Miller* is a "high standard." *Rodriguez*, 728 F.3d at 979. As long as we "can apply our prior circuit precedent without running afoul of the intervening authority, we must do so." *Lair*, 697 F.3d at 1207. For the reasons noted, we can easily do so here. Nevertheless, the majority engages in a de novo Second Amendment analysis of § 922(g)(1). Had *Bruen*, for example, redefined the meaning of "the people" under the Second Amendment, such a review may indeed be necessary. But *Bruen* did not do so. The scope of "the people" is the same now under *Bruen*, as it was under *Vongxay*, as it was under *Heller*. Felons are excluded from the right to keep and bear arms.

\* \* \*

The majority reads *Bruen*, a Supreme Court decision reviewing New York's gun licensing regime, as an invitation to uproot a longstanding prohibition on the possession of firearms by felons. *Bruen* extends no such invitation. As Justice Alito cautioned, *Bruen* decides "nothing about *who*

may lawfully possess a firearm." *Bruen*, 597 U.S. at 72, 142 S.Ct. 2111 (emphasis added).

One day—likely sooner, rather than later—the Supreme Court will address the constitutionality of § 922(g)(1) or otherwise provide clearer guidance on whether felons are protected by the Second Amendment. But it is not our role as circuit judges to anticipate how the Supreme Court will decide future cases. *See United States v. Osife*, 398 F.3d 1143, 1148 (9th Cir. 2005) ("As the Supreme Court has explained, when there is clearly controlling precedent, circuit courts are not to anticipate the direction in which the Court's jurisprudence is moving."), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009); *Tekoh v. Cnty. of Los Angeles*, 997 F.3d 1260, 1263 (9th Cir. 2021) (Miller, J., concurring in the denial of rehearing en banc) ("[M]aking such predictions is the role of academics and journalists, not circuit judges. Our duty is to follow what the Supreme Court has done, not forecast what it might do."). Until we receive contrary definitive guidance from the Supreme Court, or from a panel of our court sitting en banc, we are bound by our decision in *Vongxay*.

**\*29** I respectfully dissent and express the hope that our court will rehear this case en banc to correct the majority's misapplication of *Bruen*.

**All Citations**

--- F.4th ----, 2024 WL 2068016

---

## Footnotes

1    In the proceedings below, the Government conceded in pre-trial briefing that "none of [Duarte's] prior convictions [we]re violent." And neither Duarte's indictment, nor the pre-sentencing report prepared after his conviction, alleged that Duarte's predicate offenses involved violence.

2    18 U.S.C. § 922(g)(8) ("It shall be unlawful for any person [to possess a firearm] ... who is subject to a court order that ... restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child.").

3    When that day comes, perhaps the Court will also clarify how far back felon firearm prohibitions must stretch to qualify as "longstanding." We are confident, however, that anything postdating the 19th century is not what the Court has in mind. *See, e.g., Bruen*, 597 U.S. at 30, 142 S.Ct. 2111 (discussing *Heller*'s reference to "longstanding" laws "forbidding the carrying of firearms in sensitive places" and concluding that such

laws consisted of a limited set of "18th-and 19th-century" regulations prohibiting firearms in "schools and government buildings"); Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 73 (2024) (determining that "Founding era history is paramount" because, as the Court recognized in *Bruen*, "not all history is created equal" and "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them").

4    Even before *Bruen*, we were uncomfortable with *Vongxay*'s reliance on *Heller*'s "presumptively lawful" footnote. In *United States v. Phillips*, we upheld a defendant's Second Amendment challenge because *Vongxay*'s reading of *Heller*'s footnote "foreclose[d]" the defendant's constitutional claim. 827 F.3d at 1174. "Nevertheless, there [we]re good reasons to be skeptical of the constitutional correctness" of *Vongxay*'s deference to *Heller*'s footnote. *Id.* "*Heller*'s caveat endorsed only 'longstanding' regulations on firearms, naming felon bans in the process," and "[y]et courts and scholars are divided over how 'longstanding' tho[se] bans really are." *Id.*; *see also id.* at n.2 (collecting sources). Even *Vongxay* conceded that this "historical question ha[d] not been definitively resolved." 594 F.3d at 1118 (citing some of the same sources).

5    *See, e.g.*, *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023) ("The right to bear arms is held by 'the people.' That phrase 'unambiguously refers to all members of the political community['] ... not a special group of upright citizens.... Even as a marihuana user, Daniels is a member of our political community.") (citations omitted); *Range*, 69 F.4th at 101, 103 ("[T]he Second Amendment right, *Heller* said, presumptively 'belongs to all Americans.' ... We reject the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people[,]' ... [and] conclude that Bryan Range remains among 'the people' despite his [felony] conviction."); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (observing "even ... dangerous felons and those suffering from mental illness" are "indisputably part of 'the people' "); *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018) ("[A]t least members of the 'national community' or those with a 'sufficient connection' with that community are part of the 'people' covered by the Second Amendment.").

6    *See, e.g.*, Noah Webster, *American Dictionary of the English Language* 600 (1st ed. 1828) ("The body of persons who compose a community, town, city, or nation."); Thomas Dyche, *A New General English Dictionary* 626 (14th ed. 1776) ("[E]very person, or the whole collection of inhabitants in a nation or kingdom."); Samuel Johnson, *A Dictionary of the English Language* 297 (6th ed. 1785) ("A nation; those who compose a community.").

7    ALA. CONST. art. I, § 27; CONN. CONST. art. I, § 15; KY. CONST. of 1792, art. XII, cl. 23; ME. CONST. of 1819, art. I, § 16; MISS. CONST. of 1817, art. I, § 23; PA. CONST. art. 1, § 21; *see* Volokh, *supra*, at 208–09.

8    While *Bruen* offered no explicit guidance on who bears the burden at step one, "[w]e need not decide that issue here because our conclusion that the Second Amendment presumptively protects" Duarte "would stand regardless." *Perez-Garcia*, 96 F.4th at 1178 n.8.

9    Nor did New Hampshire, which did not ratify an arms right provision in their constitution until 1982. *See* Volokh, *supra*, at 199.

10   Act of 1779, 9 *Statutes at Large of Pennsylvania, supra*, at 347–48; Act of 1776, 5 *The Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 479 (1886); 1777 Act of Va., 9 *Statutes at Large, supra*, at 282; Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (Bartlett ed. 1862); Act of 1777, 24 *The State Records of North Carolina* 89 (Clark ed. 1905); Act of 1778, 203 *Hanson's Laws of Maryland 1763-1784* 193, 278 (1801).

Several other states passed similar laws. Connecticut disarmed those who "libel[ed] or defame[d] any of the resolves of the ... Congress of the United Colonies" or, upon "complaint being made to the civil authority," were found to be "inimical to the liberties of th[e] Colon[ies]." Act of 1775, 15 *The Public Records of the Colony of Connecticut, From May, 1775, to June 1776* 193 (Hoadly ed. 1890). New York ordered the supplying of its militias with "such good Arms ... as they may have collected by disarming disaffected persons," Order of 1776, 15 *Documents Relating to the Colonial History of the State of New York* 103 (Fernow ed. 1887). New Jersey, lastly, empowered its Council of Safety "to deprive ... [all] Arms, Accoutrements, and Ammunition" from "such Person as they shall judge disaffected." Act of 1777, *Acts of the General Assembly of the State of New Jersey* 90 (1777).

11  In any case, we doubt that the garden variety horse thief or counterfeiter, for example, stood on remotely similar legal footing as British Loyalists at the Founding. Depending on the jurisdiction, the former served several years of "hard Labor" for his nonviolent offense. *See, e.g.*, *An Act for the Punishment of certain atrocious Crimes and Felonies*, Acts and Laws of the State of Connecticut, in America, 183–84 (1796). While incarcerated, his fundamental rights as one of "the people" were "merely suspended." *Kanter*, 919 F.3d at 461 (Barrett, J., dissenting) (citing, e.g., *In re Estate of Nerac*, 35 Cal. 392, 396 (1868)). The latter was a "traitor in thought, ... [if] not in deed," NOTES ON THE STATE OF VIRGINIA, *supra*, at 165, who had no rights to speak of, Marshall, *supra*, at 725 ("The harsh yet simple principle of the Revolution was that Tories 'had no civil liberties.' ") (quoting Leonard W. Levy, *Emergence of a Free Press* 173 (1985)).

12  *See, e.g.*, An Order for All Indyans on Long Island to Bee Disarmed, in This Juncture of Ware, & That None Ramble from Place to Place, 14 *Documents Relating to the Colonial History of the State of New York* 712 (1883); Ordinance of the Director and Council of New Netherland, *Laws and Ordinances of New Netherland (1638–1674)* 234 (O'Callaghan ed. 1868) (ordering "a[ll] Indians" to forfeit their arms after "hav[ing] been inform[ed] that ... Indians of the *Tappaen* ... intended to kill one or more Christians" and "to prevent such dangers of isolated murders and assassinations").

13  *See, e.g.*, 1752 Act of Va., 2 *Statutes at Large, supra*, at 481–82 ("Whereas the frequent meeting of considerable numbers of ... slaves ... is judged of dangerous consequence ... it shall not be lawful[ ] for any ... slave to carry or arm[ ] himself[ ] with any club, staff[ ], gun[ ] ... or any other weapon."); 1770 Act of Ga., *A Codification of the Statute Law of Georgia* 813 (Hotchkiss ed. 1848) ("[A]s it is absolutely necessary to the safety of this province[ ] ... to restrain the wandering and meeting of ... slaves ... it shall be lawful for any person ... to apprehend any ... slave ... found out of the plantation ... [and] if he ... be armed ... to disarm [him]."); 1740 Act of S.C., *Statutes at Large of South Carolina* 410 (McCord ed. 1840) (same); *see also* 1790 Act of N.C., *A Manual of the Laws of North-Carolina* 172 (Haywood ed. 1814) ("When any number of ... slaves ... shall collect together in arms ... committing thefts and alarming the inhabitants of any county ... it shall be the duty of commanding [militia] officer ... to suppress[ ] such depredations or insurrections."); 12 *Colonial Records of the State of Georgia* 451–52 (Candler ed. 1907) (complaining of "a Number of Slaves appear[ing] in Arms ... [and] commit[ting] great Outrages and plunder in and about the Town" and petitioning that "all Slaves ... be immediately disarmed").

14  1768 Act, *A Compilation of the General and Public Statutes of the State of Georgia* 594 (Cobb ed. 1859); 1741 Act, *A Manual of the Laws of North-Carolina* 157 (Haywood ed. 1814); 1748 Act of Va., 6 *Statutes at Large* 169 (Hening ed. 1819); 1722 Act, 7 *Statutes at Large of South Carolina* 373 (McCord ed. 1840).

15  *See, e.g.*, Act of Conn., *Acts and Laws of the State of Connecticut* 182–83 (1796) (listing various "felonies" but punishing only some capitally (e.g., bestiality, arson, bearing false witness) and others with a term of imprisonment (e.g., forgery, horse stealing, robbery)); *General Laws of Pennsylvania, from the Year 1700 to April 22, 1846* 155 (1847) (abolishing capital punishment for *all* crimes except first-degree murder); An Act to Prevent the Stealing and Taking away of Boats and Canoes, 1 *The Laws of the Province of South Carolina* 49 (1776) (punishing boat theft with "corporal punishment" and a fine "if the Matter of Fact be a

Felony"); 1793 Act Respecting the Punishment of Criminals, 2 *The Laws of Maryland* chap. LVII, § XIII (1800) (empowering justices of the court to, "in their discretion," sentence males convicted of "[a]ny felony" "to serve and labour for any time[ ] ... not exceeding seven years"); 1801 Act Declaring the Crimes Punishable with Death or Imprisonment in the State Prison, 1 *The Laws of the State of New York* 254 (1802) (committing any person "duly convicted ... of any felony," with certain enumerated exceptions, to a "term [of imprisonment] not more than fourteen years."); *See also* 2 Timothy Cunningham, *A New and Complete Law Dictionary* (3d ed. 1783) (describing punishments for various felonies as ranging from death and estate forfeiture to imprisonment and hard labor).

16    Criminalizing drug possession, in particular, did not appear to gain significant momentum until the early 20th century, with the passage of such laws as the Food and Drug Act of 1906 and the Harrison Narcotics Tax Act of 1914. *See* Margarita Mercado Echegaray, Note, *Drug Prohibition in America: Federal Drug Policy and its Consequences* 75 Rev. Jur. U.P.R. 1215, 1219 (2006); *cf. Alaniz*, 69 F.4th at 1129–30 (citing *id.*). Before then, what we now think of as "illicit drugs," such as opium and cocaine, "were ... legal in the United States" for a long stretch of this country's history. Echegaray, *supra*, at 1218.

1    The majority does "not think that the Supreme Court, without any textual or historical analysis of the Second Amendment, intended to decide the constitutional fate of so large a population in so few words and with such little guidance." But any doubt or ambiguity on this issue cuts in favor of following circuit precedent. It is Duarte's burden to show that *Vongxay* is "clearly irreconcilable" with *Bruen.*

2    The majority claims that the Supreme Court did not even *suggest* in *Heller* or *Bruen* that felons are not among "the people" within the meaning of the Second Amendment, quoting our recent decision in *United States v. Perez-Garcia*, 96 F.4th 1166, 1175 (9th Cir. 2024). But *Perez-Garcia* itself notes that "when the Supreme Court specifically analyzed limitations on the scope of the Second Amendment's protections, *Heller* described the Second Amendment right as belonging to 'law-abiding, responsible citizens,' " that "*Bruen*, in turn, used the term 'law-abiding, responsible citizens' and its variants more than a dozen times when describing the Second Amendment's scope," and that the *Bruen* "concurrences reiterated the same point." *Perez-Garcia, 96 F.4th at 1179* (cleaned up).

3    We noted the following:

> Finally, we observe that most scholars of the Second Amendment agree that the right to bear arms was "inextricably ... tied to" the concept of a "virtuous citizen[ry]" that would protect society through "defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals) ...." Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986); *see also* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995) (noting that felons "were excluded from the right to arms" because they were "deemed incapable of virtue"). We recognize, however, that the historical question has not been definitively resolved. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 714–28 (2009) (maintaining that bans on felon gun possession are neither long-standing nor supported by common law in the founding era).

> *Vongxay*, 594 F.3d at 1118.

---

**End of Document**                                             © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    27